Valerie Laster; April 24, 2026

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action Number 1-25-cv-00085-PAB-STV

VALERIE LASTER,

    Plaintiff,

vs.

CIRCLE K STORES INC.,

    Defendant.

-----------------------------------------------------------

VIDEO-RECORDED DEPOSITION OF VALERIE LASTER

April 24, 2026

-----------------------------------------------------------

PURSUANT TO WRITTEN NOTICE and the appropriate Rules of Civil Procedure, the video-recorded deposition of VALERIE LASTER, called for examination by the Defendant, taken remotely, commenced at 10:05 a.m. on April 24th, 2026, before Debra J. Votta, Registered Professional Reporter, Certified Realtime Reporter.

Page 1

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
        DARREN O'CONNOR, ESQ.
        Darren O'Connor Law, LLC
        1400 Main Street
        Suite 200
        Louisville, Colorado 80027
        Phone: 720-961-3869
        Email: darreno@dolawllc.com

ON BEHALF OF THE DEFENDANT:
        JULIAN G.G. WOLFSON, ESQ.
        THOMAS W. CARROLL, ESQ.
        Littler Mendelson, P.C.
        1900 Sixteenth Street
        Suite 800
        Denver, Colorado 80202
        Phone: 303-629-6200
        Email: jwolfson@littler.com
                tcarroll@littler.com

Also Present:  Jerry DeBoer, Videographer

Page 2

Valerie Laster; April 24, 2026

```
                          I N D E X
EXAMINATION:                                        PAGE
       By Mr. Wolfson                                  5
       By Mr. O'Connor                               121


EXHIBITS:                                           PAGE
Exhibit 1      Photographs                            34
Exhibit 2      Plaintiff's Second Response to         96
               Defendant's First Set of Discovery
               Requests to Plaintiff
Exhibit 3      Response to Interrogatory Number 1     96
Exhibit 4      Computation of Certain Damages as of   99
               1/19/2026
```

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 10:05 a.m. Mountain time on April 24th, 2026.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera, microphone and Internet connection of participants.  What is seen from the witness and heard on the screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Valerie Laster taken by counsel for Defendant in the matter of Valerie Laster versus Circle K Stores filed in the United States District Court, for the District of Colorado, Case Number 1-25-cv-00085-PAB-STV.

This deposition is being held remotely via Zoom.  My name is Jerry DeBoer, representing Veritext Legal Solutions, and I'm the videographer.  The court reporter is Debbie Votta for the firm of Veritext Legal Solutions.  I'm not related to any party in this action, nor am I financially interested in the outcome.

Page 4

Valerie Laster; April 24, 2026

Counsel, and everyone attending remotely, will now state their appearances and affiliations for the record.  If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. WOLFSON:  Julian Wolfson and Thomas Carroll on behalf of Defendant Circle K.

MR. O'CONNOR:  And Darren O'Connor, attorney registration 54020, representing Valerie Laster.  I'm present in the room with her and virtually over Zoom.

VALERIE LASTER, after having been first duly sworn, testifies and says under oath, as follows:

EXAMINATION

BY MR. WOLFSON:

Q.   Hi.  Can you please state and spell your full name for the record.

A.   Me?

Q.   Yes.

A.   Are you talking to me?

Q.   Yes.

A.   Okay.  V-A-L-E-R-I-E.  My last name is L-A-S, as in "Sam", T, as in "Tom", E-R.

Page 5

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

Q.   Okay.  Hi, Ms. Laster.  As you know, my name is Julian Wolfson, and I'm one of the attorneys representing Circle K in this case.  Have you had your deposition taken before?

A.   Never.

Q.   Okay.  So this is our opportunity to ask you questions.  You were just sworn in by the court reporter.  Do you understand that you are under oath?

A.   Yes.

Q.   Okay.  And what does that mean to you?

A.   That means that I swear to tell the truth, the whole truth and nothing but the truth.

Q.   All right.  The court reporter will be taking everything down.

A.   Um-hum.

Q.   So that's actually a good example.  So we try to avoid uh-huhs or uh-uh or headshakes or nods.  So everything, if you could, try to verbalize.

A.   Okay.

Q.   Sometimes we'll forget, and I'll do it, too.  And, you know -- but if you could, you know, remember as much as possible to verbalize everything you say.

A.   All right.

Q.   Another kind of suggestion or rule I

Page 6

Valerie Laster; April 24, 2026

have is that you and I should avoid talking over each other so the transcript is clear.

A.    All right.

Q.    And we'll try to do that to the best of our abilities.  One very important rule I have is if you don't understand a question, please ask me to clarify it.  If you answer the question, I will assume that you understood it; is that fair?

A.    That's fair.

Q.    Okay.  Breaks.  We can take a break almost any time you need to or want to.  The only kind of caveat to that is I would -- I would ask that if there's a pending question, that we do not take a break.  So --

A.    Gotcha.

Q.    Does that make sense?

A.    Yes.

Q.    Okay.  I don't need you to give me the specifics, but are you taking any medications today that could affect your ability to answer questions?

A.    No.

Q.    Okay.  Is there anything, regardless of medication, that's affecting your ability -- that would affect your ability to answer questions or remember events or other things?

Page 7

Valerie Laster; April 24, 2026

A.    Not that I know of.

Q.    Okay.  We are on video conference.
Aside from your attorney, is there anyone else in the
room with you?

A.    No.

Q.    Okay.  Apart from the device that you
have in front of you, is there anything in front or
next to you right now besides your attorney, like books
or notes?

A.    For me?

Q.    Yes.

A.    No.  No.

Q.    And do you have any other windows or
programs currently opened on the device that you're on
right now, apart from the ones you need for this
deposition?

A.    No.

Q.    Okay.  Mr. Laster, where are you from
originally?

A.    As in where I was born?

Q.    Yes.  Where were you born?

A.    I was born in Philadelphia,
Pennsylvania.

Q.    Okay.  And when did you leave to
Colorado?

Page 8

Valerie Laster; April 24, 2026

A.    The first time I moved to Colorado was in 1991.  August, I believe, 1991.  And -- let's see. Then -- I've got to think about it.  Hold on.  A lot of things have happened.  1991.  If I'm not mistaken, we moved back in 1994.  Wow.  I've got to think.

Q.    How long --

A.    I know we moved back to Colorado in 2010 due to the economy.  Yeah.

Q.    Have you lived in Colorado since 2010?

A.    Absolutely.

Q.    Okay.  What is your highest level of education?

A.    Master's degree.

Q.    What is your --

A.    You mean completed?  Completed?

Q.    Yes.

A.    Okay.  Yeah.  Master's degree.

Q.    What is your master's degree in?

A.    My master's degree is in mental health administration.

Q.    Okay.  Are you currently employed?

A.    No.  I am retired.

Q.    Okay.  When did you retire?

A.    I retired in -- like fully retired in September of 2025.  I was working part-time for a

Page 9

Valerie Laster; April 24, 2026

mental health nonprofit, but in September of 2025, I resigned.

Q.   Okay.

A.   Fully retired.

Q.   On April 8th, 2024, the date of this incident that we're going to be talking about today, were you employed?

A.   Yes.

Q.   By whom?

A.   I'm sorry?

Q.   By whom?

A.   NAMI, the National Alliance of Mental Illness.

Q.   Okay.  And how long were you employed by them for?

A.   Let's see.  I'm going to think out loud here.  So I became a member in grad school.  I volunteered for a while.  Then I think I actually took a part-time position with them in -- I think 2023, if I'm not mistaken.

Q.   Okay.

A.   Yeah, but even when I was working, I was still volunteering with them as well.

Q.   Okay.  Have you ever been a party to a lawsuit before?

Page 10

Valerie Laster; April 24, 2026

A.   Yes.

Q.   Okay.  Can you tell me about -- well, yeah.  I guess tell me when you had been a party to a lawsuit.

A.   There's been several.  Let's see.  All righty.  So I was a party to a lawsuit as the plaintiff.  I believe it was in 2021.  Do you just want to know that, or do you want to know the caption?

Q.   Like, what do you -- I guess, what was the lawsuit about?

A.   Okay.  That particular lawsuit was about a gentleman who was stalking me that I didn't know, and I filed a restraining order.  We went to court.  He told the judge that he did what I said he did, and the judge issued a lifetime restraining order.  I probably wouldn't know the man if he walked through the door because I just didn't know who he was, but . . .

Then there's another one.  I was in a car accident in 2023.  A gentleman that was -- what's his name?  James Crook, Laster versus James Crook, et al.  I fell on their property.  No.  Back it up. James Crook, et al., was when I fell on the property and got hurt.  That was filed in federal court, but then the judge said -- because I wasn't able to show cause for it being in federal court, the Court said

Page 11

Valerie Laster; April 24, 2026

file it in state court.  So that went to state court.
We settled that.

And then the car accident that happened in 2023, a gentleman T-boned my car.  I suffered a concussion.  I was really banged up, and they said I ran a red light, but when they pulled the video they found out that I wasn't at fault for the accident, and I had to sue them like -- I had to basically fight to -- for them to settle the claim.  And that was a biggie.

Oh.  I was actually -- you know what?  I was actually DoorDashing part-time when that accident happened.  I was going to pick up an order, and DoorDash has their -- a personal or a private -- like if you get hurt on the job, they have a private -- you can get payout, you know, as long as you're not able to work.  And for over a year, they refused to pay me.

So at some point I was like, "You guys need to pay me."  So I sued their insurance company for them to pay me the back wages that they owed me.  And so they went on and paid.  They actually paid more than what I asked for.  So that was settled.  Jeez.

Q.   I have a quick question, Ms. Laster.  Are there two car accidents or just one car accident that you sued over?

Page 12

Valerie Laster; April 24, 2026

A.   In that particular case?

Q.   No.  Just generally.  You were talking about a car accident in 2023.  I just wanted to make sure there was only one accident in 2023 that you sued over.

A.   I think it was -- yeah.  Just one in 2023.

Q.   And you said that case settled?

A.   Yes.  They settled.  That was filed in small claims court.

Q.   Okay.  How much did that settle for?

A.   In total it settled for 15,000 because they paid for my continued therapy.  Their neuroscientists, after examining my file, said that I needed more vestibular therapy and physical therapy because I was hit on my left side.  And so what they did was instead of allowing my insurance company to cover it and then reimburse, they said we'll just go ahead and pay for that part of your recovery and so you can just continue on.

So that's why it was the extra money.  Because I think in total they probably owed me like 7500, but they added that in, so . . .

Q.   Okay.  And then when you were talking about the small claims court case, is that a different

Page 13

Valerie Laster; April 24, 2026

case?

A.   No.  That's it.  That's the -- I sued -- I sued DoorDash's insurance company because they have a -- what do they call it when you're out of work and then you can get paid while you're out of work?  I forget what they call it right off the top.  I'm a little nervous here.

Q.   So what -- what was the accident with Mr. Crook?

A.   Mr. Crook -- I was DoorDashing again, and it was -- it was New Year's Eve 2022.  And it was dark.  It had snowed.  So somehow or another they paved the walkway, but when they -- they didn't pave it. They removed the snow from the walkway.  And, I guess, it had snowed again, but there was a covering.  There was a hole there that they had a layer of snow, and you couldn't see it, and it was right in the walkway.  So when I walked to go up to the steps, my foot went all the way in the hole.  (Indicating.)  That's how big the hole was.  And I fell, but when I fell, I fell on my knees, and it tore a ligament in my groin area.

And so -- after about a -- I didn't know.  After about a week or so after, I -- the pain wasn't going away, and that's when I went to the doctor, and they did what they did.  And they said,

Page 14

Valerie Laster; April 24, 2026

"Ma'am, you've got a problem, so . . . ."

Q.   And how much did that settle for?

A.   If I'm remembering correct, probably like 20 grand, 20,000.  20,000 I think.  Yeah.

Q.   So we have the restraining order case you talked about; the case against DoorDash; the -- or their insurance company, I should say; the case against Mr. Crook.  What other cases do you -- have you been a party to?

A.   Okay.  So the DoorDash one was unemployment.  They owed me unemployment.  That's what I was looking for, and they wouldn't pay my unemployment that they knew they owed me.  So that's what that was about.

Q.   Okay.

A.   There was one, and I believe I told you guys about it.  Theresa Winston.

Q.   Okay.

A.   She -- it was -- it was a car accident with -- and it was kind -- it was kind of on purpose because she had blocked the entrance.  And it was -- it was a shady situation where she had some friends that were kind of nefarious.  They were moving a little close to my car, and I wasn't feeling comfortable.  And I cannot go backwards because there were cars behind

Page 15

Valerie Laster; April 24, 2026

me.

And she wouldn't let me -- I know her because I know her through a relative, and they're some really shady people, and I wasn't feeling comfortable. So I figured I can't go around, I can't go back. So I hit her car, and then I drove up and pulled over and called 911 and reported the accident.

But what she did is she told the officers that there was someone in her car that got hurt when I hit the car. So because it was -- no, it wasn't anyone in there, and she was saying, yes, it was. The police said, well, look. Y'all are going to have to fight it out in court.

So we did go to court, and she didn't show up, and her -- so her person didn't show up, but the judge allowed me to tell my story because, you know, his understanding was that I just plowed into somebody and -- you know what I mean? But when he heard the events, the chain of events, he said you had every right to do what you had -- what you did to get to safety. You called it in.

And so the case was dismissed, but because -- because she lied to the police about the situation, I sued her for my money back, and I won, so . . .

Page 16

Valerie Laster; April 24, 2026

Q.   Have you ever filed for bankruptcy?

A.   I did.  I was a bankruptcy professional.
I did.

Q.   What do you mean by "a bankruptcy
professional"?

A.   I actually had a business Laster -- no.
It was Chapter 7 Bankruptcy, and as time went on I
changed the name to Laster Administrative Services
where I did document preparation for Chapter 7
bankruptcies, divorces, child support petitions, that
type of thing.

But before I started my business --
because I'm a trained paralegal.  I have a bachelor's
in paralegal studies.  I tried it on myself because
when I moved out here in 2010 due to the economy, I
suffered a financial loss because I hadn't worked in a
year and a half and existed -- and lived off my
savings.  So I thought it was a good time to start
anew.  I tried that.  I understood the process, and I
opened my business.

And then when I retired from doing that
in -- I think it was 2022, I did a bankruptcy to clear
up all of my debt.

Q.   How much debt --

(Simultaneous crosstalk.)

Page 17

Valerie Laster; April 24, 2026

A.    I'm sorry?

Q.    (By Mr. Wolfson) How much debt did you need to clear up in 2022?

A.    Oh, God.  I don't know.  I would have to look at my documents off the top.  I couldn't give you a note because 2022 -- it was -- it was a lot going on in 2022.

Q.    That's okay.

A.    I can't think of a number right off the top.

Q.    No worries.

A.    It was mostly medical, though.  If I'm remembering right, it was mostly medical bills and maybe some credit card bills.

Q.    Are there any other bankruptcies besides those two that we talked about?

A.    Nope.

Q.    Have you been a witness in any lawsuit ever?

A.    No.  No.  Not that I can remember.  No.

Q.    Okay.  Have you been a juror ever?

A.    No.  Never made it to the jury.

Q.    Have you ever been arrested?

A.    No.

Q.    Okay.  Have you ever been accused of any

Page 18

Valerie Laster; April 24, 2026

crime, to your knowledge?

MR. O'CONNOR:  Objection.  Form.  Go ahead.

A.  Have I ever been accused of a crime? Well, I mean, when she said that I just hit her car out of the blue and she didn't know why and somebody got hurt, that's a crime because the way the judge explained it to me, if I hadn't given him the information and she won that situation, I could have gone to jail for a whole year for reckless -- reckless driving or reckless endangerment.

Q.  (By Mr. Wolfson) Have you ever accused anyone of a crime?

A.  Okay.  I have a question to that.  Like clarification.  Like falsely or truly?

Q.  Like at all.

A.  Okay.  When you say accused, I'm thinking, you know -- yeah.  Yes.

Q.  Who have you accused of a crime?

MR. O'CONNOR:  Objection.  Form.

A.  Let's see.  Would that include -- that would include a restraining order; right?  That's a crime.  Stalking is a crime; right?

Q.  (By Mr. Wolfson) So that one?

A.  That one.  One of my son's fathers.  He

Page 19

Valerie Laster; April 24, 2026

got a restraining order.  Yep.  I can't think of
anything right off.

Q.    That's fine.  That's fine.  I was just
asking.

So I wanted to talk to you a little bit
about how you prepared for today's deposition.  Did you
do anything to prepare for today's deposition?

A.    As in did I look over notes?  Like what
do you mean?  I went to bed at a regular -- at --

Q.    Did you have -- aside from your
attorney, did you have any discussions with anyone?

A.    My attorney.

Q.    Aside from your attorney.

A.    Oh.  Okay.  I didn't hear that.

No.  Well, not to prepare for it.  No,
but my son knows that I'm here.  I have a couple
relatives that know I'm here.

Q.    Okay.  And what did you tell them about
you being here today?

A.    I'm being deposed.

Q.    Did you tell them anything else?

A.    No.

Q.    Okay.  In your conversations with your
attorney, was anyone else present?

A.    No.

Page 20

Valerie Laster; April 24, 2026

Q.   Did you review any documents in preparation for your deposition today?

A.   Yes.  The documents of the case.

Q.   Which documents?

A.   I don't know what documents he reviewed, but the two of us definitely reviewed the Complaint.

Q.   When did you review these documents?

A.   I did last night and today prior to the deposition.

Q.   And for, approximately, how long?

A.   A couple hours in total.

Q.   Are any of those documents reviewed -- have all the documents that you reviewed been produced in this case?

A.   Yeah.  Yeah.

Q.   Do you --

A.   Let me back up.  When you say produced, I mean the Complaint was filed.  So you have a copy of it.  I didn't have to produce it to you because you had it already.

Q.   Correct.  So filed or produced.

A.   Okay.

Q.   So --

A.   Yes.

Q.   Do you understand that Circle K has

Page 21

Valerie Laster; April 24, 2026

requested documents from you throughout this case?

A.    Yes.

Q.    Okay.  Have you provided all such documents that we've requested?

A.    All -- all documents that I have received except for one.  I did receive the -- what -- the call log from my phone company that I'm actually in the process of going -- from the subpoena from T-Mobile.  So because I recently got it and I'm going through it, I haven't gotten it to you yet because I'm redacting, you know, certain things.  So you should have it pretty soon.

Q.    Okay.  What are you redacting?

A.    I'm redacting my personal phone calls.

Q.    Okay.

A.    Other than the phone calls relative to this case.

Q.    Okay.  And you intend to produce the redacted document to us?

A.    Absolutely.

Q.    Great.

What did you do to find relevant documents or responsive documents?

A.    I don't know what you mean.

Q.    So we asked you in discovery to produce

Page 22

Valerie Laster; April 24, 2026

certain documents.  And what did you do to find those
documents?

A.  Well, in some cases I did a subpoena.  I
made requests to the companies of the people who had
them, or if I had them in my possession already, I
provided them.

Q.  Okay.  What did you do to make sure your
emails were preserved during this lawsuit?

A.  All of my emails?

Q.  Emails relevant to this case.

A.  I left them alone.  Whatever -- okay.
So whatever emails that I gave you, I still have them.

Q.  Okay.

A.  There's nothing else for me to do but
except not erase them.

Q.  Okay.  And did you search your emails?

A.  I did.

Q.  Excuse me.  Did you search your emails
for responsive documents?

A.  I did.

Q.  Okay.  And how did you conduct that
search?

A.  Go up into the search bar and type in,
quote/unquote, Green Dot, and it'll come up all -- any
emails that I got from Green Dot.  Then I opened them

Page 23

Valerie Laster; April 24, 2026

and looked at them.

Q.    Okay.  So you searched for Green Dot?

A.    I'm sorry?

Q.    Did you search for anything else besides Green Dot in your search?

A.    No.  I'm trying to figure out what else would I search for.  Green Dot.  Based on the information that you asked for, whatever it was that you asked for, if I thought there was an email relative to that, then that's what I did; but if not, no, I didn't search if I didn't think that was pertinent.

Q.    Are there any documents that you -- that you believe relate to your claims that you have not been able to locate?

A.    Well, yeah.  The United -- UnitedHealthcare documents.  I actually -- originally they told me that I could get all of the documents that I was requesting from the platform, but when I went into the platform to get the documents and print them out, it came up short.  So I reached out to UnitedHealthcare, and that's how I ended up filing this subpoena because the woman was like -- like, for instance, the billing --

Q.    Um-hum.

A.    -- from 1/23 to 7/24, she told me

Page 24

Valerie Laster; April 24, 2026

there -- they have nothing in their system for 2023, and I said that can't be true because we have actual information from my therapist for 2023.  So that led to the subpoena as well, but to date they haven't answered.  And it's not in the platform.  It's not in the platform at all.

Q.   Besides the UnitedHealth records, were there any other records that you haven't or documents that you haven't been able to locate relevant to your claims?

A.   As far as I know, everything else that I -- that you guys have asked me for I've provided.  I provided you with everything that I have.

Q.   Okay.

A.   That you asked for.  That's what I can say.

Q.   Understood.  Great.

So I wanted to switch subjects a little bit.  I wanted to ask you a couple of questions.  This case is about racial discrimination or alleged racial discrimination, and I want to know how you would define racial discrimination in your own words.

MR. O'CONNOR:  Objection.  Form.

A.   Well, racial discrimination can take place -- it can happen in a -- in a multiplicity of

Page 25

Valerie Laster; April 24, 2026

ways.  Number 1, you know -- let me just set the stage.

I have been in spaces all of my adult life where I'm the only African-American in the room. That's not new to me.  Living on the East Coast, I worked in corporate America.  That's not a problem, but when I'm in a space, and I'm not being included, everybody else is included but me, and it's evident, that's the type of discrimination.  And there's no reason for it.  You know what I mean?

I can see if you -- if a person has a relationship with someone, they have a falling-out, but just because I'm in the room or everybody gets treated a particular way.  Say everybody gets candy.  I'm just going to make this simple.  Everybody but the Black person gets candy.  What is that about?  Everybody in the room is talked to with dignity and respect, but when you talk to the Black person, it's an authoritative attitude, and it's dismissive, and it's condescending to belittle.

I mean, discrimination happens on so many levels.  It's ingrained in the system, and that doesn't mean that everybody that's not Black is racist or discriminatory because, you know, just before I -- I have White friends.  I've still got some, but when it's apparent to everybody in the room that you're treating

Page 26

Valerie Laster; April 24, 2026

that Black or Brown person way differently than you're treating the White people, what's going on?

Q.   (By Mr. Wolfson) Would you say you've experienced racism often?

A.   Oh, oh, oh.  Here in Westminster, absolutely.

Q.   Okay.  I wanted to switch subjects one more time.  Not one more time.  An additional time to talk about your visit to the Circle K store that is at issue in this case.

A.   Okay.

Q.   So the incident that this lawsuit -- your lawsuit is based on occurred at the Circle K store located at 7584 Sheridan Boulevard, Westminster, Colorado; is that correct?

A.   Correct.

Q.   For ease of reference during this deposition, I will refer to this location as "the store".  Is that acceptable to you?

A.   Yes.

Q.   Prior to April 8th, 2024, had you ever been to the store?

A.   Yes.

Q.   When?

A.   I can't give you an exact date, but this

Page 27

Valerie Laster; April 24, 2026

is what I will say.  I haven't been in that particular Circle K store many times.  When April 8th, 2024, happened I probably had been in that particular store, and just to be fair, maybe five times.  It's not a place that I frequent a lot even though it's -- it's, like, only a few blocks from the house.  You know what I'm saying?  It's just not one of those places that I normally go, but I have been there.

Q.   Okay.  Have you ever had any issues before April 8th at the store?

A.   No.  It's just in and out.  I think I got gas there a couple times.  That's all I can think of why I would have been there, just to get some gas, but, yeah, never had a problem.

Q.   And on April 8th, you only went to the store on one occasion; is that correct?

A.   Yeah.  On April 8th.  Correct.

Q.   Okay.  And you went into the store after 8:00 p.m.  Would that be correct?

A.   That is correct.  Oh, and just let me add.  I never uploaded money at that store except -- except trying that one time.  I usually go to another place, but I know they close at 7:30, and I knew it was later.  So I said, well, let me try Circle K.

Q.   Okay.  Is there any part of your claim

Page 28

Valerie Laster; April 24, 2026

that is based on what occurred prior to April 8th, 2024?

A.   No.

Q.   Is there any part of your claim that is based on what occurred after April 8th, 2024?

A.   Okay.  So what I will say is -- because that's -- I think that's a difficult question to answer because the way the situation was handled and responded to impacted or exacerbated the situation that happened.

Q.   Okay.  Are you basing your claim off of anything that happened, though, after April 8th, 2024?

A.   No.  The claim, itself, is based upon the discrimination that happened that night.

Q.   Okay.  So you came into the store on the evening of April 8th, 2024; is that correct?

A.   Correct.  I originally thought it was the 7th.  I had the wrong date.  Yeah.

Q.   And you came to upload money onto your Green Dot prepaid debit card; is that correct?

A.   That's correct.

Q.   Why did you go to the store at that time?

A.   Because I was doing my bills.  I was doing my budget.  I do a budget.  I've been doing a budget since I've been grown.  So I just happened to be

Page 29

Valerie Laster; April 24, 2026

doing my budget that night, and I wanted to get it done

that night.  Let me do this because I had things to do

the next day.  And I just said, well, let me just run

up here and put some money on the card and come home

and pay it.  That's all it was.

Q.    And you were seeking to upload $1,500

onto your card; is that correct?

A.    Yes, because according to Green Dot, the

information that I received is that we can upload up to

$3,000 a day.  Now, what I found is that you may not be

able to upload 3,000 at one location.  You know what I

mean?  But I could do, say, a thousand here and then go

to another location that works with Green Dot, it

doesn't have to be Circle K, but any other store and do

another thousand, whatever their limits are.  But I

think the limit at Circle K I found out later was a

thousand, but I didn't know that because I had never

tried it at Circle K.

Q.    So the Circle K limit for how much money

you could upload is $1,000 on April 8th, 2024?

A.    It would -- I would say it was because

when I went back on the 9th -- how do you say her name?

Noon or Mikela?

When I asked for the 1500 upload with

her, she said I can only do a thousand.  That's how I

Page  30

Valerie Laster; April 24, 2026

found that out.  And so she had to do it in $500 increments.  And what they do is they charge you two transaction fees because they have to do two transactions.  So I was only able to get a thousand at Circle K, and so I went somewhere else and added the extra 500.

Q.   Okay.  Where did you go to add the extra 500?

A.   Probably -- if I know me, probably King Soopers.  That's usually where I go.

Q.   Okay.  And did you have any issues uploading that extra $500?

A.   Nope.

Q.   At the time you went into the store on April 8th, 2024, were you aware that money couldn't be uploaded on to the card after 8:00 p.m.?

A.   No.  Like I said, that was the first time I had ever gone to Circle K to do any type of upload because I usually do my upload at King Soopers, and they were -- I knew they were closed because I deal with them.  So I didn't know, and I didn't see any signs.  And even if they were there, I still didn't see them, wherever they were hanging.  Yeah.

Q.   Okay.  So but you have since learned that you cannot upload money past 8:00 p.m. at the

Page 31

Valerie Laster; April 24, 2026

store?

A.    Correct.

Q.    And you agree that -- would you agree that Circle K's system automatically rejects any attempts to upload money after 8:00 p.m.?

A.    I'm going to say I don't know because I don't know how your system works, but what I do know and based on what you as counsel have told me is that after 8:00, there are no uploads.  That's what Ms. Mikela said as well.  And when I'm saying that I mean I don't know how your system responds if someone tries to upload after it's down -- because some -- some stores or some systems might give an error message. You know what I mean?  Say error, we're down.

So based on what happened and based on the limited knowledge that I have, I can't make -- I can't -- I can't answer that sincerely.  I can't.

Q.    Do you have any reason to believe or evidence that would show that -- let me start again.

Do you have any reason to believe that a card is not -- an upload is not automatically rejected after 8:00 p.m. at the store?

A.    When you -- I will say this.  If the system is down, I don't even know how you could even try to do an upload.  Do you see what I'm saying?

Page 32

Valerie Laster; April 24, 2026

Q.    Okay.

A.    I know what you're trying to say, but my thing is -- because I've worked with systems before, and when I go to -- just my computer and it's off, I know I've got to bring it back up before I can do anything.  I can't type a letter unless the system is up.  Something is going to tell me that the system is down before I try to do anything.

Q.    Do you have any reason to know or believe that that's how it works at the store?

A.    That's what I'm saying.  I don't know. I asked for that information, and . . .

Q.    Okay.

A.    You know.

MR. WOLFSON:  If you don't mind, Ms. Laster, I would like to take a quick, maybe, five to 10-minute break.  Would that be okay?

THE DEPONENT:  Yep.  That's good with me.

MR. WOLFSON:  So we can go off the record.

THE VIDEOGRAPHER:  This is the end of Media Number 1.  Going off the record.  The time is 10:47.

(Break from 10:47 a.m. to 10:56 a.m.)

Page 33

Valerie Laster; April 24, 2026

THE VIDEOGRAPHER:  We're back on the record.  The time is 10:56.  This is the beginning of Media Number 2.

Q.   (By Mr. Wolfson) Ms. Laster, I wanted to pull up some pictures and share them with you.  So give me one second.  Let me know when you see the picture. I know it takes a little while to upload.

A.   I do.  I've got to take my glasses off. Yes, I do.

Q.   Okay.  Do you recognize -- well, let me say, have you seen this picture before?

A.   Yes.  Can you enlarge it again?  There you go.

Q.   That's -- is that good?

A.   Yeah.  Yeah.

MR. WOLFSON:  And can we have this marked as Exhibit 1, please.

(Exhibit 1 was marked.)

Q.   (By Mr. Wolfson) And exhibit 1 has several photographs, and I want to make sure you've seen all the photographs in this picture.  So I'm going to go slow.  We're going to start at the top one, which we started with.  Going to go to the second one.  This is the second one.  Can I go to the third one?

A.   Yes.

Page 34

Valerie Laster; April 24, 2026

Q. Okay. The third one. The fourth one. So I want to reask you, I guess, have you seen these pictures before?

A. Go to the one before this one? Is that the post? Okay. Yeah. Yeah. Okay. Yes. I've seen -- seen all of them.

Q. Okay. And these photos, you would agree that they depict the interior of the store?

A. I will say that it's the interior of the store, but I also say that when I was in the store, I didn't see those signs, so . . .

Q. Signs -- you said you didn't see those signs; is that correct?

A. Correct.

Q. Could they have been there?

A. It's possible.

Q. And this is the store, I just want to be precise, that the incident alleged in your lawsuit took place; is that correct?

A. This particular picture that you have up here, I don't know what that is. I don't know where that is.

Q. What about this next picture here, and that's Bates label 179?

A. Yes.

Page 35

Valerie Laster; April 24, 2026

Q.    Yes.  Okay.  And --

A.    Absolutely.  That --

Q.    Same as the next one?

A.    Yes.

Q.    Which is Bates label 180?

A.    Yes.

Q.    Okay.  And the same with 181, this next picture I'm showing?

A.    Yes.

Q.    Okay.  And you don't -- what about 182?

A.    With the sign, I don't remember seeing the sign.

Q.    Okay.  And this last picture?

A.    Yes.  That's a picture that I provided to you.

Q.    Right.  So apart from the picture with the sign, all -- your testimony is that all of those pictures are pictures of the inside of the store where the incident alleged in your lawsuit happened?

A.    Yes, except for that first one.  I don't know what that is.  You know which one I'm talking about?  Okay.

MR. O'CONNOR:  Sorry to interrupt, can you email us your exhibits when we take a break next time?

Page 36

Valerie Laster; April 24, 2026

MR. WOLFSON:  Sure.

MR. O'CONNOR:  And each time.  Okay.
Thank you.

Q.    (By Mr. Wolfson) So going to this
picture --

A.    Um-hum.

Q.    -- which is Bates-labeled Circle K
000182, what does it say on the white piece of paper?

MR. O'CONNOR:  Objection.  Form.

A.    It says, "We do not do any card loading
after 8:00 p.m.  Sorry for the inconvenience.
Management."

Q.    (By Mr. Wolfson) And you testified
earlier that after this incident, you learned that that
was the policy?

A.    Yes.

Q.    So regardless of what Circle K employee
was working, would you agree that you would have not
been able to upload your money?

A.    Can you say that again?  I'm sorry.

Q.    Sure.  No worries.  So regardless of
what Circle K employee was working, you would have not
been able to upload your money onto the card because it
was past 8:00 p.m.

MR. O'CONNOR:  Objection.  Form.

Page 37

Valerie Laster; April 24, 2026

A.   That's -- that's a great probability.
Correct.  I agree with that.

Q.   (By Mr. Wolfson) Now, I want to talk a
little bit about the card, itself, that you were
attempting to use.

A.   Yes.

Q.   It was a Green Dot card; is that
correct?

A.   Correct.

Q.   Have you ever had a Green Dot card,
aside from this card, that you used at the Circle K
store?

A.   If I did, it had to be over 30 years
ago.  Do you know what I mean?  That's what I would
say.  It had to be so long ago because I used prepaid
cards.

Q.   Why do you use a prepaid card?

A.   To protect my bank account.

Q.   What do you mean by that?

A.   Okay.  You have your main bank account,
and you have a debit card that you get from the bank.
Usually you have to have a checking account, which is
attached to it.  If you go in using your bank account
debit card and your -- your card get scammed, they take
all of your money.

Page 38

Valerie Laster; April 24, 2026

I take money out, put it on a prepaid debit card, whatever I need, use that because once I put the money on it, I'm going to use that right away, pay my -- pay my debt.  If they skim that card, they're not getting a dime.

Q.   Can you explain to me, to the best of your knowledge, how these prepaid cards work?

A.   So I can talk about the ones that I've used that I have is -- okay.  Just let me get clarity. How they work in terms of what?  Just how they function?

Q.   How they function.  Yes.

A.   Okay.  So you can receive a prepaid debit card in the mail from a bank, from Green Dot or any of those other -- Path -- what is it?  Pathway or -- they've got different types, different banks that's online.  They may send you one through the mail. You might get one through the mail.  You didn't ask for it, but they just sent you one.  And on that card, it'll tell you what you can do.  If you want to do direct deposit or -- because some people use those for their paycheck as well.  They just -- just like any credit card, it'll have the sticky telling you call this number to activate it.

Once you call in and activate that card,

Page 39

Valerie Laster; April 24, 2026

now you have a whole account.  That's when you have the account.  You don't have an account just because they mailed it to you.  You have an account once you activate it.  Once you activate that card, you -- and in the information, they will tell you, like, places where you can go to upload money.  They will tell you where the ATM machines are that you can use with that card.

You use it just like you would any other debit card attached to your bank account, but where you have control at it is you determine how much money is on that card.  You know what I mean?  So it kind of gives you a sense of security that if I lose that card or whatever, then my bank account is not gone.

And then I can -- I can go -- I can go in the store and buy whatever I want, but you can only buy if you have money on the card.  There's no such thing -- you know how, like, if you have a debit card attached to your bank account and you overspend, the bank will say, "Well, they've got a savings account with us.  We'll just take the extra money out of there," or if you don't, they might say, "Well, we'll pay it anyway because Johnny's been with us for such a long time.  We know he's good for it."

That's not how prepaid cards work.  If

Page  40

Valerie Laster; April 24, 2026

you don't have the money, and they don't care if you're a penny off, and you want to pay a bill, they're not paying it.  They're not going to do it.

Q.   Besides the reasons you've already stated for why you use prepaid debit cards, are there any other reasons you haven't mentioned?

A.   Absolutely.

Q.   What are those reasons?

A.   I don't get -- I don't get -- I'm not a part of the statistic with those bounced checks.  No bounced checks.  You know, that's a -- what? a billion dollar industry?  Yeah.  So I recommend it for people that's not good with a checkbook, so . . .

Q.   Are there any other reasons you haven't mentioned?

A.   Nope.

Q.   Prior to April 8th, 2024, have you ever uploaded money onto a prepaid debit card before?

A.   Absolutely.

Q.   Okay.  Ever at a Circle K?

A.   Not that I remember.  No.  No.  I usually -- no.  I don't do that at Circle K.

Q.   Okay.

A.   If I've done it -- I don't think so.  It might have been once.  No.  I usually do -- I go one

Page 41

Valerie Laster; April 24, 2026

place, and that's where I go.

Q. And what is that one place?

A. King Soopers.

Q. In your prior attempts to upload money onto your card before April 8th, have you ever had any issues?

A. That particular card?

Q. Ever with any card.

A. Not that -- not -- to do an upload?

Q. Correct.

A. No. Not that I recall an upload. No. Uh-uh.

Q. Going back to the card that you were using on April 8th, when did you obtain that card?

A. Apparently, I obtained that card in 2022. Now, the thing about it is, I don't know if they sent it to me in 2021 because I get those cards all the time, and I just throw them in the drawer. You know what I'm saying? So from the information that we both kind of uncovered is that I started the activation process in October 2022, but I didn't finish it, and then I finished it in April of 2024 because I -- I just, you know -- at random I was, like, "Let me use this card." Like, I don't have a preference. You know what I mean? So . . .

Page 42

Valerie Laster; April 24, 2026

Q.   And then when did you formally activate the card?

A.   I think Green Dot said -- you mean like complete the whole process?

Q.   Yes.  So it's ready to use.

A.   Complete the whole process was the day of.  I thought it was in the morning, but it was -- it was in the -- it was in the evening.  Maybe about 7:30, something like that I think it said, the email said.  And then I went to Circle K around 9:00.

Q.   Okay.  Have you used the card -- let me step back.

How many times did you use that card?

A.   Is that including uploads or just --

Q.   Including uploads.

A.   Including uploads.  One, two, three, four.  Maybe four or five.  Four, because -- two for the upload.  I paid the bill.  Paid the credit card bill.  I think I left $20.  Then I went to Wendy's.  So I think four times.  Yeah.  And I haven't used it since.  I haven't touched the account because it is -- I'm not touching it until this is taken care of.

Q.   Understood.  This is a minor question, but could it have been a Popeyes you went to instead of a Wendy's?

Page 43

Valerie Laster; April 24, 2026

A.   Could have been.  Yep.

Q.   Just on the record, that's why I'm asking.

A.   Oh, okay.  Yeah.  It could have been, but I know I went somewhere.

Q.   Yes.  Do you still use prepaid debit cards?

A.   I do.

Q.   Okay.  Do you still use Green Dot prepaid debit cards?

A.   The card I have is not Green Dot, but this Green Dot account we're talking about is still active, and they were going to send me a new card, but I said nope, not yet.  So, yeah.

Q.   So going to -- back to April 8th, 2024, I kind of want to know when you got to the store, everything that happened between when you got to the store and when you left the store.  So if you could take me through that, I would appreciate it.

A.   From the time I left my house?

Q.   From the time you left your house until the time you got in your car to leave the store.

A.   Okay.  So because of the time of night --

MR. O'CONNOR:  Objection.  Form.

Page 44

Valerie Laster; April 24, 2026

A.    Scared me.

From the time -- well, I don't usually go out at night by myself because of my age.  I asked my son, my youngest son, to ride with me to the store to do an upload.  So we got in the car with my money and my card and everything else.  We drove to Circle K because I already knew that King Soopers was down for the night.

Parked the car.  He waited in the car, and when I -- I didn't know if you -- I don't know if you've been to the store, but when you go from -- like, they have two entrances.  One is on the side.  One is -- one faces Sheridan.  One is on the side.  If I'm remembering correctly, I went in the side door.  And when I went in the side door, you walk around the lanes of food and whatever to get in line.  So that's one reason why I wouldn't have seen the signs the way they are around the store.

So I just walked in, and there was somebody at the counter already, and there was someone waiting.  So I, you know -- to wait my turn.  And then while we were waiting, somebody else came in and stood behind me.  So the person that was at the counter, they left, and then the person in front of me went in.  I don't know what they were doing.

Page 45

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

And when it was my turn, I just walked up and I said, "I would like to upload money on the prepaid card."  Ms. Chavez said, "How can I help you?" I said, "I would like to upload some money on the prepaid card."  And I told her --

Q.    (By Mr. Wolfson) I'm going to interrupt you real quick.  I'm so sorry.  I just have a question.

A.    Uh-huh.

Q.    Up until the point where it was your turn in line, had you experienced any racial discrimination at the store?

A.    No.  Everybody was just -- maybe the time of night.  Everybody was just, like, let me get in, let me get out.

Q.    Besides Ms. Chavez, who was the clerk -- you would agree that Ms. Chavez was the clerk?

A.    Yes.

Q.    There were -- when you first got into line, there were two people in front of you and one behind you?

A.    One was at the counter already and one standing in line waiting, and then I stood behind that person.  So if you want to count that as two, yeah, but it was just one person in front of me actually in line.

Q.    Okay.  There was someone behind you?

Page 46

Valerie Laster; April 24, 2026

A.   Yeah.  Well, they finally came in, yeah. We didn't come in at the same time, but they came in shortly thereafter.  What I did --

Q.   Go ahead, please.

A.   I was going to say, when I did come in and while I was waiting -- well, when I came in I saw Ms. -- now I know her name is Gonzalez.  She was reaching behind that counter doing something.  She's, like, reaching over the counter, and then when she finished what she was doing, she went and she stood beside -- she was standing in a way where she was standing beside all of the -- all of the customers.  So when they walked up to the counter, she was, like, standing there.  I thought that was strange, but . . .

Q.   So I want to bring back up what we've marked as Exhibit 1.

A.   Uh-huh.

Q.   Just so we have a picture and we can kind of put people where they are or where they were.

A.   Okay.  Um-hum.

Q.   Let me know when you see that picture.

A.   I do.

Q.   Okay.  Do you see that there are two registers, one on the left and one on the right?

A.   Correct.  Yes.

Page  47

Valerie Laster; April 24, 2026

Q.    Okay.  Which register were you in line for?

A.    Where the gentleman is standing.

Q.    So behind him?

A.    Well, not directly behind him, but you see where the -- the lane starts?  Through the lane like you see him.  You see that looks like water bottles or something behind him or whatever that is behind him.  Now, go back up a little bit.  Yep.  Don't go back too far, but on the other side of that soda machine is a lane.  And so that's where everybody stands.

Q.    Understood.  Thank you.

A.    Um-hum.

Q.    And where was Ms. Gonzalez standing?

A.    Okay.  When I first walked in the store -- go to the counter to your left.  Right there.  She was reaching over that counter like she was putting something back or whatever, and then when she finished, she walked over to where the gentleman is.

Q.    So she walked to the -- the register on the other side?

A.    Correct.  And she stood there, and she was standing there while everybody was getting waited on.

Page 48

Valerie Laster; April 24, 2026

Q.   Did she make any comments to any of the other customers?

A.   I didn't hear her say anything to anybody except me.

Q.   Okay.

A.   It's a real tight space.  It's real tight.

Q.   Okay.  So you're in line; correct?

A.   Um-hum.

Q.   How long do you wait in line before it's your turn?

A.   She moved pretty fast.  I don't know. Maybe five minutes.

Q.   Okay.

A.   Maybe five minutes.  Something like that.

Q.   And then it became your turn, and you walked up to the cash register; is that correct?

A.   Correct.

Q.   Up until the point you walked up to the cash register, had you experienced any racial discrimination?

A.   No.  No.

Q.   Okay.  So tell me what happens after you get to the cash register.

Page 49

Valerie Laster; April 24, 2026

A.   I get to the cash register.  I already had the money and the card out, but Ms. Chavez asked me -- I think she asked me how can I help you.  I said I would like to upload money -- some money on a prepaid card.  I said, "I would like to upload $1,500."  So I give her the card, and I start counting the money, and I counted it out.  And as I'm counting it out, that's when Ms. Gonzalez begins and she says, "You must be a drug dealer to have that kind of money."

Q.   Say that again.  I'm sorry.  You cut out for a second.

A.   I'm sorry.  She said, "You must be a drug dealer to have that kind of money."  And I said, "Excuse me."  She said, "There's no way you're not a drug dealer and you have that kind of money."  And I'm like, Ma'am, $1,500 is not a lot of money.  Like what are you talking about?"

And if I remember correctly, she -- God.  What did she say next?  She goes -- she gets into saying, "I'm hood."  She said, "You must be from the hood," and she takes out a camera.  And she literally takes out her camera and holds it up like -- gets in front of me.  And like at first I thought she was streaming.  You know, people just start streaming.  And she was, like, "Look, y'all.  Look who I found."  And

Page 50

Valerie Laster; April 24, 2026

I'm saying to myself, like, what is this?

And so when she finishes doing what she's doing on the camera -- in the meantime, Ms. Chavez tries to upload $1,500 on the card.  Now, all of this is going on at the same time, and I'm standing there a little, like, perturbed.  And Ms. Chavez says, "This transaction has been declined." I'm, like, declined?  Because I'm thinking I can put 3,000 on there.  Why is it declining?

And then -- so I said, "Well, try a thousand."  And now I'm back to this one.  And she's telling me -- because she's finished with her, like, a photo or streaming, and that's when she begins to tell me I'm going to take that money.  She said, "That money is going with me," and then she begins to tell me --

Because now, keep in mind, that Ms. Chavez, while she's trying to upload this money, she is waiting and watching this, too, because it don't take long for somebody to do an upload, but she's watching this happen.  And so Gonzalez begins to tell me how she has -- what she say?  She has a Black belt in martial arts, and she's going to take that money. And at some point she gets into my face like nose to nose, and she said to me -- she said, "Oh, I'm going to take that money."

Page 51

Valerie Laster; April 24, 2026

I said, "Well, ma'am, I've got -- I've got -- I've got some training in Kempo.  Like we can do what you need to do."  Like, that's where it was.

Q.   Okay.

A.   And so Ms. Chavez says the thousand dollars is declined, too.  Now, at some point she asked me -- not Gonzalez.  Yeah.  Gonzalez says, "Why aren't you at the bank?  Why are you not at the bank?"  And then she says what -- "Where do you bank, by the way?" I'm, like, "Where do you bank?"  And then she turns to Gonzalez -- to Chavez and they look at each other, and she says to Chavez, "Where do you bank?"  And then they both burst out laughing saying we bank at Chase.  And I'm like, "Well, then that's where I bank at.  Yeah."

And so, then -- what's her name? Gonzalez was, like, "You don't live around here.  Where do you live at?  You must be from the hood."  She started that hood stuff.  And so she asked Chavez, she says, "You ever seen her around here?  Have you ever seen her come in the store?"  Chavez is, like, "She ain't never -- she's never come in this store.  I've never seen her around here."  And I'm standing there, like, wondering what in the world is this?

Now granted, they're talking loud, like, to the top of their -- like they're talking loud, not

Page 52

Valerie Laster; April 24, 2026

like me and you talk.  Like loud.  And Chavez was, like, "No.  I've never seen her come in here before."  And I'm, like, "Hold up, ma'am.  I've been in here before.  Just because you never seen me don't mean I've never been in here.  And I live right up the street.  What are you talking about?"

Oh, God.  It was -- it was just really crazy, but at some point, Chavez says, "It won't take" -- because we're down to the 500.  Chavez says, "It won't take the 500.  This is coming back as fraud."  She said, "Ma'am, you're committing fraud.  This is a fraudulent transaction."  And that's when I reached in my purse and I pulled out my driver's license and threw it on the counter, and I said, "The card" -- because she has my card.  I said, "The card that you have in your hand and my driver's license got the same name on it, and I'm giving -- you got cash from me.  I'm not buying nothing out of your store."  I literally said this.  "I'm just asking you to put money on my card.  Please explain to me how I'm committing fraud."

So she's standing there looking at me, but she has my card.  I'm going to put something in my hand.  Hold on.  I've got a tea bag.  She has my card and she's standing here like this looking at me.  Like, no.  She's looking at me.

Page 53

Valerie Laster; April 24, 2026

Now all the time when Gonzalez is running her mouth, Chavez is standing there looking at -- staring me in my eyes like she's waiting to see some glimmer of what -- what Gonzalez is saying is true.  Like she's standing there just, like, staring at me and glaring at me.

So when she says that the $500 and everything is fraud, she tried to keep my card. "Ma'am, give me my card."  She stand there looking.  I said, "Ma'am, you need to give me my card," and I -- if I'm not mistaken, I snatched my card out and I reached up and snatched my card and snatched my money up, and that's when I left.  It was crazy.

Q.   How long were you in the store for total?

A.   In total -- because I literally -- just to let you know, I asked my son about it because I said -- I knew what I thought.  He said, "Mom, you was in there about 15, 20 minutes."  He said he was about to come in there to see what was going on.  That's how long I was in the store.  That fiasco -- I mean, it went on.  I would say that -- all those interactions and stuff -- because, I mean, I might have left this out.  But I told Chavez -- not Chavez, Gonzalez -- do I have to tell you what I said?

Page 54

Valerie Laster; April 24, 2026

Q.   Yes, please.

A.   I mean, like after she had threatened me like she said about four or five times that she was going to rob me, she said, "You ain't getting out of this store with that money."  I was looking for a glass bottle.  I was about to see something, see if I was getting out or not.  Like I literally thought I was going to have to fight -- fight to get out of that store.  I did, and I was about to do it, too.

And so I told her, I said -- I told Gonzalez, "You ain't about to taking a damn thing from me," I said, "because I'm going to knock your ass out. That's what I'm going to do, and I'm going to go out of here with my money, too."

And that's -- and then I don't know where she went, but Gonzalez got gone.  She went and sat down somewhere when I told her that, and I snatched my card from Chavez, and I snatched up my money.  I mean, I literally snatched it off the counter because I didn't know what she was going to do because she had her part in that.

And she was like while -- while Gonzalez was talking, and -- she was staring at me, and she was, like, I could hear her saying "um-hum", and she was shaking her head like um-hum.  You know how somebody is

Page 55

Valerie Laster; April 24, 2026

watching for the other person?  Yeah, okay.  Like she didn't say yeah, okay, but she was, like, um-hum, um-hum.

Q.   So I want to back up a little bit.  At what point during your visit to the store do you believe you started experiencing racial discrimination?

A.   When I walked up to the counter.

Q.   What was said to you that led you to believe that you were experiencing racial discrimination?

A.   When -- when -- not Chavez.  I keep calling her Chavez.  When Gonzalez said --

Q.   Gonzalez is the other customer; right?

A.   Yeah.  She's the other customer.  I thought she was Associate Number 2.  That's -- that's who I was referring to.  I think Associate Number 2, the one that was reaching over the counter.  At first I thought she worked there when I first counted the money because when she -- when she started calling that drug dealer thing I was like, Oh.  So is this because I'm Black?  Like because I'm Black, I can't have $1,500?  I'm, like, what is this?  Like, I never heard nothing like that before, and that's when it started.  She started the ball rolling, and Chavez chimed in.

Q.   How did Chavez chime in?

Page 56

Valerie Laster; April 24, 2026

A.    The comments that she made.  She began to talk with -- join in with Gonzalez with those comments.

Q.    Can you be specific as to what comments Chavez made?

MR. O'CONNOR:  Objection.  Form.

A.    Well, when she said she -- when she started talking with Gonzalez about she had never seen me in the store before, and I didn't live around here, and both of them were asking me where I banked.  And Gonzalez and Chavez were like, well, we bank at -- I mean, you know the story.  They bank at Chase Bank. That's how I knew, and, I mean, all the things I said.

Q.    (By Mr. Wolfson) So my understanding --

A.    And she tried to keep my card.  She tried to keep that card, and then I was like, no, you're not keeping my card ma'am.

Q.    So according to your testimony, Chavez said three things to you that you believe indicate that she was racially discriminating against you?  One was that she had never seen you before; two, that you did not live in the area; and, three, asked where you banked; is that correct?

A.    I've got to think on that.  I'm going to say that the entire situation was -- was racially

Page 57

Valerie Laster; April 24, 2026

motivated and Chavez participated.

Q.   I'm asking how Chavez participated in it.

A.   And I just told you.

Q.   So I'm asking you again what other comments did she make besides that she's never seen you before, that you didn't live in the area and she asked where you banked?

A.   And I've never been in the store before. Not only did she not never see me before, but -- and they were like "Never seen her walk up and down -- walking up and down the street."  I mean, it was a whole -- whole theatric.  I mean, I'm telling you the main points of what I remember, but it was a whole situation going on for about 15 minutes.  And it was not all Gonzalez.  It was not all Gonzalez.

Q.   You've only mentioned three comments by Ms. Chavez.

A.   And the fact -- Number 1, she knew that the system was down.  She knew that.  She's --

Q.   How do you know she knew that?  How do you know she knew that?

A.   You just showed me the sign.

Q.   How do you know she knew that?

A.   You showed me the sign.

Page 58

Valerie Laster; April 24, 2026

Q.   So that's the only --

A.   Didn't you just show me the sign?  And you said based on the information that you provided me, she'd been working there for seven years.  And you showed me the sign -- the signs in the store where she worked.

Q.   So that's how she knew?

A.   I mean, if she was trying to use the system, didn't she know how to use it?  I don't know, but it would make sense to me.

Q.   Okay.

A.   I mean, if you come to my house where I've been living for five to 10 years, and I've got signs around about whatever happens in my house, wouldn't I know something?  I mean, that's common sense to me, but the whole idea that my -- that I was under the assumption that I could make the transaction and no one said -- Chavez did not say, "Ma'am, you can't make this transaction.  It's beyond 8:00."

And she went -- she went through the motions of acting like she was uploading the money on the card.

Q.   Is it possible she did not know?

A.   I'm sorry?

Q.   Is it possible that she didn't know?

Page 59

Valerie Laster; April 24, 2026

A.   Anything is possible.

Q.   Okay.  Why would she ever try to attempt to upload the card three times if she thought or knew that it could not be done?

A.   Well, there are possibilities, but -- you know, I'm not trying to be funny, but just like you asked me, did she know?  I don't know why.  You would have to ask her.

Q.   I'm asking you what those possibilities are, though.

MR. O'CONNOR:  Objection.  Form.

A.   I mean, maybe she was -- it was a whole ripoff situation that they was working together.

Q.   (By Mr. Wolfson) What did they rip you off of?

A.   I don't know.

Q.   Did they take any money from you?

A.   I snatched it up before they could.

Q.   So they took no money from you?

A.   They didn't take it.  I took my money back and my card.

Q.   Okay.

A.   All I'm saying is I can't get in her head.  All I can tell you is what I experienced.

Q.   So you don't know what her intent was?

Page 60

Valerie Laster; April 24, 2026

A.    I'm not her, but I know what I experienced.

Q.    Do you know what her intent was, though?

A.    I don't think the intent would have to be -- you can discriminate against people unintentionally.  There's people walking around every day saying "I didn't know I was being racist".  People say that all the time.

Q.    So it could have been unintentional?

A.    Anything is possible.

Q.    Well, do you think it was unintentional?

A.    I don't.

Q.    Why not?

A.    Because for someone to -- I just kind of explained it to you, though.  Like I've worked in jobs for years.  I would know if our system goes down at 5:00, 7:00, 9:00.  So what was the purpose?  What other reason would it be?

Q.    The only reason you provided, and correct me if I'm wrong, is that she was conspiring with Ms. Gonzalez to take your money; is that correct?  Did I state that correctly?

A.    No.  You asked me what could be the possibilities, and I said that could have been a possibility.  I didn't tell you what she intended.  I'm

Page 61

Valerie Laster; April 24, 2026

telling you what I experienced, and what I experienced was wrong, and that was racism.

Q.    Okay.  So I'm going to ask you one more time.  Besides the comments you've already stated or attributed to Ms. Chavez, did Ms. Chavez say anything else to you while you were in the store?

A.    Can I take a look at the Complaint?

Q.    No.  I would ask you not to.

A.    Oh.  I can't take a look at the Complaint because I put it in the Complaint.

Q.    I'm asking you from your memory right now.

A.    Let me see.  Let me take a minute.

Q.    Take your time.

A.    She accused me of fraud.  She told me I was committing fraud, and she said this is a fraudulent transaction, and she tried to confiscate my card.  She told me that each time she attempted, which was three times, as far as I remember, each time she attempted to upload the money on the card, she said it came back declined.

What else did she do?  Let's see. Because I know I'm leaving stuff out.  I'm just condensing it.  That's not what we want.  You want to get specific.

Page 62

Valerie Laster; April 24, 2026

She -- I mean, that's in conjunction with the other three things that you said -- you know, that you wrote down.

Q.   Okay.

A.   And when I asked her to explain how it's fraud, like she was looking at me when -- at the times when Gonzalez was talking, she just -- she just stood there and stared at me because she couldn't explain it, and that's when I snatched -- I mean, that's what I remember at this point.  And in connection with what I put in my Complaint, that's what she said.  That's what she did.

Q.   Are there parts of the incident that you do not recall today?

A.   I would say -- due the fact I was doing -- I've never done this before.  I think I'm a little nervous.  It's possible.  Yeah.  I would say yeah.  I think that's a normal response.  And I don't want to say something that's not true.  You know what I mean?  So I would rather say less than to try to ad lib when I don't need to.

Q.   So sitting here today, can you think of anything else besides the following comments?  I want to go through them and make sure I'm not missing anything.

Page 63

Valerie Laster; April 24, 2026

A.    Okay.

Q.    Chavez said -- Ms. Chavez said that she had never seen you before, that you did not live in the area.  She asked where you banked.  She accused you of engaging in a fraudulent transaction, and she attempted to confiscate your card.  Am I missing anything that you can recall today?

A.    That I can recall right off the top today, yeah.  I think -- I would say that was . . .

I don't know.  Because she said she's never been in here.  I've never seen her in here before.  Kept telling me that the card was declining.  Excuse me.  Yeah.  Let's -- let's -- that, as well as what's in my Complaint.  Yep.  So if anything else in my Complaint that I didn't mention, that's what she said.

Q.    Okay.  Anything else?

A.    Not at this moment.

Q.    Is there anything else that wouldn't be in your knowledge right now or in the Complaint?

A.    Say that again.

Q.    Would there be anything that's not in the Complaint that you have not mentioned?

A.    No.  Not that I can think of.

Q.    Okay.  Why did you believe the comments

Page 64

Valerie Laster; April 24, 2026

that we've just talked about, the ones that Ms. Chavez said to you, were racist?

A. Well, Number 1, with all the other people in the store and me being the only Black person in the store, I was the only one who received that treatment. Nobody else would -- nobody else was grilled about their transaction. Nobody else.

Q. Anyone else try to upload money onto their card?

A. I don't know what they were doing.

Q. You don't know?

A. I don't -- I don't know what they did because when you walk up -- if you -- if you remember the photo with the gentleman there, because the space is kind of small when you're standing there, unless you're talking loud, you don't -- you don't know what people are saying. And most -- I know most of the people that were in there, they weren't talking loud. You couldn't even hardly hear them speak. They went in, did whatever they were doing and they left.

I don't know what they did because you can't see. Everything is so close together, you know. I just don't know, but I know when I stepped up there, I was treated like a dog, and I was talked to like --

Q. How do you know how the other people

Page 65

Valerie Laster; April 24, 2026

were treated?

A.   I was talked to like a dog.

Q.   How do you know how the other people were treated?

A.   Because I was -- do you see how close in proximity everybody was?  You can't see them -- you can't see on the other side of the lane, but everything is, like, real close proximity.  Like you couldn't even stretch your arms out in the lane.  So there was no loud talking.  There was no disparaging statements. Nobody was -- was asked where they worked -- I mean, where they live, none of that, but when I got up there, I was asked.  As a matter of fact, I was told where I was and where I was from, and, basically, telling me I didn't belong there.  That's, basically, what I was told.

Q.   Did anyone tell you you did not belong there?

A.   Those exact words?  Is that what you're asking me?

Q.   Yes.

A.   No, but I was told that I wasn't from there and I don't live around there and --

Q.   Who told you that?

A.   Gonzalez, and then she chimed in with

Page 66

Valerie Laster; April 24, 2026

Chavez.

Q.   Okay.  And does Gonzalez --

A.   So they both were involved.

Q.   Okay.  Does Gonzalez work for Circle K?

A.   Gonzalez doesn't but Chavez does.

Q.   Okay.  So besides you being the only African-American person in the store at the time --

A.   Um-hum.

Q.   -- and being, according to you, treated differently than the other customers, is there anything else that makes you believe that what Ms. Chavez said or did was racially motivated?

A.   Yeah, because it wasn't true.

Q.   How do you know it wasn't true?

A.   How do I know it wasn't true?  That the card came back as fraudulent and declined?  Is that what you're asking?  Because when Green Dot sent me my statement, my statement for the month of April, there was not one swipe on April 8th, none.

Q.   Is it possible because the computer was turned off where the system could not process it?

A.   Yeah, but -- so how is the system -- this is my thinking.  So if the system couldn't process it, how is the system telling you I'm a fraud?

Q.   So is there any other -- so you said

Page 67

Valerie Laster; April 24, 2026

that you were treated differently than other people in the store?

A.    Yes.

Q.    You said that you believed that Ms. Chavez lied to you about their being a fraudulent transaction?

A.    Yes.

Q.    Is there anything else that led you to believe that Ms. Chavez was discriminating against you because of your race?

A.    And then she was trying to confiscate my card, and she was -- she was collaborating with and agreeing with Gonzalez.

Q.    Okay.  Anything else?

A.    I mean, do you have -- I mean, is there anything in particular?

Q.    I'm asking is there anything else?

A.    I would need a specific question.  I mean, the whole situation was discriminatory.

Q.    Right, but I'm trying to get specific. So you said being treated differently than other people in the store.  You said being allegedly lied to about the transaction being fraudulent.

A.    Um-hum.

Q.    You also mentioned that Ms. Chavez tried

Page 68

Valerie Laster; April 24, 2026

to confiscate your card.

A.    Yes.

Q.    And then is there anything else besides those things that Ms. Chavez did that you believed were racist?

A.    Well, also, not just her saying that the card was -- that the transaction was fraudulent, but she was saying that the card was being declined all along.

Q.    Do you think she was lying about that?

A.    Well, it was three different -- right. Of course she was because not even Circle K system has any record of that card being swiped.  Circle K doesn't have it.  My bank doesn't have it.  And at some point, if I remember correctly, the way you described it was it's the customer who swipes the card, but it was Chavez that was swiping my card.

Q.    What evidence do you have besides the evidence that you've just told me that she lied to you about the card being declined?

A.    Because there's -- because on my statement, if you -- if you remember, when they did -- like, with the two uploads, it shows a swipe.  Even -- you'll see swipe.  From my understanding, the way it was explained to me, every time a -- their card is

Page 69

Valerie Laster; April 24, 2026

swiped, it'll say swipe.  That's why it shows up on my statement.

Q.   Okay.

A.   The fact that the day before you don't even see a swipe.  The way it was explained to me is she had swiped that card, whether it was declined fraudulent, rejected, that would have showed up on those statements, and it does not.

Q.   Okay.  Is there anything else?

A.   I mean, I don't know.

Q.   Okay.  Do you think -- why do you think Ms. Chavez lied to you?

A.   I have no idea.  I mean --

Q.   I understand.

A.   I mean, I don't know.  It got down to me being the only Black person in the store that was treated like that.

Q.   But you don't know why she lied to you?

A.   I know --

MR. O'CONNOR:  Sorry.  Objection.  Form.

A.   I know what the result was:  A discriminatory interaction.

Q.   (By Mr. Wolfson) Do you know why she lied to you?

MR. O'CONNOR:  Objection.  Form.

Page 70

Valerie Laster; April 24, 2026

A.   I don't know what was going on in her head.  I don't.

Q.   (By Mr. Wolfson) What was that?

A.   I mean -- I mean, I can only tell you, like I said, earlier, what I experienced.

Q.   Okay.

A.   And you've got to call it what it is.

Q.   Okay.

A.   That's the only way things get fixed. You can't change nothing if you don't accept it and face it and call it what it is because when you don't call things what they are and fix it, that leaves room for it to keep happening.

MR. WOLFSON:  Okay.  I think this is a good time for another break, if that's okay with you, Ms. Laster.

THE VIDEOGRAPHER:  This is the end of Media Number 2.  Going off the record.  The time is 11:51.

(Break from 11:51 a.m. to 12:07 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 12:07 p.m.  This is the beginning of Media Number 3.

Q.   (By Mr. Wolfson) Before we went on the last break, we were talking about comments that

Page 71

Valerie Laster; April 24, 2026

Ms. Chavez made to you and to Ms. Gonzalez, and I had a question.  Was there anything -- were any of the comments that Ms. Chavez made in reference to your race?

A.    As in did she call me Black or African-American?

Q.    Did she make any comments that explicitly referenced a race in any way?

A.    Neither one of them said the words.

Q.    Neither one of them said anything explicit about your race?

A.    Neither one of them called me -- Oh, let me back up.  That's not true because I remember I said -- I said so -- because I'm Black, I have to be a drug dealer because I have $1,500.  And what's her name?  Gonzalez said, "Oh, you're not Black.  You're Brown."

Q.    Okay.

A.    I remember her saying that.  Yeah.

Q.    Other than that statement, did Ms. Gonzalez specifically say anything that explicitly referenced your race?

A.    Well, the fact that -- what's her name? Gonzalez referred to me as a drug dealer, okay, because of the money, and then we have Chavez telling me I'm

Page  72

Valerie Laster; April 24, 2026

committing fraud.  It's those two simultaneous things.
I mean, you can -- I can walk into a store, and then
just to give you an example, and if they say, well,
ma'am, your card declined, like a credit card or
something, nobody gets upset about that.  Nobody files
a lawsuit just because they had a credit card or a card
declined.  Nobody does that.  It's the situation as a
whole.  To try to distance Chavez from the whole is not
sensible because she was involved.

         Q.   So I'm asking what else did Ms. Gonzalez
say that explicitly referenced your race?

         A.   Well, I'm from the hood.  She said I was
from the hood.

         Q.   How does that explicitly reference race?

         A.   Because the term hood was originated
from a Black man.  The word -- the term hood was
specifically embedded in the Black neighborhoods.  It's
actually a short term.  Instead of saying neighborhood,
it was hood.  There's actually a movie Boyz from the
Hood [sic], and when people say hood, Oh, you live in
the hood?  That means you live in a Black, low-scale
neighborhood impoverished.  That's what the term hood
means, and it's a negative term concerning Black
people.

         Q.   Okay.  So besides the comment about

Page 73

Valerie Laster; April 24, 2026

being from the hood and the comments that we talked about before where she directly -- Ms. Gonzalez directly referenced your race, is there anything else that she said that was explicitly based on your race?

A.  Yeah.  She took out her camera and said, "Look who I found."  What does that mean?  Now, this is in her whole rant.  And then to tell me that I didn't live in Westminster.  They told -- they -- both of them told me they -- I don't -- she don't live around here.  So I can't live around there.  So I actually asked that question.

Q.  Did you ask -- did they explicitly reference your race, though?

A.  Okay.  So -- okay.  So why would it be an issue saying I don't live around there?

Q.  My question is simple.  Did they -- besides the two comments that we've talked about that Ms. Gonzalez said, did she ever explicitly reference your race?

A.  She never called me Black.  She never called me African-American, if that's what you're asking me.

Q.  I'm asking if she ever explicitly referenced race when she was talking to you, Ms. Gonzalez?

Page 74

Valerie Laster; April 24, 2026

MR. O'CONNOR: Objection. Form. Asked and answered.

A.    I know.  I thought I answered that.

Q.    (By Mr. Wolfson) You can answer again, though.

A.    Being called Black or Brown is in reference to your race.  Just like being called White is in reference to your race.

Q.    Apart from that comment, I'm asking if there was anything else?

A.    Oh.  Okay.  I didn't hear that part. Not that I can think of at this moment.

Q.    Okay.  Shifting to Ms. Chavez.  Okay. Did Ms. Chavez say anything that explicitly referenced your race?

A.    In conjunction with what Ms. Gonzalez said?  Yeah.  Calling me a fraud, but she didn't say you're Black, you're committing fraud.

Q.    How did she explicitly reference -- how did Ms. Chavez explicitly reference your race?

A.    In chiming it -- okay.  So -- I'm not trying to be difficult.  I just want to let you know that.  But being Black in America is not easy.  Black people are considered thieves.  They're considered criminals.  You know, you're Black; you've got to be a

Page 75

Valerie Laster; April 24, 2026

criminal.  You have to have been -- that's the mindset in America.  That foundation has been laid for centuries.

So when we walk into situations like that, it's not that they have to say, Oh, it's a Black person in here.  All they gotta do is make certain comments.  Oh, you must be a drug dealer.  Every -- and I can't say everybody, but most people understand that, especially Black people understand that.  That's why Black people they get patted down, they get stopped by the police just because they're driving a nice car.  This is not new information.

That's what I'm saying.  It's the mindset.  You don't have to say -- they don't have to say, Oh, you're Black, you're driving a nice car, you're dressed a certain way.  It's the fact that that's already there.  So now a Black person and a White person walk into the room, you gotta -- walk into a store following that person over there because they shouldn't be in this store.  That happens all the time every day in America.  That's what happened at Circle K.

Q.   Someone followed you in the store?

A.   What happened in Circle K, "She shouldn't have this kind of money.  She's black."

Page 76

Valerie Laster; April 24, 2026

That's what I'm telling you.

Q.   Okay.  I'm asking you what Ms. Chavez said that explicitly referenced your race.

A.   Me being a fraud.

Q.   Anything else?

A.   Having that kind of money implies that no way me being Black should be able to do what I was doing.  It's the whole -- it's the whole, sir.

Q.   Your testimony earlier, and I asked you was never indicated that Ms. Chavez said that you had too much money or indicated that you shouldn't have that money.  That was Ms. Gonzalez; am I correct?

A.   Absolutely.

Q.   Okay.

A.   Okay.  So I think what I was -- what I'm trying to explain to you coming from a Black perspective as a Black person, I don't think you're trying to hear that.

Q.   I'm hearing -- I'm here for anything.

A.   No, no.  I'm saying I don't think you're trying to hear it.  You hear it, but that's not your goal.  I'm trying to explain to you how situations like that impact Black people, and I'm one of them.

Q.   Okay.  I want to turn to another subject.  Did you submit documents to the EEOC in this

Page 77

Valerie Laster; April 24, 2026

case?

A.   I think I did.  Yeah.  I did.

Q.   Okay.  And were you honest in those documents?

A.   Yep.  As far as I know.

Q.   Okay.  Do you dispute that you categorized or characterized Ms. Chavez's statements as being vague and bland?  Do you dispute that?

A.   Her statements being vague and bland?

Q.   Yes.

A.   Okay.  Ask that question again.

Q.   Do you dispute that you told the EEOC that Ms. Chavez's statements were vague and bland?

A.   In what context?  I just said that.

Q.   In your rebuttal position statement, to the position statement.

A.   Oh.  As far as her -- her statement, because she wrote a statement and to the police. That's what I was referring to.

Q.   That's what you were referring to?

A.   Yes.

Q.   Thank you for clarifying that.

A.   Okay.

Q.   Is there anything else that we haven't talked about already that Ms. Chavez did that you have

Page 78

Valerie Laster; April 24, 2026

had an issue with that we haven't addressed already?

A.    I can't think of anything off the top.

Q.    Okay.  So I wanted to go back to before you had testified about Ms. Chavez and your experience uploading or attempting to upload the card at the Circle K store.

A.    Um-hum.

Q.    Is it your contention that she faked swiping the card?  That's a question.

A.    I know.  I'm trying to figure out how to answer you.  You know what I mean?  I'm trying to figure out how to answer you.  I heard you.  Thank you for that.

I guess -- I mean, even your system doesn't even have any evidence of -- of it being swiped.

Q.    Did you see her swipe it?

A.    No.  I didn't see her swipe it.  She had it, though.

Q.    Could she have swiped it?

A.    The way the counter was, it was a lot of stuff.

Q.    You couldn't see?

A.    I couldn't see what she was doing because it was kind of like all those -- like she would

Page 79

Valerie Laster; April 24, 2026

face me at the counter, which whatever she got ready to do, she would step to the side or something. And it was stuff all over -- on the counter, like candy, whatever. So I couldn't see. I don't know what she did.

Q. Okay. But she did -- I guess, let me step back.

You have previously alleged or you alleged in your Complaint that she tried to process the transaction three times?

A. That's what she said.

Q. Okay. So you're saying that's what she said?

A. Yeah. That's what she said.

Q. But --

A. And just for good measure, usually if there's a problem with even your prepaid card, they will give you a little printout. It's a little short slip of paper. I don't know. It's about an inch by three inches or something like that. And they'll also say, well, call this number. They will give you a number to call to see what the problem is. I didn't get none of that. Nothing. You get a receipt, and my understanding is she should have gotten a receipt from your system.

Page 80

Valerie Laster; April 24, 2026

Q.   What is that understanding based off of?

A.   The people I talked to that work for Circle K and my experience of using prepaid debit cards.

Q.   But you had never used a prepaid debit card in a Circle K before; correct?

A.   That's correct.

Q.   Okay.  Who did you talk to when you went to the Circle K?

A.   Oh, I don't have -- that information is included in my statement for our next discovery hearing.  I don't know the people by name, but I can -- I think -- I spoke to a manager named Erica.  I don't know -- I can't tell you the exact address.  I spoke with -- Oh, God.  Marget (ph).  I don't know if Miguel said that, but a couple other people that's on that list.  And they also said that she should have gotten something from the system saying that it was a fraudulent or declined transaction, and she didn't have none of that.

Q.   Did you tell them, the people you spoke with at the stores, like Erica and Miguel, did you tell them what time you were conducting the transaction at?

A.   Yeah.  Well, what I told them was at the time of the transaction -- I don't think I told them a

Page 81

Valerie Laster; April 24, 2026

time, but I think I said at the time of the transaction, supposedly the system was down for the night.

Q. Okay.

A. But they all said an upload never gets declined.

Q. An upload never gets declined?

A. They said -- well, let me -- let me reword that. When I said I was doing an upload of cash on a prepaid card, the first reaction of everybody was, like -- they were like, no, that doesn't happen. They said that does not happen. And then -- but Erica -- because I talked in detail with Erica.

Q. Um-hum.

A. And I think she was pretty grounded. She's -- she said she was a manager, but she said -- she said that if -- if there was a decline or fraud, the system would have given Ms. Chavez -- now, they don't know Chavez's name. I didn't call her name. But your system would have given Chavez a printout, and Chavez was supposed to contact the manager right away. She didn't.

Q. So is your contention that Ms. Chavez never ran the card, never even attempted to?

MR. O'CONNOR: Objection. Form.

Page 82

Valerie Laster; April 24, 2026

A.    I don't know.

Q.    (By Mr. Wolfson) You don't know either way?

A.    I mean --

MR. O'CONNOR:  Objection.  Form.

A.    I try to be a decent person.  I try not to accuse people, but the way it looked, ain't no way she ran that card because there's no evidence at my bank, with Circle K.  The Circle K employees are saying, "Did you ask about that little slip of paper?" She don't have that.  Like you tell me.

Q.    (By Mr. Wolfson) Why don't you think she ran your card?

A.    I just told you.  There's no evidence of it.

Q.    I meant why -- why didn't she run the card?

MR. O'CONNOR:  Objection.  Form.

A.    You're going to have to ask her.

Q.    (By Mr. Wolfson) You don't know?

A.    I don't know what was going through her mind, but there's no evidence anywhere that that trans -- those transactions that she claimed were declined and fraudulent is nowhere on the planet.

Q.    I understand.  Thank you.

Page 83

Valerie Laster; April 24, 2026

A.    You're welcome.

Oh.  And let me just say, that's why I went back the next day to see if -- because after I called the bank and told them what happened and they said there was nothing wrong with my card, I went back the next day to see if it was your system and not my card, and Mikela had no problem.

Q.    Okay.  Did Ms. Chavez ever tell you that she would not run your card?

A.    She never said that.  She never said anything.

Q.    Okay.

A.    You know, she didn't say that, but she tried to keep it.

Q.    Why do you think she tried to keep it?

A.    Because she wouldn't give it to me when I asked for it.

Q.    I'm asking you why do you think she did that, though?

MR. O'CONNOR:  Objection.  Form.

A.    You've got to make it plain for grandma.  Okay.  I don't -- I don't know.

Q.    (By Mr. Wolfson) Okay.

A.    Kids.

Q.    You agree that the card was never

Page 84

Valerie Laster; April 24, 2026

actually flagged for fraud; is that correct?

A.   Correct.

Q.   Okay.  Did you ask -- at the third time, did you ask Ms. Chavez to upload money a fourth time?

A.   No, because each transaction was -- let me see.  It was $1,500, and after she tried the $500 one, she was like this is -- this is fraud.  I'm, like, I wouldn't ask her to upload money again.  She said I was committing fraud.

Q.   So you didn't ask her again?

A.   No.

Q.   How long did Ms. Chavez have your card for?

A.   From the time I stepped up to the counter?

Q.   Yeah.

A.   Oh.  You mean the time spent?  I mean the whole thing was about 15 minutes.  She had it the whole time until I snatched it out of her hand.

Q.   Okay.  Before earlier when we were talking, I'm bouncing around a little bit, but before when we were talking, you mentioned that there were a few other individuals in the store.

A.   Yeah.

Q.   What race were those individuals?

Page 85

Valerie Laster; April 24, 2026

A.    They looked like White.

Q.    And correct me if I'm wrong, and I'm sorry to go back through this.

A.    That's okay.

Q.    You don't know if any of them came to upload money onto a prepaid debit card; is that correct?

A.    I don't know what they did, because it was -- you couldn't hear anything.

Q.    Couldn't hear anything.  Okay.

A.    You know what I mean?  Like they were talking very low.  I couldn't hear.

Q.    Okay.  But you would agree that if any of them came and tried to upload money onto the card at that time, they wouldn't have been able to?

MR. O'CONNOR:  Objection.  Form.

A.    I can't agree.  I mean, there's a lot of maybes.

Q.    (By Mr. Wolfson) Well, how could --

A.    Maybe she -- maybe she told them the system is down, come back tomorrow.  I don't know.

Q.    Could they have -- could she have uploaded it that night, though?

MR. O'CONNOR:  Objection.  Form.

A.    It's possible.  I don't know.  Like I

Page 86

Valerie Laster; April 24, 2026

said earlier, I don't know how your system works.  When I asked for that information, you declined to give it to me.

Q.   (By Mr. Wolfson) So the following day is April 9th; is that correct?

A.   Yes.

Q.   Okay.  And you returned to the store?

A.   Yes.  Yes.  That's right.  The 9th.

Q.   Do you know what time in the morning it was?

A.   Not off the top.  I would have to look at the statement because I think the statement has the time on there.  I want to say it was before 12:00.  I want to say before 12:00, but I would have to look at the statement because if I'm correct, the statement has the time that the card was swiped.

Q.   You have no reason to believe that that statement is incorrect?

A.   No.  Why would it be?

Q.   So why did you go back to this store if you felt you had been discriminated against there?

MR. O'CONNOR:  Objection.  Form.

A.   I believe I told you earlier.  Because after I talked to the bank -- because when I left, when I left that night, I was, like, up in arms.  But what I

Page 87

Valerie Laster; April 24, 2026

said to myself was, well, let me call the bank and see if there's really a problem with the card because I had never used it before.

So when I called the bank, they told me that there was nothing wrong with my card. And then they told me -- the guy told me then, the associate, there was no indication that the card had ever been used at all. He told me no upload, no nothing. No even attempt.

And that's when he told me he said, "Ma'am, every time your card is swiped, whether it's declined or whatever," he says, "it's going to show up in our system." He said, "And I don't see anything." He said, "But your card is ready to use."

So I went back to Circle K to see if the -- if there really was a problem with your system and not my card, and that's why I stood in line, and I asked for the upload. And when there was no problem with the upload, that's when I went and talked to Mikela. I told her, I said, "When you're finished with your customers, Ma'am, I need to talk to you about an issue that happened here last night", and she said, "Okay."

And so I waited for everybody to leave the store, and that's when we had our conversation.

Page 88

Valerie Laster; April 24, 2026

That's why I went back to the store.  But I ain't
bought nothing since.

Q.    (By Mr. Wolfson) Okay.  So you never
went back to the store since that time?

A.    Not to buy anything.  I went back and
took some videos, pictures.

Q.    For this case?

A.    Yeah.

Q.    Okay.

A.    For this case.

Q.    And just to go back to the transaction
on the 9th in the morning, you made two transactions
for $500 each?  Does that sound right?

A.    Upload.

Q.    Upload.  I'm sorry.

A.    Yeah.  That was the upload.

Q.    And there was no issues with your
ability to upload?

A.    She had no problem.  The only thing she
told me was before she started anything, she said we
can only do a thousand dollars here, she said.  And
that's when she told me she did two separate $500.  She
said but their limit was a thousand for Green Dot.

Q.    Okay.  I want to pull up another
document.

Page 89

Valerie Laster; April 24, 2026

MR. O'CONNOR:  And, Mr. Wolfson, I'll remind you, that on the breaks I was hoping you would send me the exhibits.

MR. WOLFSON:  I'm sorry.

MR. O'CONNOR:  No problem.

MR. WOLFSON:  Well, we can take a quick break right now so I can do that.

MR. O'CONNOR:  Okay.

MR. WOLFSON:  All right.  I'll do that right now.  Give me five minutes.

MR. O'CONNOR:  Okay.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:34.

(Break from 12:34 p.m. to 12:54 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 12:54.

Q.  (By Mr. Wolfson) Hi, Ms. Laster.  I am going to show you a document.  I'll share it with you.  Let me know when you see it.

A.  I see it, but --

Q.  Do you want me to get it closer, zoom in?

A.  Yeah.  That's better.

Q.  Better.  Okay.  Do you recognize this document?

Page 90

Valerie Laster; April 24, 2026

A.    Yes.

Q.    Okay.  Do you recognize -- do you agree that this is the document you provided us after the hearing on December 18th?

A.    It looks like -- I mean, yeah.  It looks fine.

Q.    And you'll see in the first question, Number 1, "Identify every person likely to have discoverable information about the claims or defenses in this case, regardless of whether you may use the information to support your claims in this case."

A.    Okay.

Q.    Now, I want to go through some of these names.  David Laster, you said that is -- well, who is that, I should say?

A.    That's my youngest son.

Q.    Okay.  And he was not in the store at any time?

A.    No.  He was -- he was waiting for me in the car.

Q.    Okay.  So besides -- did you tell him anything about the incident?

A.    When I got in the car I did.  I did.

Q.    But besides the information you told him, he doesn't have any firsthand knowledge of what

Page 91

Valerie Laster; April 24, 2026

occurred in the store?

A.    No.  He wasn't in the store.  No.

Q.    Okay.  I just want to say the next one, B, is a stranger.  I don't need any information on that.  C you say that you mentioned off the fly on several occasions.  You alluded to this incident, let's say, in passing?

A.    Yeah.

Q.    Okay.  And you don't recall any of those people?

A.    No.  It was just like -- you're out and about, and, you know, you might have a conversation with someone and that type of thing.  You don't know them.

Q.    Okay.  And then Edward White?

A.    Um-hum.

Q.    He's your therapist?

A.    He's my -- he's retired.

Q.    Okay.

A.    Yeah.  He was my therapist.  Yeah.

Q.    Okay.  When did you stop seeing him?

A.    I think he -- I think he retired the end of December.

Q.    Of 2025?

A.    Yes.  Yes.  I think it was December.

Page 92

Valerie Laster; April 24, 2026

Yeah.  It was December or January.  I think it was December.  December or January.

Q.    Up till 2020 -- December of 2025?

A.    Yeah.  Yeah.

Q.    The next person on the list is, I believe, Mikela.  She's the manager, the individual you referenced that you spoke to the morning after; is that correct?

A.    Correct.

Q.    Do you allege that Mikela did anything wrong or is in any way responsible for the claims that you're alleging?

A.    She wasn't involved, if that's what you're asking me.

Q.    Did she violate your rights, I should say, in any way?  Are you alleging that in this lawsuit?

A.    No.

Q.    Okay.  The next person says gentleman/assistant manager who provided CK -- so Circle K home office's phone number.  Do you allege that this individual violated any of your rights, at least to the extent you're alleging them in this lawsuit?

A.    No.

Page 93

Valerie Laster; April 24, 2026

Q.   Okay.  The next person is a Circle K employee plaintiff is speaking to directly outside in front of Circle K.

A.   No.

Q.   Let me ask the question.

A.   I thought you were going to ask the same question.  I'm sorry.  I'm sorry.

Q.   Did this person do anything that you would believe violated your rights or you've alleged to have violated your rights in this case?

A.   No.  Uh-uh.

Q.   James Abrams, he is your former attorney; is that correct?

A.   Yes.

Q.   Okay.  Matthew Skeen I understand was -- is an attorney at the federal pro se clinic?

A.   Correct.

Q.   That's at the federal court?

A.   Yes.  The federal.

Q.   Shannon Felts, he at the time was employed by Circle K.  Do you agree?

A.   Yes.

Q.   Okay.  Did he violate your rights as alleged in this lawsuit in any way?

A.   Can I just say, I haven't considered

Page 94

Valerie Laster; April 24, 2026

that.  So I don't know.  I mean, you know what I mean?
If you're asking me if he was involved, no, he wasn't
involved, but --

Q.   Okay.

A.   I haven't -- I haven't looked at these
people in that context.

Q.   Okay.  Ms. Gonzalez, she is the other
customer that we've talked about before; is that
correct?

A.   Correct.

Q.   Okay.  Why did you not sue Ms. Gonzalez?

A.   Well, originally Circle K -- Circle K,
Ms. Chavez, Mikela claimed they didn't know who she
was.

Q.   Okay. Okay.  And Cebrun.  I think we
know him as Cebrun Russel.

A.   Yes.

Q.   Are you alleging that that individual
who was employed by Circle K at the time violated your
rights as alleged in this lawsuit in any way?

A.   No.  Not that I know of.

Q.   The next is the CCRD.  That's N.  And I
assume that you were referencing the Colorado Civil
Rights Division; is that correct?

A.   Yes.

Page 95

Valerie Laster; April 24, 2026

Q.   Okay.  You supplemented this document that we -- the answer we just looked at with another document that has two names.  I'm going to pull that up for you right now.

A.   Okay.

MR. O'CONNOR:  Mr. Wolfson, are you labeling any of these as exhibits?

MR. WOLFSON:  I'm sorry.  I wasn't going to, but we can label the last one as Exhibit Number 2.

(Exhibit 2 was marked.)

MR. WOLFSON:  And this one as Exhibit Number 3 that I'm about to pull up.  Sorry.

(Exhibit 3 was marked.)

Q.   (By Mr. Wolfson) Okay.  Let me know when you see Exhibit Number 3.

A.   I see it.  It's a little small.

Q.   I'll make it bigger.  Do you see that?

A.   That's great.  Okay.

Q.   Do you recognize this document?

A.   I do.

Q.   And you provided it to us, to Circle K's attorneys?

A.   Yes.

Q.   Okay.  And this -- I read it before, but just to make sure it's clear, this is in response to --

Page 96

Valerie Laster; April 24, 2026

this is a response to the question in Number 1, "Identify every person to have discoverable information about the claims or defenses in this case." That's what this is in response to; right?

A.    Yes.  And my understanding, to make sure I'm on the right page, is you're asking me to give you information about anyone I even mentioned this case to?

Q.    Yep.

A.    Okay.  So, yeah.

Q.    Okay.  So the first person -- this is a continuation, basically, of the list we just went over; right?

A.    Right.

Q.    So this first person is Aaron Laster?

A.    Um-hum.

Q.    And that is your grandson?

A.    Yep.  That's one of my grandsons.

Q.    What knowledge of this case or the claims in this case does he have?

A.    Nothing much.  We had a conversation, and my personality, I was, like, "Yeah.  Well, you know, now your grandma is a drug dealer."  And he was, like, "What are you talking about, Granny?"  So it was one of those things.

Q.    Okay.  Anything else you talked to your

Page 97

Valerie Laster; April 24, 2026

grandson, Aaron Laster, about related to this case?

A.   Yeah. I don't know.  He doesn't even know I'm here.

Q.   Okay.  Who is the second person listed, Nicole Wheeler?

A.   That's Aaron's mother.

Q.   Okay.  And what did you -- what did Ms. Wheeler know about this case or your claims in this case?

A.   Pretty much the same thing.  Nothing much.  She doesn't know I'm here either.

Q.   All right.  Is there anyone that we -- that you can think of now that we haven't gone over yet that you would want to include on this list?

A.   Nope.

Q.   Okay.  Do you expect any of these individuals that we just talked about to testify on your behalf at trial?

A.   Okay.  As in do I -- like me using them as a witness?

Q.   Yes.

A.   Not that I could think of off the top.

Q.   Okay.

A.   I have -- I haven't -- I haven't made that determination at this point.

Page 98

Valerie Laster; April 24, 2026

Q.   I understand, but as of today, as of right now, you don't intend to call --

A.   Yeah.  I haven't made a determination.

Q.   Okay.  I wanted to pull up another tab, which will be marked as Exhibit 4.  Give me one second.

(Exhibit 4 was marked.)

Q.   (By Mr. Wolfson) Let me know when you can see that document.

A.   Okay.  Bring it up.  Can you make it bigger, a little bigger.

Q.   Bigger?

A.   Yeah.  Please.  That's good.

Q.   That's good?

A.   Uh-huh.

Q.   Okay.  Do you recognize this document, Ms. Laster?

A.   I do.

Q.   Okay.  What do you recognize this document to be?

A.   A tally of damages as of January 9th.

Q.   Okay.  Going through the -- to the -- and you don't dispute that this is the document you provided us as of January 19th?

A.   I do not.

Q.   Okay.  So is there -- it says that you

Page 99

Valerie Laster; April 24, 2026

are -- I guess, is this still accurate, this document?

A.    It's accurate as of January, but it's not up-to-date.

Q.    Okay.  As of today, what would you change?

A.    The process server fees, because remember, I served subpoenas.

Q.    Okay.  And how much -- how many subpoenas did you serve?

A.    Three.

Q.    And how much did they cost each?

A.    They were different costs.  I'm actually working on that.  So I'll get that information to you as soon as I can, but I can also tell you that the postage and copy costs are going to change, too.

Q.    Okay.

A.    Because I do go to Kinko's a lot to make my copies.

Q.    So that will change, and you will provide us an updated document with that information?

A.    Yes.  And then there's other costs that we added, too.

Q.    What other costs -- so it would just be in the -- I guess what other costs are you referring to that will be added?

Page 100

Valerie Laster; April 24, 2026

A.   Let's see.  Deposition costs, because we've got depositions next week.

Q.   Okay.

A.   And attorney's fees maybe.  I'm not sure how that will go.  So, yeah.  I mean, I'm pretty much up-to-date.  You can probably have an update -- what's today?  Friday.  I can probably get something to you by the end of next week.

Q.   Okay.

A.   You know what I mean?

Q.   For the attorney's fees, what fees would those be?  Would that just be limited to what you have -- I'm not asking you any questions about it, but any money you may have paid to your attorney with you today, Mr. O'Connor?

A.   Yeah.  I didn't hear the last part, but I'm thinking you're saying any fees I paid to my attorney, correct, that I've paid out of pocket. Absolutely.

Q.   Okay.  And how much were the fees?

A.   So far 2 grand, 2,000.

Q.   So you had mentioned besides the attorney's fees and some costs, is there anything else that's not accurate on -- let me go down so you can see it all -- accurate on this document?

Page 101

Valerie Laster; April 24, 2026

A.   Well, I did request in one of our documents that the Court lift the -- the cap of the 50,000.  So, I mean, we don't know how it'll go, but . . .

Q.   Okay.  I guess is there any additional medical or therapy costs that you need -- is that number correct, the $2,400?

A.   As far as I know, because that's what Mr. White, when I asked him about how many sessions or how long we dealt with that, he gave me six months.  He said it's about six months.  And because -- like the latter -- I guess when discovery started, when discovery started up, it was like every session we talked about the case and this, that and the other, so . . .

Q.   Okay.  But you don't -- as of today, 12 sessions at $200 a session, that's what you're claiming.  So that would equal $2,400 for the therapy?

A.   For six months.  Yeah.  Let's see.  I think I gave you all of the data concerning that. There was an issue, and I'm not sure if you saw that. His rate is 200 -- was 200 an hour.  The insurance paid, I think, 117.  At some point, it was 113, whatever.  So when they produced the billing, they would produce it based on what the insurance company

Page 102

Valerie Laster; April 24, 2026

paid versus what he charged.  It wasn't that much of a difference, but -- well, yes, it was.  It was about $100 a difference.  So that's why you've got the 2400.

And to date -- I think I gave you a -- what do they call it?  A couple of statements from the insurance company that I got off of the -- off the platform showing that it actually is a $200 an hour charge.  So that's why you have all of that.  But as of now, I haven't gotten a response from UnitedHealthcare regarding the subpoena.

Q.   Okay.  Are there any other -- are you claiming that any other sessions to -- besides the 12 sessions?

A.   No.  No.

Q.   Okay.  Did you pay $200 for each of those sessions, or did the insurance contribute to some --

A.   My insurance up until -- Oh, God.  Up until -- I don't -- I can't think of the actual date now, but at some point I had to do a co-pay, but it wasn't that much.  So I didn't even throw that in there.

Q.   So would it be fair to say you did not pay $2,400 out of your pocket for the 12 sessions?

A.   Not out of my pocket, but my

Page 103

Valerie Laster; April 24, 2026

insurance -- the insurance should be reimbursed.

Q.   Okay.  Is there anything you would have had to pay out of pocket for the 12 sessions?

A.   I would have to go back in and see when that began.

Q.   Okay.

A.   Because there was a point where I had to do a co-pay.

Q.   And how much was that co-pay?

A.   It probably was like $24, $25, something like that.

Q.   How many sessions, approximately, do you think?

A.   I can't -- I've got to see when it started and then I can be more accurate.

Q.   Okay.  But you would agree that you did not pay $2,400 out of pocket for those 12 sessions?

A.   Not out of my pocket.  Well, not out of pocket, no, but from my insurance, yeah.

Q.   But the second category is court costs and filing fees.  You said you were going to update that and give that to us next week, at the end of next week.

A.   Well, the Court costs and filing fees, that's my understanding is when I filed the initial

Page 104

Valerie Laster; April 24, 2026

Complaint, you -- when you sent it over to federal court, I don't think I was charged or anything.  I didn't -- I don't think I got a charge.

Q.   Okay.  So we don't need -- you don't need to update Category 2?

A.   No.  No.

Q.   Category 3 is the one you are going to update?

A.   Three and four.

Q.   Three and four.  Okay.  And we'll wait for those.

I wanted to talk about Category 5.  Is that $50,000 number accurate?

A.   I don't know.

Q.   I'm sorry?

A.   I don't know.

Q.   Well, I guess let me ask you this:  How much -- if we went to trial, how much would you ask the jury to award you in punitive damages?

A.   Well, that's the thing.  There's no cap.  I put a cap on it here, you know, just for good measure.  I mean, that's hard to determine in my estimation.  Number 1, I've never been through this particular process, and that would be up -- to me, that would be up to the jury to decide.

Page 105

Valerie Laster; April 24, 2026

Q. I understand, but if you had to estimate today, how much you would be asking for the jury to award, how much would you ask them to award you?

A. I don't -- can I consult with my attorney?

Q. No. Unfortunately, not.

A. Okay. I just don't know. I don't want to be presumptuous and -- but . . .

Q. Well, how much do you think the claim is worth?

A. Me personally or . . .

Q. Yeah. You personally.

A. A million dollars, but --

Q. So would you ask the jury for a million dollars?

A. No. I would -- I don't think I would do that, but -- I don't know. I don't know. It's hard for me to answer that question at -- like off the cuff like this, really.

Q. So less than a million dollars, more than zero dollars, right, I would assume?

A. You said -- you said less than how much?

Q. A million.

A. Less than a million. Oh, yeah.

Q. More than -- I'm just trying to give us

Page 106

Valerie Laster; April 24, 2026

a range here.

A.    Yeah.

Q.    So --

A.    I'm just gonna -- honestly, I just would let the jury decide.  That's exactly what I would do.

Q.    I understand.  Part of your obligations under the rules is to provide a calculation of the damages you're seeking.  So I understand that you may not be able to do that for me right now, but I would like when you update your --

A.    Okay.

Q.    -- to provide me an updated number, if you could.

A.    Okay.  All right.

Q.    Okay.  Are there any other damages that we haven't discussed that are not listed on this page that you are seeking, types of damages?  I'm not talking about the dollar amounts necessarily.

A.    Never thought about this.  I really haven't.  I've been really busy on other paperwork.  So I haven't really considered that.  I was -- I think it's just something I have to really sit down and think through.  And I may have to have the case assessed by an attorney to give me a legitimate and reasonable financial -- or financial -- give me a financial price

Page 107

Valerie Laster; April 24, 2026

on it.  I don't know.  I don't want to tell you one

thing and then it's something else.

Q.    But you gave us --

A.    If you would -- huh?

Q.    You submitted this document to us;

right?

A.    I did.  I did.

Q.    Is there anything else at this time that

you have that we haven't talked about and that's not on

this page?

A.    Yeah, because you have -- well, okay.

We've talked about it already.  Yeah.  No.

Q.    Okay.

A.    That I can think of, no.

Q.    Okay.  You provided us with notes from

your therapist, I believe, Mr. White; is that correct?

A.    Yes.  Yes.  And just to let you know,

all of those notes -- because I think some were from

Room 22 or something like that.  That's all him.

Q.    Okay.

A.    Yeah.  And then Carlos filled in for him

when -- when he was out again on a medical leave.  So

it's the same.

Q.    Who is Carlos?

A.    You'll see.  He's one of the therapists

Page 108

Valerie Laster; April 24, 2026

that filled in for Mr. White at one point when he was out on medical leave.

Q.   Do you recall his last name?

A.   It's Mexican.  I don't remember.

Q.   Okay.

A.   I can find out, though.  I can find out.

Q.   Okay.  No.  The notes you gave us, are those the complete set of notes?

A.   That's all -- I didn't see the notes until right before you saw them, so . . .

Q.   The notes you provided us, they're accurate?

A.   As far as I know.  I requested them. They sent them to me, and I sent them to you.

Q.   You have no reason to dispute the accuracy of those notes?

A.   No.

Q.   Okay.  Without getting into too many specifics, when did you start seeing Mr. White?

A.   Oh, God.  Shoot.  Let me think because -- I may not be the best with dates.  Let's see.  My son -- my son passed in 2021.  Probably somewhere -- I think around 2021 during the time my son passed.  Yeah.  I don't remember.

Q.   I --

Page 109

Valerie Laster; April 24, 2026

A.    I don't remember.

Q.    Okay.  I wanted to go back to the -- sorry.  I was just thinking more about this, the damages.  Discovery is closed, and I do really need you to provide an estimate of your punitive damages.

MR. O'CONNOR:  Objection.  Form.

A.    Can you go back to that?  Can you go back to that?

Q.    (By Mr. Wolfson) Yeah.  Sure.  Give me one second.

A.    Scroll up a little bit.

Q.    Do you see that?

A.    Yeah.

Q.    I think the only thing, and correct me if I'm wrong, the only thing that we haven't nailed down is really the punitive damages.  I'm -- we -- discovery is closed, and we -- I'm asking you to provide what you are seeking in punitive damages.

A.    And that's the thing.  Like, you want me to give you a number other than what's there.

Q.    I want -- you can give me that number.  Whatever number you think is accurate.

A.    So you're saying that I -- that -- since I'm going to be giving you an updated amount of all the damages -- oh, next Friday I have -- by next Friday,

Page 110

Valerie Laster; April 24, 2026

because I want the case -- I would say just from the consultations that I've had already --

Q.   Um-hum.

A.   -- I've already been told that the case is worth 100,000.  I've already been told that, but I haven't changed that number, and that's why I said I would let the Court decide.

Q.   I'm asking you, though, what that number should be.

A.   I don't know.

Q.   So you would tell the jury -- I mean --

A.   No.  No, no, no.  What I'm saying is I can't give you that number like right off the top just like that.  There's more things involved -- go ahead. I'm sorry.

Q.   This is information that's been required for months now.

A.   What do you mean?  I've been giving it to you as it comes through.

Q.   For the punitive damages, you had months to determine what your punitive damages should be.

MR. O'CONNOR:  Objection.  Form.

A.   Okay.  And what does that mean?  I don't know.  I don't know.  I mean, you just want me to take a number out of the sky?

Page 111

Valerie Laster; April 24, 2026

Q. (By Mr. Wolfson) I don't know. I don't know how you got 50,000, but however you want to -- you know, whatever it would be, I do want to know.

MR. O'CONNOR: Objection. Form.

A. But I don't know what -- I don't know what I want to put there yet. That's what I'm telling you.

Q. (By Mr. Wolfson) What I'm saying --

A. You're saying today at my deposition, I have to give you a number today?

Q. Well, you should have given us a number months ago. We've been -- this document is required for --

A. But you have a number.

Q. Okay. So can I take that number?

MR. O'CONNOR: Objection. Form.

A. I don't know what to tell you.

Q. (By Mr. Wolfson) Can I take that --

A. Because I'm still -- the reason -- I mean, I don't know what to tell you like right this minute because I'm still working on updating this information. Like I understand that -- okay. We just -- we are getting ready for -- or we just had a discovery hearing. I made copies and everything. Those numbers are being updated as we go along.

Page 112

Valerie Laster; April 24, 2026

Q.    I'm just talking about punitive damages.

A.    I am not able to give you numbers six months ago and they hold tight until the day.

Q.    I'm just talking about punitive damages which would not have any impact on cost.  That doesn't come into the picture.

A.    You don't think so?

Q.    No.

A.    So, then, why are you asking me for a number if you have 50,000?

Q.    Well, I'm asking you can I take that number?

MR. O'CONNOR:  Objection.  Form.

A.    It might change --

Q.    (By Mr. Wolfson) Okay.

A.    -- by the time we get to trial.

Q.    Okay.  By the time we get to trial?

A.    Like I'm not trying -- I'm not trying to be difficult.  I'm really not.

Q.    I understand, but we have the right to know how much you're seeking now.

A.    Right, but I don't know.  That's what I'm telling you.

Q.    Right.

A.    I don't know.

Page 113

Valerie Laster; April 24, 2026

Q.   Okay.  Is there any other damages that we haven't gone over that are not -- I'm not talking about numbers here.  I'm talking about types of damages that you are seeking or you will be seeking?

A.   I don't know that either.  I mean, I have to -- I have to consult with an attorney.  I don't -- I don't know.  I can't give you the answer because I don't have it.  Not because I don't want to.  It's because I don't have that answer.

Q.   Sure, but we are entitled to that information.

MR. O'CONNOR:  Objection.  Form.

A.   How are you going to get information that I don't have?  How do I give you information that I don't have yet?

Q.   (By Mr. Wolfson) So you have no idea how much you're seeking?  I guess, why didn't you get this information already?

A.   Because it's being worked on.

Q.   By who?

A.   By me.

Q.   Okay.  Okay.

Going back to the therapy records, you testified earlier that you started therapy with Mr. White before this incident; is that correct?

Page 114

Valerie Laster; April 24, 2026

A.    Yes.

Q.    Okay.

A.    Because I think I gave you records from 2023, I think, if I'm correct.

Q.    And you talked about -- you didn't just talk about this incident with Mr. White throughout your entirety of therapy; is that correct?

Let me rephrase that.  Did you talk to Mr. White about other issues besides this incident during therapy?

A.    Up until -- when did we start discovery? We start discovery in October, I believe.  Yeah.  Up until then, April.  Like when it first happened, when the first -- the situation first began, we talked about it.  Then as time went on, not as much, but then once discovery started, it was pretty much ongoing.

Q.    Okay.  So we would expect to see that in his notes?

A.    I can't tell you what he put in his notes, sir.  I told you I only saw the notes right before you got them.  That's all I can tell you.  I've seen the notes.

Q.    Okay.

A.    He put in there what he put in there.  I don't know.

Page 115

Valerie Laster; April 24, 2026

MR. WOLFSON:  Okay.  We're going to -- I am close to wrapping up.  I just want to take a break to review my outline and make sure and ask some final questions, but we should be done in not too long.

MR. O'CONNOR:  Mr. Wolfson, will you send me Exhibits 2 through 4?  And the previous one you sent had no labels.  If you could put labels on them, even if it's just in the name of the document so I know which one is which.

MR. WOLFSON:  I see what you're saying.  Yeah.  I'll resend them with -- let me just make sure real quick.

MR. O'CONNOR:  You don't have -- you don't have to send the first one.  I never received the larger whole package email.

MR. WOLFSON:  Okay.  Are we off the record?

THE VIDEOGRAPHER:  No.  We're still on.

MR. WOLFSON:  Can we, please, go off the record.

THE VIDEOGRAPHER:  This is the end of Media Number 3.  Going off the record.  The time is 1:31.

(Break from 1:31 p.m. to 1:42 p.m.)

THE VIDEOGRAPHER:  We're back on the

Page 116

Valerie Laster; April 24, 2026

record.  The time is 1:42.  This the beginning of Media 4.

Q.  (By Mr. Wolfson) Hi.  All right. Ms. Laster, I just have a couple more questions.

A.  Um-hum.

Q.  One being what should Ms. Chavez have done differently?

MR. O'CONNOR:  Objection.  Form.

A.  I'll say what I would have done if it was me.

Q.  (By Mr. Wolfson) Well, that's not what I'm asking.  I'm asking you what should she have done differently?

A.  Well, that's how I'm going to answer it. I've got to put myself in that headspace.

Q.  All right.

A.  I would have said, ma'am, I'm sorry, but the system is down for the night.  You can return tomorrow morning, and you can come back tomorrow between the hours of whatever they start until 8:00 p.m., but I can't help you tonight.

Q.  Is there anything else she should have done differently?

A.  Well, I mean, I think we've talked about this.  By her being an agent for Circle K, an extension

Page 117

Valerie Laster; April 24, 2026

of Circle K, the responsibility was maybe not on her but on Circle K who she represents. She should have told Ms. Gonzalez hold up. You know, maybe you should leave or go outside or take a walk.

And when it comes to -- and I've already answered what she should have done as far as the -- the declines, declines. But if she really thought that it was a fraud going on, if the system really gave her a readout, a fraud, she should have followed company policy. She should have contacted her manager. There should have been a police report done and the whole 9 yards. None of that was done. None of it.

And she should not have participated in that conversation. If she was going to allow Ms. Gonzalez to stay in that -- in that area, even if she wasn't going to intervene, she should not have made one statement, nothing.

Q. So let me just get this straight. So if she had told Ms. Gonzalez to leave, one; two, if she told you to come back the next day because the machine was down past 8:00 p.m.; three, if she had reported it to the manager and/or police; and, four, if she had not participated in the conversation with Ms. Gonzalez, if she did all of those things, would you still be bringing a lawsuit?

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

MR. O'CONNOR:  Objection.  Form.

A.    Probably not.

Q.    (By Mr. Wolfson) Okay.  Why not?

A.    What do you mean why not?

Q.    I'm asking you --

A.    I'm not trying to be funny.  What do you mean why not?  Because then she would not have -- so let me say this.  There were more parts to this story because I filed a police report, and they were looking for Ms. Gonzalez to bring charges against her, but Circle K would not give me her information.

Once I got Ms. Gonzalez's information and I went back to the police department, they told me that the 18 or whatever the cutoff was had expired and to let that roll with the case.  Ms. Gonzalez would have been held accountable, too, but it was Circle K that wouldn't give me her information because remember, y'all didn't know her.  "We don't know her."

So all I'm saying is I wasn't, quote/unquote, coming for Circle K.  I was holding both of them responsible.

Q.    Okay.

A.    You know what I'm saying?

Q.    Aside from what you've already testified to, do you have any additional facts that support your

Page 119

Valerie Laster; April 24, 2026

claim that we have not gone over?

A.    I mean, not that I want to talk about at this point.  No.

Q.    Well --

A.    I mean, I don't have anything I want to say.  No.

Q.    Well, I'm asking you are there any additional facts that support your claims that we haven't talked about?

A.    Did you say thoughts or facts?

Q.    Facts.

A.    Oh.  I thought you said thoughts.  Sounded like you said thoughts.

Q.    Oh.

A.    Not that I can think of at the time.  No.

Q.    Okay.  Is there anything that you personally think is important about your lawsuit that you have not yet testified about during this deposition?

A.    Not at this time.  No.

MR. WOLFSON:  That is all the questions I have for now.  I'm going to, I believe, turn it over to your attorney who I believe has questions.

THE DEPONENT:  All right.  Thank you.

Page 120

Valerie Laster; April 24, 2026

MR. WOLFSON:  Thank you, Ms. Laster.

MR. O'CONNOR:  Thank you, Mr. Wolfson.

EXAMINATION

BY MR. O'CONNOR:

Q.  Let's see.  Ms. Laster, you were asked if the Complaint was based on anything that happened after you went to the store on April 8th, 2024, and you answered no.  Do you recall that?

A.  Yes.

Q.  All right.  Now, you have an intentional infliction of emotional damages claim, correct, in this case?

A.  Yes, but I -- yes.

Q.  Did you have symptoms related -- did you have emotional distress symptoms -- symptoms related to your experience at Circle K after April 8th, 2024, at the store?

A.  Yeah.  Yes.

Q.  Can you elaborate on those?

A.  Well, and as I've said previously, is the anxiety.  I had problems sleeping.  I had to learn how to -- like I couldn't sleep through the night.  So I had to learn different ways or techniques to sleep.  Like what do you call it?  It's not -- it's not hypnotizing, but it's like talk downs.

Page 121

Valerie Laster; April 24, 2026

I definitely feel like going to Circle K to transact business, it's -- it's kind of like -- you feel -- like Circle K is there, but it's apprehension that is created -- that was created in me, and it's like I don't ever want to go there again, that type of thing.

MR. WOLFSON:  I don't mean to interrupt, but, Darren, the IED claim was dismissed on a motion to dismiss.  Just to let you know.

MR. O'CONNOR:  Okay.  That helps.  Thank you.

A.    Okay.  Yeah.  All claims.

Q.    (By Mr. O'Connor) So question -- we'll just move on, then.

A.    Okay.

Q.    Just to be -- just to be certain, did Ms. Chavez ever inform you the system could not upload your money after 8:00 p.m.?

A.    No.  She never said that.

Q.    Did she ever point to a sign such as was shown on an Exhibit 1 presented by opposing counsel today saying that these transactions can't take place after 8:00 p.m.?

A.    Never.

MR. WOLFSON:  Object to form.

Page 122

Valerie Laster; April 24, 2026

THE DEPONENT:  Did you hear me?

MR. WOLFSON:  No.

THE DEPONENT:  Oh.  I said -- I said never.

Q.    (By Mr. O'Connor) Were the photos of the interior of the store that were shown in Exhibit 1, were any of those photos you took?

MR. WOLFSON:  Objection.  Form.

A.    I think it was just the one where that -- that the gentleman is standing at the counter.

Q.    (By Mr. O'Connor) Okay.  When you went back the next day on April 9th, is that when you took photos?

A.    No.

MR. O'CONNOR:  Object to form.

A.    No.  It was probably about a week or so later.

Q.    (By Mr. O'Connor) Okay.  At that time, did you see any of the signs represented in Exhibit 1 that informed customers that the upload doesn't work after 8:00 p.m. to prepaid debit cards?

A.    No.  And I would have to check my videos to see if it's in there.

Q.    You agreed at some point that no employee of the store could have loaded money on your

Page 123

Valerie Laster; April 24, 2026

card at Circle K after 8:00 p.m.; is that right?

A.    That's what I was told.

Q.    All right.  So my next question is, was this based on information you've learned since filing the Complaint against the store?

A.    It was -- it was before the Complaint was filed.  It was the day after because Ms. Noon, if I'm saying her name right, Mikela, she's the one as I was walking out of the store after talking to her, she asked me, she said, "Well, what time is this?"  I said, "It's about 8:45, 9:00, or something like that."  She said, "How could she have done this when the system was down?"

Q.    Okay.

A.    That's how I found out.

Q.    Did Ms. Chavez on April 8th, 2024, during the time of this incident accuse you of any wrongdoing that indicated it was your fault she could not upload your cash to your card?

MR. WOLFSON:  Object to form.

A.    Yes.  Yes.

Q.    (By Mr. O'Connor) And what was that?

A.    She pretty much told me that the reason the card wasn't uploading was because it was -- the transaction was fraudulent.  Like the card was -- was

Page 124

Valerie Laster; April 24, 2026

not a good card.

Q.    All right.  Now, you said you normally go to King Soopers, and in another moment you said that I didn't go to King Soopers because -- because of something.  Why didn't you go to King Soopers to upload the money?

A.    Because King Soopers' customer service for uploads and money transactions closed about 7:30, between 7:00 and 7:30.  Sometimes it's 7:00, but there's times when it's 7:30.  And this was like -- I remember walking out of the house seeing the clock say 8:36.  I don't know why I looked at it, but by the time we got to the car and got there, that type of thing, you know, it was much later.

Q.    Did Ms. Chavez ever threaten to call the police during the incident?

A.    No.

Q.    Did she say anything to Ms. Gonzalez after Gonzalez said that she was going to take your money or something similar?

A.    No.

MR. WOLFSON:  Objection.  Form.

A.    No.  Did you hear me?  No, no.  Okay.

Q.    (By Mr. O'Connor) When Ms. Gonzalez was threatening to take your money, did Ms. Chavez do

Page 125

Valerie Laster; April 24, 2026

nothing in response?

MR. WOLFSON:  Objection.  Form.

A.   She said absolutely -- she did not tell Ms. Gonzalez to cut it out in any way.

Q.   (By Mr. O'Connor) And she didn't ask Ms. Gonzalez to leave?

A.   No.

Q.   And if you'll just give a moment so that Mr. Wolfson can object if he wants, we'll get through this quicker.

A.   Oh, I'm sorry.

Q.   It's okay.

A.   I also don't just answer.  Just wait. I'm sorry.

Q.   No worries.

Were you asked by Ms. Chavez if you were from the hood?

A.   That was -- no.  Neither one of them asked me if I was from the hood.

I did it again.  Sorry.

Q.   That's okay.  What was the comment about the hood?

MR. WOLFSON:  Objection.  Foundation.

Q.   (By Mr. O'Connor) Was there a comment, as you've discussed before, about you being from the

Page 126

Valerie Laster; April 24, 2026

hood?

A.   Yes.  There were several.

Q.   Did Ms. Chavez make any of those?

A.   She didn't say the word "hood".  No.

Q.   Okay.  Now, you answered earlier that Ms. Chavez accused you of fraud.  Do you remember that?

A.   Yes.

Q.   Did you feel it was discriminatory when she did that?

A.   Yes.

MR. WOLFSON:  Objection.  Form.

A.   Sorry.  Yes.  I'll slow down.  Sorry.

Q.   (By Mr. O'Connor) Did Ms. Chavez ever accuse you of being a drug dealer?

A.   No.  Ms. Gonzalez did.

Q.   You stated that Ms. Gonzalez started recording you on her phone.  How did you know that?

A.   Because she -- sorry.  Go ahead.

Q.   Go ahead.

A.   She took her phone out and she started saying, "Look".  I mean, she had it up like that, and she was close to me.  (Indicating.)  And she was saying, "Look at who I found."

Q.   Okay.

A.   "She's from the hood.  She's hood."

Page 127

Valerie Laster; April 24, 2026

Q.   When she started doing that, did Ms. Chavez say anything in response to her apparent recording of you?

A.   No.  She just stood there watching.

Q.   So from your observation, Ms. Chavez allowed Ms. Gonzalez to video you with her phone?

A.   Yes.

MR. WOLFSON:  Objection.  Form.

A.   Yes.

Sorry.  I'll get it together.

Q.   (By Mr. O'Connor) Were there any managers on duty at the store on April 8th, 2024, to your knowledge?

A.   To my knowledge --

Q.   Go ahead.

A.   To my --

Q.   You just paused for just a moment. That's fine.  Okay.  Go ahead.

A.   To my knowledge, there was not.  That's what I was told.

Q.   Okay.  So, to your knowledge, Ms. Chavez was fully in charge of the store on April 8th, 2024, when you went in to upload your money on your prepaid card?

MR. WOLFSON:  Objection.  Form.

Page 128

Valerie Laster; April 24, 2026

A.    Yes.

MR. O'CONNOR:  That's all my questions. Thank you.

MR. WOLFSON:  The defense has nothing further.

THE VIDEOGRAPHER:  Thank you.  This concludes today's --

MR. O'CONNOR:  I'm sorry.  I'm sorry.  I have one more question.

THE VIDEOGRAPHER:  Go ahead, Counsel.

Q.    (By Mr. O'Connor) One question.  The close of discovery was discussed earlier.  Is it the case that discovery was extended until the end of April of this month?

A.    Yes.

MR. O'CONNOR:  That's it.  Thank you.

MR. WOLFSON:  No further questions from defense.

THE VIDEOGRAPHER:  Thank you.  This concludes today's testimony given by Valerie Laster. The total number of media units used was four and will be retained by Veritext Legal Solutions.  Going off the video record.  The time is 2:00 p.m.

THE REPORTER:  Counsel, are you ordering?

Page 129

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

MR. WOLFSON:  Yes, please.  I think we just need a -- for now, is it okay -- Tom, just a written transcript?

MR. CARROLL:  Yeah.  I mean, I think an E-transcript, and then we'll send exhibits to be stamped by Veritext, please.

THE REPORTER:  Did you want a copy, Mr. O'Connor?

MR. O'CONNOR:  Yes.  She would like a copy.

*    *    *    *    *    *    *

WHEREUPON, the foregoing deposition was concluded at 2:02 p.m.

Page 130

Valerie Laster; April 24, 2026

CERTIFICATE OF DEPOSITION OFFICER

STATE OF COLORADO                )

CITY AND COUNTY OF DENVER      )

I, Debra J. Votta, a Registered Professional Reporter, Certified Realtime Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof; that I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

DEBRA J. VOTTA, RPR, CRR
Registered Professional Reporter
Certified Realtime Reporter

Page 131

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

VALERIE LASTER

lastervalerie@gmail.com

                        May 7, 2026

RE:    LASTER v. Circle K Stores, Inc., Et Al.

     4/24/2026, VALERIE LASTER(#8019640)

     The above-referenced transcript is available for

review.

     Within the applicable timeframe, the witness should

read the testimony to verify its accuracy. If there are

any changes, the witness should note those with the

reason, on the attached Errata Sheet.

     The witness should sign the Acknowledgment of

Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at

Calendar-CO@Veritext.com


 Return completed errata within 30 days from

 receipt of testimony.

     If the witness fails to do so within the time

 allotted, the transcript may be used as if signed.


                   Yours,

                   Veritext Legal Solutions



                                                Page 132

Valerie Laster; April 24, 2026

LASTER v. Circle K Stores, Inc., Et Al.

VALERIE LASTER (#8019640)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____    _____

VALERIE LASTER                                        Date

Page 133

Valerie Laster; April 24, 2026

LASTER v. Circle K Stores, Inc., Et Al.

VALERIE LASTER(#8019640)

                    ACKNOWLEDGEMENT OF DEPONENT

    I, VALERIE LASTER, do hereby declare that I

have read the foregoing transcript, I have made any

corrections, additions, or changes I deemed necessary as

noted above to be appended hereto, and that the same is

a true, correct and complete transcript of the testimony

given by me.


_____    _____

VALERIE LASTER                          Date

*If notary is required

                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20___.




                    _____

                    NOTARY PUBLIC

Page 134

Valerie Laster; April 24, 2026

**[000182 - 5:00]**

| 0 |
|---|
| **000182**   37:8 |
| **00085**   1:2 4:18 |

| 1 |
|---|
| **1**   3:6,10 4:13 26:1 33:23 34:17,18,19 47:16 58:19 65:3 91:8 97:1 105:23 122:21 123:6,19 |
| **1,000**   30:20 |
| **1,500**   30:6 50:5 50:16 51:4 56:21 72:15 85:6 |
| **1-25**   1:2 4:18 |
| **1/19/2026**   3:12 |
| **1/23**   24:25 |
| **10**   33:17 59:13 |
| **100**   103:3 |
| **100,000**   111:5 |
| **10:05**   1:16 4:3 |
| **10:47**   33:24,25 |
| **10:56**   33:25 34:2 |
| **113**   102:23 |
| **117**   102:23 |
| **11:51**   71:19,20 |
| **12**   102:16 103:12,24 104:3,17 |

| | |
|---|---|
| **121**   3:3 | |
| **12:00**   87:13,14 | |
| **12:07**   71:20,22 | |
| **12:34**   90:13,14 | |
| **12:54**   90:14,16 | |
| **1400**   2:3 | |
| **15**   54:19 58:15 85:18 | |
| **15,000**   13:12 | |
| **1500**   30:24 | |
| **179**   35:24 | |
| **18**   119:14 | |
| **180**   36:5 | |
| **181**   36:7 | |
| **182**   36:10 | |
| **18th**   91:4 | |
| **1900**   2:8 | |
| **1991**   9:2,2,4 | |
| **1994**   9:5 | |
| **19th**   99:23 | |
| **1:31**   116:23,24 | |
| **1:42**   116:24 117:1 | |

| 2 |
|---|
| **2**   3:7 34:3 56:15,16 71:18 96:9,10 101:21 105:5 116:6 |
| **2,000**   101:21 |
| **2,400**   102:7,18 103:24 104:17 |
| **20**   15:4 43:19 54:19 134:15 |

| | |
|---|---|
| **20,000**   15:4,4 | |
| **200**   2:4 102:17 102:22,22 103:7,15 | |
| **2010**   9:7,9 17:15 | |
| **2020**   93:3 | |
| **2021**   11:7 42:17 109:22 109:23 | |
| **2022**   14:11 17:22 18:3,6,7 42:16,21 | |
| **2023**   10:19 11:19 12:4 13:3,4,7 25:1,3 115:4 | |
| **2024**   10:5 27:21 28:2 29:2,5,11,15 30:20 31:15 41:17 42:22 44:15 121:7,16 124:16 128:12 128:22 | |
| **2025**   9:25 10:1 92:24 93:3 | |
| **2026**   1:10,16 4:4 132:3 | |
| **22**   108:19 | |
| **24**   1:10 104:10 | |
| **2400**   103:3 | |
| **24175**   131:19 | |

| | |
|---|---|
| **24th**   1:16 4:4 | |
| **25**   104:10 | |
| **2:00**   129:23 | |
| **2:02**   130:13 | |

| 3 |
|---|
| **3**   3:10 71:23 96:12,13,15 105:7 116:22 |
| **3,000**   30:10,11 51:9 |
| **30**   38:13 132:17 |
| **303-629-6200**   2:10 |
| **34**   3:6 |

| 4 |
|---|
| **4**   3:11 99:5,6 116:6 117:2 |
| **4/24/2026**   132:5 |

| 5 |
|---|
| **5**   3:2 105:12 |
| **50,000**   102:3 105:13 112:2 113:10 |
| **500**   31:1,6,8,12 53:9,10 54:7 85:6 89:13,22 |
| **54020**   5:10 |
| **5:00**   61:17 |

Page 1

Valerie Laster; April 24, 2026

**[7 - administrative]**

| 7 | | | |
|---|---|---|---|
| **7** 17:7,9 132:3 | 121:7,16 | 36:2 41:7,19 | **acknowledg...** |
| **7/24** 24:25 | 124:16 128:12 | 77:13 101:19 | 132:12 |
| **720-961-3869** | 128:22 | 126:3 | **acting** 59:21 |
| 2:5 | **9** | **accept** 71:10 | **action** 1:2 4:24 |
| **7500** 13:23 | | **acceptable** | 131:16,17 |
| **7584** 27:14 | **9** 118:12 | 27:19 | **activate** 39:24 |
| **7:00** 61:17 | **911** 16:7 | **accident** 11:19 | 39:25 40:4,4 |
| 125:9,9 | **96** 3:7,10 | 12:3,7,12,24 | 43:1 |
| **7:30** 28:23 43:8 | **99** 3:11 | 13:3,4 14:8 | **activation** |
| 125:8,9,10 | **9:00** 43:10 | 15:19 16:7 | 42:20 |
| **7th** 29:17 | 61:17 124:11 | **accidents** 12:24 | **active** 44:13 |
| **8** | **9th** 30:22 87:5 | **account** 38:18 | **actual** 25:2 |
| | 87:8 89:12 | 38:20,22,23 | 103:19 |
| **800** 2:9 | 99:20 123:12 | 40:1,2,2,3,10 | **actually** 6:16 |
| **80027** 2:4 | **a** | 40:14,19,20 | 10:18 12:11,12 |
| **8019640** 132:5 | | 43:21 44:12 | 12:21 17:6 |
| 133:2 134:2 | **a.m.** 1:16 4:3 | **accountable** | 22:7 24:16 |
| **80202** 2:9 | 33:25,25 71:20 | 119:16 | 46:24 73:18,19 |
| **8:00** 28:19 | **aaron** 97:14 | **accuracy** | 74:10 85:1 |
| 31:16,25 32:5 | 98:1 | 109:16 132:9 | 100:12 103:7 |
| 32:9,22 37:11 | **aaron's** 98:6 | **accurate** 100:1 | **ad** 63:20 |
| 37:24 59:19 | **abilities** 7:5 | 100:2 101:24 | **add** 28:21 31:7 |
| 117:21 118:21 | **ability** 7:20,23 | 101:25 104:15 | **added** 13:23 |
| 122:18,23 | 7:24 89:18 | 105:13 109:12 | 31:5 100:22,25 |
| 123:21 124:1 | **able** 11:24 | 110:22 | **additional** 27:8 |
| **8:36** 125:12 | 12:16 24:14 | **accuse** 83:7 | 102:5 119:25 |
| **8:45** 124:11 | 25:9 30:11 | 124:17 127:14 | 120:8 |
| **8th** 10:5 27:21 | 31:4 37:19,23 | **accused** 18:25 | **additions** 134:6 |
| 28:2,10,15,17 | 77:7 86:15 | 19:4,12,17,19 | **address** 81:14 |
| 29:1,5,11,15 | 107:9 113:2 | 62:15 64:4 | **addressed** 79:1 |
| 30:20 31:15 | **above** 132:6 | 127:6 | **administration** |
| 41:17 42:5,14 | 134:7 | **acknowledge...** | 9:20 |
| 44:15 67:19 | **abrams** 94:12 | 134:3 | **administrative** |
| | **absolutely** 9:10 | | 17:8 |
| | 22:20 27:6 | | |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

[adult - asking]

**adult**  26:2
**affect**  7:20,24
**affecting**  7:23
**affiliations**  5:3
**aforesaid**
  131:11
**african**  26:3
  67:7 72:6
  74:21
**age**  45:3
**agent**  117:25
**ago**  38:14,15
  112:12 113:3
**agree**  4:11 32:3
  32:3 35:7
  37:18 38:2
  46:16 84:25
  86:13,17 91:2
  94:21 104:16
**agreed**  123:24
**agreeing**  68:13
**ahead**  13:19
  19:3 47:4
  111:14 127:18
  127:19 128:15
  128:18 129:10
**ain't**  52:21 55:4
  55:11 83:7
  89:1
**al**  11:21,22
  132:4 133:1
  134:1
**allege**  93:10,21

**alleged**  25:20
  35:18 36:19
  80:8,9 94:9,24
  95:20
**allegedly**  68:22
**alleging**  93:12
  93:16,23 95:18
**alliance**  10:12
**allotted**  132:20
**allow**  118:14
**allowed**  16:16
  128:6
**allowing**  13:17
**alluded**  92:6
**america**  26:5
  75:23 76:2,21
**american**  26:3
  67:7 72:6
  74:21
**amount**  110:24
**amounts**
  107:18
**anew**  17:19
**answer**  7:7,20
  7:24 29:7
  32:17 75:4
  79:11,12 96:2
  106:18 114:7,9
  117:14 126:13
**answered**  25:5
  75:2,3 118:6
  121:8 127:5
**anxiety**  121:21

**anybody**  49:4
**anyway**  40:23
**apart**  8:6,15
  36:16 75:9
**apparent**  26:25
  128:2
**apparently**
  42:15
**appearance**  5:5
**appearances**
  2:1 5:2
**appended**
  134:7
**applicable**
  132:8
**appreciate**
  44:19
**apprehension**
  122:3
**appropriate**
  1:13
**approximately**
  21:10 104:12
**april**  1:10,16
  4:4 10:5 27:21
  28:2,10,15,17
  29:1,5,11,15
  30:20 31:15
  41:17 42:5,14
  42:22 44:15
  67:18,19 87:5
  115:13 121:7
  121:16 123:12
  124:16 128:12

  128:22 129:13
**area**  14:21
  57:22 58:7
  64:4 118:15
**arms**  66:9
  87:25
**arrested**  18:23
**arts**  51:22
**aside**  8:3 20:10
  20:13 38:11
  119:24
**asked**  12:22
  22:25 24:8,9
  25:12,15 30:24
  33:12 45:3
  50:2,3 52:6,18
  54:17 57:22
  58:7 60:7
  61:23 63:5
  64:4 66:11,13
  74:10 75:1
  77:9 84:17
  87:2 88:18
  102:9 121:5
  124:10 126:16
  126:19
**asking**  20:4
  44:3 53:19
  57:10 58:2,5
  60:9 62:11
  66:20 67:17
  68:17 73:10
  74:22,23 75:9
  77:2 84:18

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[asking - believed]**

93:14 95:2
97:6 101:13
106:2 110:17
111:8 113:9,11
117:12,12
119:5 120:7
**ass** 55:12
**assessed** 107:23
**assistant** 93:20
**associate** 56:15
56:16 88:6
**assume** 7:7
95:23 106:21
**assumption**
59:17
**atm** 40:7
**attached** 38:23
40:10,19
132:11
**attempt** 60:2
88:9
**attempted**
62:18,19 64:5
82:24
**attempting**
38:5 79:5
**attempts** 32:5
42:4
**attending** 5:1
**attitude** 26:18
**attorney** 5:6,10
8:3,8 20:11,12
20:13,24 94:13
94:16 101:14

101:18 106:5
107:24 114:6
120:24 131:14
131:15 132:13
**attorney's**
101:4,11,23
**attorneys** 6:2
96:22
**attributed** 62:5
**audio** 4:10
**august** 9:2
**authoritative**
26:18
**automatically**
32:4,21
**available** 132:6
**avoid** 6:17 7:1
**award** 105:19
106:3,3
**aware** 31:15

**b**

**b** 92:4
**bachelor's**
17:13
**back** 9:5,7
11:21 12:20
16:5,24 21:17
30:22 33:5
34:1 42:13
43:12 44:15
47:15 48:9,10
48:19 51:11
53:10 56:4

60:21 62:20
67:16 71:21
72:13 79:3
80:7 84:3,5
86:3,21 87:20
88:15 89:1,4,5
89:11 90:15
104:4 110:2,7
110:8 114:23
116:25 117:19
118:20 119:13
123:12
**backwards**
15:25
**bag** 53:23
**ball** 56:24
**banged** 12:5
**bank** 38:18,20
38:21,23 39:14
40:10,14,19,20
52:8,8,9,10,12
52:13,14 57:11
57:12,12 69:14
83:9 84:4
87:24 88:1,4
**banked** 57:10
57:23 58:8
64:4
**bankruptcies**
17:10 18:15
**bankruptcy**
17:1,2,4,7,22
**banks** 39:16

**bar** 23:23
**based** 24:7
27:13 29:1,5
29:12 32:8,15
32:15 59:3
74:4 81:1
102:25 121:6
124:4
**basically** 12:8
66:14,15 97:11
**basing** 29:10
**bates** 35:24
36:5 37:7
**bed** 20:9
**began** 57:1
104:5 115:14
**beginning** 5:5
34:2 71:22
117:1
**begins** 50:8
51:13,15,20
**behalf** 2:2,6 5:8
98:18
**believe** 9:2 11:7
15:16 24:13
32:18,20 33:10
56:6,9 57:19
64:25 67:11
68:9 87:17,23
93:6 94:9
108:16 115:12
120:23,24
**believed** 68:4
69:4

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[belittle - card]**

**belittle**  26:19
**belong**  66:15
  66:17
**belt**  51:21
**best**  7:4 39:6
  109:21
**better**  90:23,24
**beyond**  59:19
**big**  14:19
**bigger**  96:17
  99:10,10,11
**biggie**  12:10
**bill**  41:2 43:18
  43:19
**billing**  24:23
  102:24
**billion**  41:11
**bills**  18:13,14
  29:23
**bit**  20:5 25:19
  38:4 48:9 56:4
  85:21 110:11
**black**  26:14,17
  26:22 27:1
  51:21 56:21,21
  65:4 70:16
  72:5,14,16
  73:16,17,21,23
  74:20 75:6,18
  75:23,23,25
  76:5,9,10,15,17
  76:25 77:7,16
  77:17,23

**bland**  78:8,9,13
**blocked**  15:21
**blocks**  28:6
**blue**  19:6
**boned**  12:4
**books**  8:8
**born**  8:20,21
  8:22
**bottle**  55:6
**bottles**  48:8
**bought**  89:2
**boulevard**
  27:14
**bounced**  41:10
  41:11
**bouncing**  85:21
**boyz**  73:19
**break**  7:10,14
  33:17,25 36:24
  71:15,20,25
  90:7,14 116:2
  116:24
**breaks**  7:10
  90:2
**bring**  33:5
  47:15 99:9
  119:10
**bringing**
  118:25
**brown**  27:1
  72:17 75:6
**budget**  29:24
  29:24,25 30:1

**burst**  52:13
**business**  17:6
  17:12,20 122:2
**busy**  107:20
**buy**  40:16,17
  89:5
**buying**  53:18

**c**

**c**  4:1 92:5
**calculation**
  107:7
**calendar**
  132:15
**call**  14:4,6 22:7
  39:23,25 71:7
  71:11,12 72:5
  80:21,22 82:19
  88:1 99:2
  103:5 121:24
  125:15
**called**  1:14 16:7
  16:21 72:12
  74:20,21 75:6
  75:7 84:4 88:4
**calling**  56:12
  56:19 75:17
**calls**  22:14,16
**camera**  4:7
  50:21,22 51:3
  74:5
**candy**  26:13,15
  80:3

**cap**  102:2
  105:20,21
**caption**  11:8
**car**  11:19 12:3
  12:4,24,24
  13:3 15:19,24
  16:6,9,10 19:5
  44:22 45:5,9,9
  76:11,15 91:20
  91:23 125:13
**card**  18:14
  29:19 30:4,7
  31:16 32:21
  37:10,23 38:4
  38:7,10,11,17
  38:21,24,24
  39:2,4,14,19,23
  39:25 40:4,8
  40:10,12,13,17
  40:18 41:18
  42:5,7,8,13,14
  42:15,24 43:2
  43:11,13,18
  44:11,13 45:6
  46:3,5 50:2,5,6
  51:4 53:14,15
  53:15,19,22,23
  54:8,9,10,11,12
  55:18 57:15,16
  57:17 59:22
  60:3,21 62:17
  62:20 64:6,12
  65:9 67:16
  68:12 69:1,7,8

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[card - circle]**

69:13,16,17,20
69:25 70:6
73:4,4,6,6 79:5
79:9 80:17
81:6 82:10,24
83:8,13,17
84:5,7,9,25
85:12 86:6,14
87:16 88:2,5,7
88:11,14,17
124:1,19,24,25
125:1 128:24
**cards** 38:16
39:7 40:25
41:5 42:17
44:7,10 81:4
123:21
**care** 41:1 43:22
**carlos** 108:21
108:24
**carroll** 2:7 5:8
130:4
**cars** 15:25
**case** 4:17 6:3
13:1,8,25 14:1
15:5,6,7 16:22
21:3,14 22:1
22:17 23:10
25:20 27:10
78:1 89:7,10
91:10,11 94:10
97:3,7,18,19
98:1,8,9
102:14 107:23

111:1,4 119:15
121:12 129:13
**cases** 15:8 23:3
**cash** 49:18,21
49:25 50:1
53:17 82:9
124:19
**categorized**
78:7
**category**
104:20 105:5,7
105:12
**cause** 11:25
**caveat** 7:12
**ccrd** 95:22
**cebrun** 95:15
95:16
**centuries** 76:3
**certain** 3:11
22:11 23:1
76:6,16 122:16
**certificate**
131:1
**certified** 1:17
131:5,20
**certify** 131:6
**chain** 16:19
**change** 71:10
100:5,15,19
113:14 133:4,7
133:10,13,16
133:19
**changed** 17:8
111:6

**changes** 132:10
134:6
**chapter** 17:7,9
**characterized**
78:7
**charge** 31:2
103:8 105:3
128:22
**charged** 103:1
105:2
**charges** 119:10
**chase** 52:13
57:12
**chavez** 46:3,15
46:16 50:2
51:4,7,17 52:5
52:11,12,18,20
53:1,8,9 54:2
54:24,24 55:18
56:11,12,24,25
57:5,11,18
58:1,2,18
59:18 62:5,5
64:2,2 65:1
67:1,5,11 68:5
68:9,25 69:4
69:17 70:12
72:1,3,25 73:8
75:13,14,20
77:2,10 78:25
79:4 82:18,20
82:21,23 84:8
85:4,12 95:13
117:6 122:17

124:16 125:15
125:25 126:16
127:3,6,13
128:2,5,21
**chavez's** 78:7
78:13 82:19
**check** 123:22
**checkbook**
41:13
**checking** 38:22
**checks** 41:10
41:11
**child** 17:10
**chime** 56:25
**chimed** 56:24
66:25
**chiming** 75:21
**circle** 1:7 4:16
5:8 6:3 21:25
27:9,13 28:2
28:24 30:14,16
30:18,19 31:5
31:18 32:4
37:7,17,22
38:11 41:20,22
43:10 45:6
67:4 69:12,13
76:22,24 79:6
81:3,6,9 83:9,9
88:15 93:21
94:1,3,21
95:12,12,19
96:21 117:25
118:1,2 119:11

Page 6

Valerie Laster; April 24, 2026

**[circle - contacted]**

119:16,20
121:16 122:1,3
124:1 132:4
133:1 134:1
**city** 131:3
**civil** 1:2,13
95:23
**ck** 93:20
**claim** 12:9
28:25 29:4,10
29:12 106:9
120:1 121:11
122:8
**claimed** 83:23
95:13
**claiming**
102:18 103:12
**claims** 13:10,25
24:13 25:10
91:9,11 93:11
97:3,19 98:8
120:8 122:12
**clarification**
19:15
**clarify** 7:7
**clarifying**
78:22
**clarity** 39:9
**clear** 7:2 17:22
18:3 96:25
**clerk** 46:15,16
**clinic** 94:16
**clock** 125:11

**close** 15:24
28:23 65:22
66:5,8 116:2
127:22 129:12
**closed** 31:20
110:4,17 125:8
**closer** 90:21
**coast** 26:4
**collaborating**
68:12
**colorado** 1:1
2:4,9 4:17 8:25
9:1,7,9 27:15
95:23 131:2
**come** 23:24
30:4 47:2,5
52:20,21 53:2
54:20 59:12
86:21 113:6
117:19 118:20
**comes** 111:19
118:5
**comfortable**
15:24 16:4
**coming** 53:10
77:16 119:20
**commenced**
1:15
**commencem...**
131:6
**comment** 73:25
75:9 126:21,24
**comments** 49:1
57:1,3,4 58:6

58:17 62:4
63:23 64:25
71:25 72:3,7
74:1,17 76:7
**committing**
53:11,20 62:16
73:1 75:18
85:9
**common** 59:15
**companies** 23:4
**company** 12:19
13:17 14:3
15:7 22:7
102:25 103:6
118:9
**complaint** 21:6
21:18 62:7,10
62:10 63:11
64:14,15,20,23
80:9 105:1
121:6 124:5,6
**complete** 43:4
43:6 109:8
134:8
**completed** 9:15
9:15 132:17
**computation**
3:11
**computer** 33:4
67:20
**concerning**
73:23 102:20
**concluded**
130:13

**concludes**
129:7,20
**concussion**
12:5
**condensing**
62:24
**condescending**
26:19
**conduct** 23:21
**conducted** 4:6
**conducting**
81:23
**conference** 8:2
**confiscate**
62:17 64:6
68:11 69:1
**conjunction**
63:1 75:16
**connected**
131:15
**connection** 4:8
63:10
**considered**
75:24,24 94:25
107:21
**conspiring**
61:20
**consult** 106:4
114:6
**consultations**
111:2
**contact** 82:21
**contacted**
118:10

Page 7

Valerie Laster; April 24, 2026

**[contention - date]**

| | | | |
|---|---|---|---|
| **contention** 79:8 82:23 | 47:25 48:23 49:8,18,19 | 47:8,9,13 48:17,18 53:14 | 15:8 **crosstalk** 17:25 |
| **context** 78:14 95:6 | 57:23 61:20,21 77:12 81:6,7 | 55:19 56:7,17 79:21 80:1,3 | **crr** 131:19 **cuff** 106:18 |
| **continuation** 97:11 | 85:1,2 86:2,7 87:5,15 93:8,9 | 85:15 123:10 **counting** 50:6,7 | **currently** 8:14 9:21 |
| **continue** 4:10 13:20 | 94:13,17 95:9 95:10,24 | **county** 131:3 **couple** 20:16 | **customer** 56:13 56:14 69:16 |
| **continued** 13:13 | 101:18 102:7 108:16 110:14 | 21:11 25:19 28:12 81:16 | 95:8 125:7 **customers** |
| **contribute** 103:16 | 114:25 115:4,7 121:11 131:13 | 103:5 117:4 **course** 69:12 | 47:12 49:2 67:10 88:21 |
| **control** 40:11 | 134:8 | **court** 1:1 4:17 | 123:20 |
| **controversy** 131:8 | **corrections** 134:6 | 4:22 6:7,13 11:13,23,25,25 | **cut** 50:10 126:4 **cutoff** 119:14 |
| **conversation** 88:25 92:12 | **correctly** 45:14 50:18 61:22 | 12:1,1 13:10 13:25 16:13,14 | **cv** 1:2 4:18 |
| 97:20 118:14 118:23 | 69:15 **cost** 100:11 | 94:18 102:2 104:20,24 | **d** |
| **conversations** 20:23 | 113:5 **costs** 100:12,15 | 105:2 111:7 **cover** 13:18 | **d** 3:1 4:1 **damages** 3:11 |
| **copies** 100:18 112:24 132:14 | 100:21,23,24 101:1,23 102:6 | **covering** 14:15 **crazy** 53:8 | 99:20 105:19 107:8,15,17 |
| **copy** 21:18 100:15 130:7 | 104:20,24 **counsel** 4:15 | 54:13 **created** 122:4,4 | 110:4,5,16,18 110:25 111:20 |
| 130:10 | 5:1 32:8 122:21 129:10 | **credit** 18:14 39:23 43:18 | 111:21 113:1,4 114:1,3 121:11 |
| **corporate** 26:5 **correct** 15:3 | 129:24 131:14 131:15 132:14 | 73:4,6 **crime** 19:1,4,7 | **damn** 55:11 **dark** 14:12 |
| 21:21 27:15,16 28:16,17,19,20 | **count** 46:23 **counted** 50:7 | 19:13,19,23,23 **criminal** 76:1 | **darren** 2:2,3 5:9 122:8 |
| 29:15,16,19,20 30:7 32:2 | 56:18 **counter** 45:20 | **criminals** 75:25 **crook** 11:20,20 | **darreno** 2:5 **data** 102:20 |
| 35:13,14,19 38:2,8,9 42:10 | 45:23 46:21 | 11:22 14:9,10 | **date** 10:5 25:4 27:25 29:17 |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

[date - discussed]

100:3 101:6
103:4,19
133:24 134:12
**dates** 109:21
**david** 91:14
**day** 30:3,10
43:6 61:7 70:4
76:21 84:3,6
87:4 113:3
118:20 123:12
124:7 134:15
**days** 132:17
**deal** 31:20
**dealer** 50:9,13
50:15 56:20
72:15,24 76:7
97:22 127:14
**dealt** 102:10
**debbie** 4:22
**debit** 29:19
38:21,24 39:2
39:14 40:10,18
41:5,18 44:6
44:10 81:3,5
86:6 123:21
**deboer** 2:12
4:20
**debra** 1:16
131:4,19
**debt** 17:23,24
18:2 39:4
**december** 91:4
92:23,25 93:1
93:2,2,3

**decent** 83:6
**decide** 105:25
107:5 111:7
**declare** 134:4
**decline** 82:17
**declined** 51:7,8
52:6 62:21
67:16 69:8,20
70:6 73:4,7
81:19 82:6,7
83:24 87:2
88:12
**declines** 118:7
118:7
**declining** 51:9
64:12
**deemed** 134:6
**defendant** 1:8
1:15 2:6 4:15
5:8
**defendant's** 3:8
**defense** 129:4
129:18
**defenses** 91:9
97:3
**define** 25:21
**definitely** 21:6
122:1
**degree** 9:13,17
9:18,19
**denver** 2:9
131:3
**department**
119:13

**depends** 4:7
**depict** 35:8
**deponent** 33:18
120:25 123:1,3
132:13 134:3
**deposed** 20:20
**deposing**
132:13
**deposit** 39:21
**deposition** 1:9
1:14 4:5,14,19
6:4 8:16 20:6,7
21:2,9 27:18
101:1 112:9
120:20 130:12
131:1,9
**depositions**
101:2
**described**
69:15
**detail** 82:13
**determination**
98:25 99:3
**determine**
40:11 105:22
111:21
**device** 8:6,14
**difference**
103:2,3
**different** 13:25
39:16,16 69:11
100:12 121:23
**differently** 27:1
67:10 68:1,21

117:7,13,23
**difficult** 29:7
75:22 113:19
**dignity** 26:16
**dime** 39:5
**direct** 39:21
**directly** 48:5
74:2,3 94:2
**discoverable**
91:9 97:2
**discovery** 3:8
22:25 81:11
102:12,13
110:4,17
112:24 115:11
115:12,16
129:12,13
**discriminate**
61:5
**discriminated**
87:21
**discriminating**
57:20 68:9
**discrimination**
25:20,21,22,24
26:8,20 29:13
46:11 49:22
56:6,10
**discriminatory**
26:23 68:19
70:22 127:8
**discussed**
107:16 126:25
129:12

Page 9

Valerie Laster; April 24, 2026

**[discussions - equal]**

| | | | |
|---|---|---|---|
| **discussions** 20:11 | 78:4 102:2 | **dressed** 76:16 | **either** 83:2 |
| **dismiss** 122:9 | **dog** 65:24 66:2 | **driver's** 53:13 | 98:11 114:5 |
| **dismissed** 16:22 122:8 | **doing** 17:21 | 53:16 | **elaborate** 121:19 |
| **dismissive** 26:18 | 29:23,24,24 | **driving** 19:11 | **email** 2:5,10 |
| **disparaging** 66:10 | 30:1 45:25 | 76:11,15 | 24:9 36:24 |
| **dispute** 78:6,8 | 47:8,10 51:2,3 | **drove** 16:6 45:6 | 43:9 116:15 |
| 78:12 99:22 | 63:16 65:10,20 | **drug** 50:9,13 | **emails** 23:8,9 |
| 109:15 | 77:8 79:24 | 50:15 56:19 | 23:10,12,16,18 |
| **distance** 73:8 | 82:9 128:1 | 72:15,24 76:7 | 23:25 |
| **distress** 121:15 | **dolawllc.com** 2:5 | 97:22 127:14 | **embedded** 73:17 |
| **district** 1:1,1 | **dollar** 41:12 | **due** 9:8 17:15 | **emotional** 121:11,15 |
| 4:17,17 | 107:18 | 63:15 | **employed** 9:21 |
| **division** 95:24 | **dollars** 52:6 | **duly** 5:14 131:7 | 10:7,14 94:21 |
| **divorces** 17:10 | 89:21 106:13 | **duty** 128:12 | 95:19 |
| **doctor** 14:25 | 106:15,20,21 | | **employee** 37:17 |
| **document** 17:9 | **door** 11:16 | **e** | 37:22 94:2 |
| 22:19 89:25 | 45:14,15 | **e** 3:1 4:1,1 5:24 | 123:25 |
| 90:18,25 91:3 | **doordash** 12:14 | 5:24,25 130:5 | **employees** 83:9 |
| 96:1,3,19 99:8 | 15:6,10 | 133:3,3,3 | **endangerment** 19:11 |
| 99:15,19,22 | **doordash's** 14:3 | **earlier** 37:14 | **ended** 24:21 |
| 100:1,20 | **doordashing** | 71:5 77:9 | **engaging** 64:5 |
| 101:25 108:5 | 12:12 14:10 | 85:20 87:1,23 | **enlarge** 34:12 |
| 112:12 116:8 | **dot** 23:24,25 | 114:24 127:5 | **entire** 57:25 |
| **documents** | 24:2,5,7 29:19 | 129:12 | **entirety** 115:7 |
| 18:5 21:1,3,4,5 | 30:8,13 38:7 | **ease** 27:17 | **entitled** 114:10 |
| 21:7,12,13 | 38:10 39:14 | **east** 26:4 | **entrance** 15:21 |
| 22:1,4,5,23,23 | 43:3 44:9,11 | **easy** 75:23 | **entrances** 45:12 |
| 23:1,2,19 | 44:12 67:17 | **economy** 9:8 | |
| 24:12,16,17,19 | 89:23 | 17:15 | **equal** 102:18 |
| 25:8 77:25 | **downs** 121:25 | **education** 9:12 | |
| | **drawer** 42:18 | **edward** 92:15 | |
| | | **eeoc** 77:25 78:12 | |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[erase - fight]**

| | | | |
|---|---|---|---|
| **erase** 23:15 | **exactly** 107:5 | **experiencing** 56:6,9 | **facts** 119:25 120:8,10,11 |
| **erica** 81:13,22 82:12,13 | **examination** 1:15 3:2 5:16 121:3 131:7 | **expired** 119:14 | **fails** 132:19 |
| **errata** 132:11 132:13,17 | **examining** 13:14 | **explain** 39:6 53:20 63:5,8 77:16,22 | **fair** 7:8,9 28:4 103:23 |
| **error** 32:13,14 | **example** 6:16 73:3 | **explained** 19:8 61:15 69:25 70:5 | **faked** 79:8 |
| **especially** 76:9 | **except** 22:6 23:15 28:21,22 36:20 49:4 | **explicit** 72:11 | **falling** 26:11 |
| **esq** 2:2,7,7 | **excuse** 23:18 50:14 64:13 | **explicitly** 72:8 72:21 73:11,14 74:4,12,18,23 75:14,19,20 77:3 | **falsely** 19:15 |
| **estimate** 106:1 110:5 | **exhibit** 3:6,7,10 3:11 34:17,18 34:19 47:16 96:9,10,11,13 96:15 99:5,6 122:21 123:6 123:19 | **extended** 129:13 | **far** 25:11 48:10 62:19 78:5,17 101:21 102:8 109:13 118:6 |
| **estimation** 105:23 | | **extension** 117:25 | **fast** 49:12 |
| **et** 11:21,22 132:4 133:1 134:1 | | **extent** 93:23 | **fathers** 19:25 |
| **eve** 14:11 | **exhibits** 3:5 36:24 90:3 96:7 116:6 130:5 | **extra** 13:21 31:6,7,12 40:21 | **fault** 12:7 124:18 |
| **evening** 29:15 43:8 | **existed** 17:17 | **eyes** 54:3 | **federal** 11:23 11:25 94:16,18 94:19 105:1 |
| **events** 7:25 16:19,19 | **expect** 98:16 115:17 | **f** | **feel** 122:1,3 127:8 |
| **everybody** 26:7 26:12,13,14,15 26:22,25 46:12 46:13 48:11,24 66:6 76:8 82:10 88:24 | **experience** 79:4 81:3 121:16 | **face** 51:23 71:11 80:1 | **feeling** 15:24 16:4 |
| **evidence** 32:19 69:18,19 79:15 83:8,14,22 | **experienced** 27:4 46:10 49:21 60:24 61:2 62:1,1 71:5 | **faces** 45:13 | **fees** 31:3 100:6 101:4,11,11,17 101:20,23 104:21,24 |
| **evident** 26:7 | | **fact** 58:19 63:15 66:13 70:4 72:23 76:16 | **fell** 11:21,22 14:20,20,20 |
| **exacerbated** 29:9 | | | **felt** 87:21 |
| **exact** 27:25 66:19 81:14 | | | **felts** 94:20 |
| | | | **fiasco** 54:21 |
| | | | **fight** 12:8 16:13 55:8,8 |

Page 11

Valerie Laster; April 24, 2026

**[figure - give]**

**figure** 24:6 79:10,12
**figured** 16:5
**file** 12:1 13:14
**filed** 4:16 11:13 11:23 13:9 17:1 21:18,21 104:25 119:9 124:7
**files** 73:5
**filing** 24:21 104:21,24 124:4
**filled** 108:21 109:1
**final** 116:3
**finally** 47:1
**financial** 17:16 107:25,25,25
**financially** 4:24
**find** 22:22 23:1 109:6,6
**fine** 20:3,3 91:6 128:18
**finish** 42:21
**finished** 42:22 47:10 48:19 51:12 88:20
**finishes** 51:2
**firm** 4:22
**first** 3:8 5:14 9:1 31:17 36:20 46:18 48:16 50:23

56:17,18 82:10 91:7 97:10,14 115:13,14,14 116:14
**firsthand** 91:25
**five** 28:4 33:16 43:17 49:13,15 55:3 59:13 90:10
**fix** 71:12
**fixed** 71:9
**flagged** 85:1
**fly** 92:5
**followed** 76:23 118:9
**following** 63:23 76:19 87:4
**follows** 5:15
**food** 45:16
**foot** 14:18
**foregoing** 130:12 131:12 134:5
**forget** 6:20 14:6
**form** 19:2,20 25:23 37:9,25 44:25 57:6 60:11 70:20,25 75:1 82:25 83:5,18 84:20 86:16,24 87:22 110:6 111:22 112:4,16

113:13 114:12 117:8 119:1 122:25 123:8 123:15 124:20 125:22 126:2 127:11 128:8 128:25 131:12
**formally** 43:1
**former** 94:12
**found** 12:7 30:10,16 31:1 50:25 74:6 124:15 127:23
**foundation** 76:2 126:23
**four** 43:17,17 43:17,20 55:3 105:9,10 118:22 129:21
**fourth** 35:1 85:4
**fraud** 53:10,11 53:20 54:8 62:15,16 63:6 67:24 73:1 75:17,18 77:4 82:17 85:1,7,9 118:8,9 127:6
**fraudulent** 53:12 62:16 64:5 67:16 68:5,23 69:7 70:7 81:19 83:24 124:25

**frequent** 28:5
**friday** 101:7 110:25,25
**friends** 15:22 26:24
**front** 8:7,7 45:24 46:19,24 50:23 94:3
**full** 5:19
**fully** 9:24 10:4 128:22
**function** 39:11 39:12
**funny** 60:6 119:6
**further** 129:5 129:17

**g**

**g** 4:1
**g.g.** 2:7
**gas** 28:12,13
**generally** 13:2
**gentleman** 11:12,19 12:4 48:3,20 65:14 93:20 123:10
**getting** 39:5 48:24 55:4,7 109:18 112:23
**give** 7:18 18:5 27:25 32:13 34:5 50:6 54:9 54:10 73:3

Page 12

Valerie Laster; April 24, 2026

**[give - green]**

| | | | |
|---|---|---|---|
| 80:18,21 84:16 | 47:4 48:9,10 | 55:20 57:24 | 127:16 128:6 |
| 87:2 90:10 | 48:17 55:13 | 58:15 62:3 | **gonzalez's** |
| 97:6 99:5 | 63:24 79:3 | 71:1,18 83:19 | 119:12 |
| 104:22 106:25 | 86:3 87:20 | 83:21 88:12 | **good**  4:2 6:16 |
| 107:24,25 | 89:11 91:13 | 90:12,18 94:6 | 17:18 33:18 |
| 110:9,20,21 | 100:17 101:5 | 96:3,8 99:21 | 34:14 40:24 |
| 111:13 112:10 | 101:24 102:3 | 100:15 104:21 | 41:13 71:15 |
| 113:2 114:7,14 | 104:4 110:2,7 | 105:7 110:24 | 80:16 99:12,13 |
| 119:11,17 | 110:7 111:14 | 114:13,23 | 105:21 125:1 |
| 126:8 | 112:25 116:19 | 116:1,22 | **gotcha**  7:15 |
| **given**  19:8 | 118:4 122:5 | 117:14 118:8 | **gotta**  76:6,18 |
| 82:18,20 | 125:3,4,5 | 118:14,16 | **gotten**  22:10 |
| 112:11 129:20 | 127:18,19 | 120:23 122:1 | 80:24 81:17 |
| 134:9 | 128:15,18 | 125:19 129:22 | 103:9 |
| **gives**  40:13 | 129:10 | **gonna**  107:4 | **grad**  10:17 |
| **giving**  53:17 | **goal**  77:22 | **gonzalez**  47:7 | **grand**  15:4 |
| 110:24 111:18 | **god**  18:4 50:18 | 48:15 50:8 | 101:21 |
| **glaring**  54:6 | 53:7 81:15 | 51:20 52:7,7 | **grandma**  84:21 |
| **glass**  55:5 | 103:18 109:20 | 52:11,16 54:1 | 97:22 |
| **glasses**  34:8 | **goes**  50:19 | 54:4,24 55:11 | **grandson**  97:16 |
| **glimmer**  54:4 | 61:16 | 55:16,22 56:12 | 98:1 |
| **gmail.com** | **going**  4:3 10:6 | 56:13 57:2,8 | **grandsons** |
| 132:2 | 10:16 12:13 | 57:11 58:16,16 | 97:17 |
| **go**  4:11 13:18 | 14:24 16:12 | 61:21 63:7 | **granny**  97:23 |
| 14:18 15:25 | 18:6 22:8,9 | 66:25 67:2,4,5 | **granted**  52:24 |
| 16:5,5,14 19:2 | 26:14 27:2 | 68:13 72:1,16 | **great**  22:21 |
| 23:23 28:8,22 | 32:6 33:7,23 | 72:21,24 73:10 | 25:17 38:1 |
| 29:21 30:12 | 34:21,22,23 | 74:2,18,25 | 96:18 |
| 31:7,10 33:4 | 37:4 39:3 41:3 | 75:16 77:12 | **green**  23:24,25 |
| 33:20 34:13,22 | 42:13 44:13,15 | 95:7,11 118:3 | 24:2,5,7 29:19 |
| 34:23,24 35:4 | 46:6 47:5 51:5 | 118:15,19,23 | 30:8,13 38:7 |
| 38:23 40:6,15 | 51:14,15,22,24 | 119:10,15 | 38:10 39:14 |
| 40:15 41:25 | 53:22 54:20 | 125:18,19,24 | 43:3 44:9,11 |
| 42:1 45:3,11 | 55:4,8,12,13,13 | 126:4,6 127:15 | 44:12 67:17 |

Page 13

Valerie Laster; April 24, 2026

**[green - incident]**

89:23
**grilled** 65:7
**groin** 14:21
**grounded**
82:15
**grown** 29:25
**guess** 11:3,9
14:14 35:2
79:14 80:6
100:1,24 102:5
102:12 105:17
114:17
**guy** 88:6
**guys** 12:18
15:17 25:12

**h**

**h** 133:3
**half** 17:17
**hand** 53:16,23
85:19
**handled** 29:8
**hanging** 31:23
**happen** 25:25
51:20 82:11,12
**happened** 9:4
12:3,13 28:3
29:9,11,13,25
32:15 36:19
44:17 76:21,24
84:4 88:22
115:13 121:6
**happening**
71:13

**happens** 26:20
49:24 59:14
76:20
**hard** 105:22
106:17
**head** 55:25
60:24 71:2
**headshakes**
6:17
**headspace**
117:15
**health** 9:19
10:1
**hear** 20:14 49:3
55:24 65:19
75:11 77:18,21
77:21 86:9,10
86:12 101:16
123:1 125:23
**heard** 4:9 16:19
56:22 79:12
**hearing** 77:19
81:12 91:4
112:24
**held** 4:19
119:16
**help** 46:3 50:3
117:21
**helps** 122:10
**hereto** 134:7
**hi** 5:18 6:1
90:17 117:3
**highest** 9:11

**hit** 13:16 16:6
16:10 19:5
**hold** 9:3 53:3
53:23 113:3
118:3
**holding** 119:20
**holds** 50:22
**hole** 14:16,19
14:20
**home** 30:4
93:21
**honest** 78:3
**honestly** 107:4
**hood** 50:20,21
52:17,18 73:12
73:13,15,16,19
73:20,20,21,22
74:1 126:17,19
126:22 127:1,4
127:25,25
**hoping** 90:2
**hour** 102:22
103:7
**hours** 21:11
117:20
**house** 28:6
44:20,21 59:12
59:14 125:11
**huh** 46:8 47:17
99:14 108:4
**huhs** 6:17
**hum** 6:15 24:24
37:6 47:20
48:14 49:9

55:24,25 56:2
56:3 67:8
68:24 79:7
82:14 92:16
97:15 111:3
117:5
**hurt** 11:23
12:15 16:10
19:7
**hypnotizing**
121:25

**i**

**idea** 59:16
70:13 114:16
**identify** 91:8
97:2
**ied** 122:8
**illness** 10:13
**impact** 77:23
113:5
**impacted** 29:9
**implies** 77:6
**important** 7:5
120:18
**impoverished**
73:22
**inch** 80:19
**inches** 80:20
**incident** 10:6
27:12 35:18
36:19 37:14
63:13 91:22
92:6 114:25

Page 14

Valerie Laster; April 24, 2026

**[incident - k]**

| | | | |
|---|---|---|---|
| 115:6,9 124:17 125:16 | 92:4 97:2,7 100:13,20 111:16 112:22 114:11,13,14 114:18 119:11 119:12,17 124:4 | **interior** 35:8,9 123:6 | **jobs** 61:15 |
| **include** 19:21 19:22 98:14 | | **internet** 4:8 | **johnny's** 40:23 |
| **included** 26:6,7 81:11 | | **interrogatory** 3:10 | **join** 57:2 |
| **including** 43:14 43:15,16 | | **interrupt** 36:23 46:6 122:7 | **judge** 11:14,15 11:24 16:16 19:7 |
| **inconvenience** 37:11 | **informed** 123:20 | **intervene** 118:16 | **julian** 2:7 5:7 6:2 |
| **incorrect** 87:18 | **ingrained** 26:21 | **involved** 67:3 73:9 93:13 95:2,3 111:14 | **juror** 18:21 |
| **increments** 31:2 | **initial** 104:25 | | **jury** 18:22 105:19,25 106:2,14 107:5 111:11 |
| **indicate** 57:19 | **inside** 36:18 | **issue** 27:10 74:15 79:1 88:22 102:21 | |
| **indicated** 77:10 77:11 124:18 | **instance** 24:23 | | **jwolfson** 2:10 |
| **indicating** 14:19 127:22 | **insurance** 12:19 13:17 14:3 15:7 102:22,25 103:6,16,18 104:1,1,19 | **issued** 11:15 | **k** |
| **indication** 88:7 | | **issues** 28:9 31:11 42:6 89:17 115:9 | **k** 1:7 4:16 5:8 6:3 21:25 27:9 27:13 28:2,24 30:14,16,18,19 31:5,18 37:7 37:17,22 38:11 41:20,22 43:10 45:6 67:4 69:12,13 76:22 76:24 79:6 81:3,6,9 83:9,9 88:15 93:21 94:1,3,21 95:12,12,19 117:25 118:1,2 119:11,16,20 121:16 122:1,3 124:1 132:4 |
| **individual** 93:6 93:22 95:18 | | **it'll** 23:24 39:20 39:23 70:1 102:3 | |
| **individuals** 85:23,25 98:17 | **intend** 22:18 99:2 | | |
| **industry** 41:12 | **intended** 61:25 | **j** | |
| **infliction** 121:11 | **intent** 60:25 61:3,4 | **j** 1:16 131:4,19 | |
| **inform** 122:17 | **intentional** 121:10 | **jail** 19:10 | |
| **information** 19:9 24:8 25:3 30:9 33:12 40:5 42:19 59:3 76:12 81:10 87:2 91:9,11,24 | **interaction** 70:22 | **james** 11:20,20 11:22 94:12 | |
| | **interactions** 54:22 | **january** 93:1,2 99:20,23 100:2 | |
| | **interested** 4:24 131:16 | **jeez** 12:22 | |
| | | **jerry** 2:12 4:20 | |
| | | **job** 12:15 | |

Page 15

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[k - lawsuit]**

| | | | l |
|---|---|---|---|
| 133:1 134:1 | 18:4 19:6,18 | 81:14,15 82:19 | **l** 5:24,25 |
| **k's** 32:4 96:21 | 20:17 21:5 | 83:1,2,20,21 | **label** 35:24 |
| **keep** 51:16 54:8 | 22:11,24 25:11 | 84:13,22 86:5 | 36:5 96:9 |
| 56:11 57:15,16 | 25:21 26:1,9 | 86:8,11,21,25 | **labeled** 37:7 |
| 71:13 84:14,15 | 26:23 28:6,23 | 87:1,9 90:19 | **labeling** 96:7 |
| **keeping** 57:17 | 30:11,17 31:9 | 92:12,13 95:1 | **labels** 116:7,7 |
| **kempo** 52:2 | 31:21 32:6,7,7 | 95:1,13,16,21 | **laid** 76:2 |
| **kept** 64:12 | 32:11,14,24 | 96:14 97:22 | **lane** 48:6,6,11 |
| **kids** 84:24 | 33:2,5,9,11,14 | 98:2,3,8,11 | 66:7,9 |
| **kind** 6:25 7:11 | 34:6,7 35:21 | 99:7 101:10 | **lanes** 45:15 |
| 15:20,20,23 | 35:21 36:21,21 | 102:3,8 105:14 | **larger** 116:15 |
| 40:12 42:20 | 38:14 40:12,18 | 105:16,21 | **laster** 1:4,9,14 |
| 44:16 47:19 | 40:24 41:11 | 106:7,17,17 | 4:14,15 5:11 |
| 50:9,13,15 | 42:16,18,23,24 | 108:1,17 | 5:13 6:1 8:18 |
| 61:14 65:15 | 44:5,16 45:10 | 109:13 111:10 | 11:20 12:23 |
| 76:25 77:6 | 45:10,21,25 | 111:24,24 | 17:6,8 33:16 |
| 79:25 122:2 | 47:7,21 49:12 | 112:1,2,3,3,5,5 | 34:4 71:16 |
| **king** 31:9,19 | 50:24 54:17 | 112:17,20 | 90:17 91:14 |
| 42:3 45:7 | 55:15,20,25 | 113:21,22,25 | 97:14 98:1 |
| 125:3,4,5,7 | 57:12 58:21,22 | 114:5,7 115:25 | 99:16 117:4 |
| **kinko's** 100:17 | 58:24 59:9,9 | 116:8 118:3 | 121:1,5 129:20 |
| **knees** 14:21 | 59:15,23,25 | 119:18,18,23 | 132:1,4,5 |
| **knew** 15:13 | 60:6,7,7,16,25 | 122:9 125:12 | 133:1,2,24 |
| 28:23 31:20 | 61:1,3,7,16 | 125:14 127:17 | 134:1,2,4,12 |
| 45:7 54:18 | 62:23 63:2,19 | **knowledge** | **lastervalerie** |
| 57:13 58:19,20 | 64:10 65:10,11 | 19:1 32:16 | 132:2 |
| 58:21,22,24 | 65:12,16,17,21 | 39:7 64:20 | **laughing** 52:13 |
| 59:7 60:3 | 65:22,23,23,25 | 91:25 97:18 | **law** 2:3 |
| **knock** 55:12 | 66:3 67:14,15 | 128:13,14,19 | **lawsuit** 10:25 |
| **know** 6:1,21,21 | 70:10,15,18,19 | 128:21 | 11:4,6,10,11 |
| 8:1 9:7 11:8,8 | 70:21,23 71:1 | **knows** 20:16 | 18:18 23:8 |
| 11:12,16,17 | 75:3,22,25 | | 27:12,13 35:18 |
| 12:11,16 14:23 | 78:5 79:10,11 | | |
| 16:2,3,17,18 | 80:4,19 81:12 | | |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[lawsuit - made]**

36:19 73:6
93:17,24 94:24
95:20 118:25
120:18
**layer**  14:16
**learn**  121:21,23
**learned**  31:24
37:14 124:4
**leave**  8:24
44:22 88:24
108:22 109:2
118:4,19 126:6
**leaves**  71:12
**leaving**  62:23
**led**  25:3 56:8
68:8
**left**  13:16 23:11
43:19 44:18,20
44:21 45:24
47:24 48:17
54:13,23 65:20
87:24,25
**legal**  4:21,23
129:22 132:23
**legitimate**
107:24
**letter**  33:6
**level**  9:11
**levels**  26:21
**lib**  63:20
**license**  53:13
53:16
**lied**  16:23 68:5
68:22 69:19

70:12,18,24
**life**  26:3
**lifetime**  11:15
**lift**  102:2
**ligament**  14:21
**light**  12:6
**likely**  91:8
**limit**  30:16,19
89:23
**limited**  32:16
101:12
**limits**  30:15
**line**  45:16
46:10,19,22,24
48:1 49:8,10
88:17 133:4,7
133:10,13,16
133:19
**list**  81:17 93:5
97:11 98:14
**listed**  98:4
107:16
**literally**  50:21
53:18 54:16
55:7,19
**little**  14:7 15:23
20:5 25:18
34:7 38:4 48:9
51:6 56:4
63:17 80:18,18
83:10 85:21
96:16 99:10
110:11

**littler**  2:8
**littler.com**  2:10
2:11
**live**  52:16,17
53:5 57:9,22
58:7 64:3
66:12,23 73:20
73:21 74:8,9
74:10,15
**lived**  9:9 17:17
**living**  26:4
59:13
**llc**  2:3
**loaded**  123:25
**loading**  37:10
**locate**  24:14
25:9
**located**  27:14
**location**  27:18
30:11,13
**log**  22:7
**long**  9:6 10:14
12:16 21:10
38:15 40:24
49:10 51:19
54:14,21 85:12
102:10 116:4
**look**  16:12 18:5
20:8 50:25,25
52:11 62:7,9
74:6 87:11,14
127:21,23
**looked**  24:1
83:7 86:1 95:5

96:2 125:12
**looking**  15:12
53:21,24,25
54:2,9 55:5
63:6 119:9
**looks**  48:7 91:5
91:5
**lose**  40:13
**loss**  17:16
**lot**  9:3 18:6
28:5 50:16
79:21 86:17
100:17
**loud**  10:16
52:24,25 53:1
65:16,18 66:10
**louisville**  2:4
**low**  73:21
86:12
**lying**  69:10

**m**

**ma'am**  15:1
50:16 52:1
53:3,11 54:9
54:10 57:17
59:18 73:4
88:11,21
117:17
**machine**  48:11
118:20
**machines**  40:7
**made**  18:22
23:4 57:1,5

Page 17

Valerie Laster; April 24, 2026

**[made - money]**

72:1,3 89:12
98:24 99:3
112:24 118:16
134:5
**mail** 39:14,17
39:18
**mailed** 40:3
**main** 2:3 38:20
58:14
**make** 7:16 13:3
23:7 26:14
32:16 34:20
49:1 58:6
59:10,17,18
63:24 72:7
76:6 84:21
96:17,25 97:5
99:9 100:17
116:3,11 127:3
**makes** 67:11
**man** 11:16
73:16
**management**
37:12
**manager** 81:13
82:16,21 93:6
93:20 118:10
118:22
**managers**
128:12
**marget** 81:15
**marked** 34:17
34:18 47:16
96:10,13 99:5

99:6
**martial** 51:22
**master's** 9:13
9:17,18,19
**matter** 4:15
66:13
**matters** 131:8
**matthew** 94:15
**maybes** 86:18
**mean** 6:10 9:15
16:18 17:4
19:5 20:9
21:18 22:24
26:9,20,22
30:12 32:11,14
38:14,19 40:12
42:25 43:3
53:4 54:21,23
55:2,19 57:12
57:13 58:12,13
59:8,12,15
60:12 63:1,9
63:20 66:11
68:15,15,19
70:10,13,15
71:4,4 73:2
74:6 79:11,14
83:4 85:17,17
86:11,17 91:5
95:1,1 101:5
101:10 102:3
105:22 111:11
111:18,23,24
112:20 114:5

117:24 119:4,7
120:2,5 122:7
127:21 130:4
**means** 6:11
73:21,23
**meant** 83:16
**measure** 80:16
105:22
**media** 4:13
33:23 34:3
71:18,23
116:22 117:2
129:21
**medical** 18:12
18:13 102:6
108:22 109:2
**medication**
7:23
**medications**
7:19
**member** 10:17
**memory** 62:11
**mendelson** 2:8
**mental** 9:19
10:1,12
**mention** 64:15
**mentioned** 41:6
41:15 58:17
64:23 68:25
85:22 92:5
97:7 101:22
**message** 32:13
**mexican** 109:4

**microphone**
4:7
**miguel** 81:15
81:22
**mikela** 30:23
32:10 84:7
88:20 93:6,10
95:13 124:8
**million** 106:13
106:14,20,23
106:24
**mind** 33:15
51:16 83:22
**mindset** 76:1
76:14
**minor** 43:23
**minute** 33:17
62:13 112:21
**minutes** 49:13
49:15 54:19
58:15 85:18
90:10
**missing** 63:24
64:6
**mistaken** 9:4
10:20 54:11
**mobile** 22:9
**mom** 54:18
**moment** 64:18
75:12 125:3
126:8 128:17
**money** 13:21
16:24 28:21
29:18 30:4,19

Page 18

Valerie Laster; April 24, 2026

**[money - notes]**

31:15,25 32:5 37:19,23 38:25 39:1,3 40:6,11 40:17,21 41:1 41:18 42:4 45:5 46:2,4 50:2,4,4,6,9,13 50:15,16 51:14 51:14,17,22,25 53:19 54:12 55:5,14,18 56:18 59:21 60:17,19,20 61:21 62:20 65:8 72:25 76:25 77:6,11 77:12 85:4,8 86:6,14 101:14 122:18 123:25 125:6,8,20,25 128:23

**month** 67:18 129:14

**months** 102:10 102:11,19 111:17,20 112:12 113:3

**morning** 4:2 43:7 87:9 89:12 93:7 117:19

**mother** 98:6

**motion** 122:8

**motions** 59:21

**motivated** 58:1 67:12

**mountain** 4:3

**mouth** 54:2

**move** 122:14

**moved** 9:1,5,7 17:15 49:12

**movie** 73:19

**moving** 15:23

**multiplicity** 25:25

**n**

**n** 3:1 4:1 95:22

**nailed** 110:15

**name** 4:20 5:19 5:24 6:2 11:20 17:8 30:22 47:7 52:15 53:16 72:16,23 81:12 82:19,19 109:3 116:8 124:8

**named** 81:13

**names** 91:14 96:3

**nami** 10:12

**national** 10:12

**necessarily** 107:18

**necessary** 134:6

**need** 7:11,18 8:15 12:19 18:3 39:2 52:3 54:10 63:21 68:18 88:21 92:4 102:6 105:4,5 110:4 130:2

**needed** 13:15

**nefarious** 15:23

**negative** 73:23

**neighborhood** 73:18,22

**neighborhoods** 73:17

**neither** 72:9,10 72:12 126:18

**nervous** 14:7 63:17

**neuroscientists** 13:14

**never** 6:5 18:22 28:14,21 30:17 52:21,21,22 53:2,4,5 56:22 57:8,21 58:6,9 58:10,11 63:16 64:3,11,11 74:20,20 77:10 81:5 82:5,7,24 82:24 84:10,10 84:25 88:3 89:3 105:23 107:19 116:14

122:19,24 123:4

**new** 14:11 26:4 44:13 76:12

**nice** 76:11,15

**nicole** 98:5

**night** 21:8 29:13 30:1,2 44:24 45:3,8 46:13 82:3 86:23 87:25 88:22 117:18 121:22

**nods** 6:17

**nonprofit** 10:1

**noon** 30:23 124:7

**nope** 18:17 31:13 41:16 44:14 98:15

**normal** 63:18

**normally** 28:8 125:2

**nose** 51:23,24

**notary** 134:13 134:19

**note** 4:5 18:6 132:10

**noted** 134:7

**notes** 8:9 20:8 108:15,18 109:7,8,9,11,16 115:18,20,20 115:22 131:13

Page 19

Valerie Laster; April 24, 2026

**[notice - okay]**

| | | | |
|---|---|---|---|
| **notice** 1:12 | 87:22 90:1,5,8 | **objections** 5:4 | 9:17,21,23 |
| **noticing** 5:5 | 90:11 96:6 | **obligations** | 10:3,14,21,24 |
| **number** 1:2 | 101:15 110:6 | 107:6 | 11:2,11 13:11 |
| 3:10 4:18 18:9 | 111:22 112:4 | **observation** | 13:24 15:10,15 |
| 26:1 33:23 | 112:16 113:13 | 128:5 | 15:18 18:8,21 |
| 34:3 39:24 | 114:12 116:5 | **obtain** 42:14 | 18:25 19:14,17 |
| 56:15,16 58:19 | 116:13 117:8 | **obtained** 42:15 | 20:14,18,23 |
| 65:3 71:18,23 | 119:1 121:2,4 | **occasion** 28:16 | 21:22 22:3,13 |
| 80:21,22 91:8 | 122:10,13 | **occasions** 92:6 | 22:15,18 23:7 |
| 93:21 96:9,12 | 123:5,11,15,18 | **occurred** 27:13 | 23:11,13,16,21 |
| 96:15 97:1 | 124:22 125:24 | 29:1,5 92:1 | 24:2 25:14 |
| 102:7 105:13 | 126:5,24 | **october** 42:21 | 27:7,11 28:9 |
| 105:23 107:12 | 127:13 128:11 | 115:12 | 28:18,25 29:6 |
| 110:20,21,22 | 129:2,8,11,16 | **office's** 93:21 | 29:10,14 31:7 |
| 111:6,8,13,25 | 130:8,9 | **officer** 131:1 | 31:11,24 33:1 |
| 112:10,11,14 | **oath** 5:15 6:8 | **officers** 16:9 | 33:13,17 34:10 |
| 112:15 113:10 | **object** 122:25 | **oh** 12:11 18:4 | 35:1,5,5,7 36:1 |
| 113:12 116:22 | 123:15 124:20 | 20:14 27:5,5,5 | 36:7,10,13,22 |
| 129:21 | 126:9 | 28:20 44:4 | 37:2 38:20 |
| **numbers** | **objection** 19:2 | 51:24 53:7 | 39:9,13 41:20 |
| 112:25 113:2 | 19:20 25:23 | 56:20 62:9 | 41:23 43:11 |
| 114:3 | 37:9,25 44:25 | 72:12,16 73:20 | 44:4,9,23 |
| | 57:6 60:11 | 75:11 76:5,7 | 46:25 47:20,23 |
| **o** | 70:20,25 75:1 | 76:15 78:17 | 48:1,16 49:5,8 |
| **o** 4:1 | 82:25 83:5,18 | 81:10,15 84:2 | 49:14,24 52:4 |
| **o'connor** 2:2,3 | 84:20 86:16,24 | 85:17 103:18 | 56:1,2 59:11 |
| 3:3 5:9,9 19:2 | 87:22 110:6 | 106:24 109:20 | 60:2,22 62:3 |
| 19:20 25:23 | 111:22 112:4 | 110:25 120:12 | 63:4 64:1,17 |
| 36:23 37:2,9 | 112:16 113:13 | 120:14 123:3 | 64:25 67:2,4,6 |
| 37:25 44:25 | 114:12 117:8 | 126:11 | 68:14 70:3,9 |
| 57:6 60:11 | 119:1 123:8 | **okay** 5:24 6:1,6 | 70:11 71:6,8 |
| 70:20,25 75:1 | 125:22 126:2 | 6:10,19 7:10 | 71:14,15 72:18 |
| 82:25 83:5,18 | 126:23 127:11 | 7:18,22 8:2,6 | 72:24 73:25 |
| 84:20 86:16,24 | 128:8,25 | 8:18,24 9:11 | 74:14,14 75:11 |

Page 20

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[okay - passed]**

75:13,13,21
77:2,14,15,24
78:3,6,11,23
79:3 80:6,12
81:8 82:4 84:8
84:12,22,23
85:3,20 86:4
86:10,13 87:7
88:23 89:3,9
89:24 90:8,11
90:24 91:2,12
91:17,21 92:3
92:9,15,19,21
93:19 94:1,15
94:23 95:4,7
95:11,15,15
96:1,5,14,18,24
97:9,10,25
98:4,7,16,19,23
99:4,9,15,18,21
99:25 100:4,8
100:16 101:3,9
101:20 102:5
102:16 103:11
103:15 104:2,6
104:16 105:4
105:10 106:7
107:11,14,15
108:11,13,15
108:20 109:5,7
109:18 110:2
111:23 112:15
112:22 113:15
113:17 114:1

114:22,22
115:2,17,23
116:1,16 119:3
119:22 120:17
122:10,12,15
123:11,18
124:14 125:23
126:12,21
127:5,24
128:18,21
130:2
**once**   39:2,25
40:3,4 41:25
115:15 119:12
**ones**   8:15 39:8
65:1
**ongoing**   115:16
**online**   39:17
**opened**   8:14
17:20 23:25
**opportunity**
6:6
**opposing**
122:21
**order**   11:13,15
12:13 15:5
19:22 20:1
**ordering**
129:25
**originally**   8:19
24:16 29:16
95:12
**originated**
73:15

**outcome**   4:25
131:17
**outline**   116:3
**outside**   94:2
118:4
**overspend**
40:19
**owed**   12:20
13:22 15:11,13
**own**   25:22

## p

**p**   4:1
**p.c.**   2:8
**p.m.**   28:19
31:16,25 32:5
32:22 37:11,24
71:20,22 90:14
90:14 116:24
116:24 117:21
118:21 122:18
122:23 123:21
124:1 129:23
130:13
**pab**   1:2 4:18
**package**   116:15
**page**   3:2,5 97:6
107:16 108:10
133:4,7,10,13
133:16,19
**paid**   12:21,21
13:13 14:5
43:18,18
101:14,17,18

102:23 103:1
**pain**   14:23
**paper**   37:8
80:19 83:10
**paperwork**
107:20
**paralegal**   17:13
17:14
**parked**   45:9
**part**   9:25 10:19
12:12 13:19
28:25 29:4
41:10 55:21
75:11 101:16
107:6
**participants**
4:8
**participated**
58:1,2 118:13
118:23
**particular**
11:11 13:1
26:13 28:1,3
35:20 42:7
68:16 105:24
**parties**   4:11
131:9,16
**parts**   63:13
119:8
**party**   4:23
10:24 11:3,6
15:9
**passed**   109:22
109:24

Page 21

Valerie Laster; April 24, 2026

**[passing - possible]**

| | | | |
|---|---|---|---|
| **passing** 92:7 | 92:10 95:6 | **photographs** | **plowed** 16:17 |
| **past** 31:25 | **person** 16:15 | 3:6 34:20,21 | **pocket** 101:18 |
| 37:24 118:21 | 26:10,15,17 | **photos** 35:7 | 103:24,25 |
| **path** 39:15 | 27:1 45:23,24 | 123:5,7,13 | 104:3,17,18,19 |
| **pathway** 39:15 | 46:23,24 56:1 | **physical** 13:15 | **point** 12:18 |
| **patted** 76:10 | 65:4 67:7 | **pick** 12:13 | 46:9 49:20 |
| **paused** 128:17 | 70:16 76:6,17 | **picture** 34:6,11 | 51:23 52:6 |
| **pave** 14:13 | 76:18,19 77:17 | 34:21 35:20,23 | 53:8 56:5 |
| **paved** 14:12 | 83:6 91:8 93:5 | 36:8,13,14,16 | 63:10 69:14 |
| **pay** 12:17,19 | 93:19 94:1,8 | 37:5 47:18,21 | 98:25 102:23 |
| 12:20 13:19 | 97:2,10,14 | 113:6 | 103:20 104:7 |
| 15:12 30:5 | 98:4 | **pictures** 34:5 | 109:1 120:3 |
| 39:4,4 40:23 | **personal** 12:14 | 35:3 36:18,18 | 122:20 123:24 |
| 41:2 103:15,20 | 22:14 | 89:6 | **points** 58:14 |
| 103:24 104:3,8 | **personality** | **piece** 37:8 | **police** 16:12,23 |
| 104:9,17 | 97:21 | **place** 4:11 | 76:11 78:18 |
| **paycheck** 39:22 | **personally** | 25:25 28:5,23 | 118:11,22 |
| **paying** 41:3 | 106:11,12 | 35:19 42:1,2 | 119:9,13 |
| **payout** 12:16 | 120:18 | 122:22 131:10 | 125:16 |
| **pending** 7:13 | **perspective** | **places** 28:7 | **policy** 37:15 |
| **pennsylvania** | 77:17 | 40:5 | 118:10 |
| 8:23 | **pertinent** 24:11 | **plain** 84:21 | **popeyes** 43:24 |
| **penny** 41:2 | **perturbed** 51:6 | **plaintiff** 1:5 2:2 | **position** 10:19 |
| **people** 16:4 | **petitions** 17:10 | 3:9 11:7 94:2 | 78:15,16 |
| 23:4 27:2 | **ph** 81:15 | **plaintiff's** 3:7 | **possession** 23:5 |
| 39:21 41:12 | **philadelphia** | **planet** 83:24 | **possibilities** |
| 46:19 47:19 | 8:22 | **platform** 24:18 | 60:5,9 61:24 |
| 50:24 61:5,6,7 | **phone** 2:5,10 | 24:19 25:5,6 | **possibility** |
| 65:4,17,18,25 | 22:7,14,16 | 103:7 | 61:25 |
| 66:3 68:1,21 | 93:21 127:17 | **please** 4:5 5:4 | **possible** 6:22 |
| 73:20,24 75:24 | 127:20 128:6 | 5:18 7:6 34:17 | 35:16 59:23,25 |
| 76:8,9,10 | **photo** 51:13 | 47:4 53:20 | 60:1 61:10 |
| 77:23 81:2,12 | 65:14 | 55:1 99:12 | 63:17 67:20 |
| 81:16,21 83:7 | | 116:19 130:1,6 | 86:25 |

Page 22

Valerie Laster; April 24, 2026

**[post - quicker]**

post  35:5
postage  100:15
precise  35:18
preference
  42:24
prepaid  29:19
  38:15,17 39:1
  39:7,13 40:25
  41:5,18 44:6
  44:10 46:3,5
  50:4 80:17
  81:3,5 82:10
  86:6 123:21
  128:23
preparation
  17:9 21:2
prepare  20:7
  20:15
prepared  20:6
present  2:12
  5:11 20:24
presented
  122:21
preserved  23:8
presumptuous
  106:8
pretty  22:12
  49:12 82:15
  98:10 101:5
  115:16 124:23
previous  116:6
  131:6
previously  80:8
  121:20

price  107:25
print  24:19
printout  80:18
  82:20
prior  21:8
  27:21 29:1
  41:17 42:4
private  12:14
  12:15
pro  94:16
probability
  38:1
probably  11:15
  13:22 15:3
  28:3 31:9,9
  101:6,7 104:10
  109:22 119:2
  123:16
problem  15:1
  26:5 28:14
  80:17,22 84:7
  88:2,16,18
  89:19 90:5
problems
  121:21
procedure  1:13
proceeding  5:4
process  17:19
  22:8 42:21
  43:4,6 67:21
  67:23 80:9
  100:6 105:24
produce  21:19
  22:18,25

102:25
produced
  21:13,17,21
  102:24
professional
  1:17 17:2,5
  131:4,20
programs  8:14
property  11:21
  11:22
protect  38:18
provide  100:20
  107:7,12 110:5
  110:18
provided  22:3
  23:6 25:12,13
  36:14 59:3
  61:19 91:3
  93:20 96:21
  99:23 108:15
  109:11
proximity  66:6
  66:8
public  134:19
pull  34:5 89:24
  96:3,12 99:4
pulled  12:6
  16:6 53:13
punitive  105:19
  110:5,16,18
  111:20,21
  113:1,4
purpose  15:20
  61:17

purse  53:13
pursuant  1:12
put  30:4 39:1,3
  47:19 51:8
  53:19,22 62:10
  63:11 105:21
  112:6 115:19
  115:24,24
  116:7 117:15
putting  48:18

**q**

quality  4:6,7
question  7:6,7
  7:13 12:23
  19:14 29:7
  43:23 46:7
  68:18 72:2
  74:11,16 78:11
  79:9 91:7 94:5
  94:7 97:1
  106:18 122:13
  124:3 129:9,11
questions  6:7
  7:20,24 25:19
  101:13 116:4
  117:4 120:22
  120:24 129:2
  129:17
quick  12:23
  33:16 46:7
  90:6 116:12
quicker  126:10

Page 23

Valerie Laster; April 24, 2026

**[quote - registration]**

| quote - range | read - rebuttal / recall | receipt - red | redacted - registration |
|---|---|---|---|
| **quote** 23:24 119:20 | **read** 96:24 132:9 134:5 | **receipt** 80:23 80:24 132:18 | **redacted** 22:19 |
| **r** | **readout** 118:9 | **receive** 22:6 39:13 | **redacting** 22:11,13,14 |
| **r** 4:1 5:24,25 133:3,3 | **ready** 43:5 80:1 88:14 112:23 | **received** 22:6 30:9 65:5 116:14 | **reduced** 131:11 |
| **race** 68:10 72:4 72:8,11,22 73:11,14 74:3 74:4,13,19,24 75:7,8,15,20 77:3 85:25 | **real** 46:7 49:6,6 66:8 116:12 | **recently** 22:9 | **refer** 27:18 |
| | **really** 12:5 16:4 53:7 88:2,16 106:19 107:19 107:20,21,22 110:4,16 113:19 118:7,8 | **reckless** 19:10 19:10,11 | **reference** 27:17 72:3 73:14 74:13,18 75:7 75:8,19,20 |
| **racial** 25:20,20 25:22,24 46:10 49:21 56:6,9 | **realtime** 1:18 131:5,20 | **recognize** 34:10 90:24 91:2 96:19 99:15,18 | **referenced** 72:8 72:22 73:11 74:3,24 75:14 77:3 93:7 132:6 |
| **racially** 57:20 57:25 67:12 | **reask** 35:2 | **recommend** 41:12 | **referencing** 95:23 |
| **racism** 27:4 62:2 | **reason** 26:9 32:18,20 33:9 45:17 61:18,19 87:17 109:15 112:19 124:23 132:11 133:6,9 133:12,15,18 133:21 | **record** 4:3,12 5:3,19 33:21 33:23 34:2 44:2 69:13 71:18,22 90:12 90:16 116:17 116:20,22 117:1 129:23 | **referred** 72:24 |
| **racist** 26:22 61:7 65:2 69:5 | | | **referring** 56:16 78:19,20 100:24 |
| **ran** 12:6 82:24 83:8,13 | | | **refused** 12:17 |
| **random** 42:23 | **reasonable** 107:24 | **recorded** 1:9 1:14 4:10,14 | **regarding** 103:10 |
| **range** 107:1 | **reasons** 41:4,6 41:8,14 | **recording** 4:6 4:10 127:17 128:3 | **regardless** 7:22 37:17,21 91:10 |
| **rant** 74:7 | | | |
| **rate** 102:22 | **rebuttal** 78:15 | | **register** 48:1,21 49:18,21,25 50:1 |
| **rather** 63:20 | **recall** 42:11 63:14 64:7,8 92:9 109:3 121:8 | **records** 25:7,8 114:23 115:3 | **registered** 1:17 131:4,20 |
| **reached** 24:20 53:12 54:11 | | **recovery** 13:19 | **registers** 47:24 |
| **reaching** 47:8,9 48:18 56:17 | | **red** 12:6 | **registration** 5:10 |
| **reaction** 82:10 | | | |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[regular - room]**

| | | | |
|---|---|---|---|
| **regular** 20:9 | **remotely** 1:15 | **responds** 32:11 | 19:23 20:2 |
| **reimburse** 13:18 | 4:19 5:2 | **response** 3:7,10 | 36:16 39:3 |
| **reimbursed** 104:1 | **removed** 14:14 | 63:18 96:25 | 47:24 48:17 |
| **rejected** 32:21 | **rephrase** 115:8 | 97:1,4 103:9 | 53:5 56:13 |
| 70:7 | **report** 118:11 | 126:1 128:2 | 62:11 64:8,20 |
| **rejects** 32:4 | 119:9 | **responsibility** 118:1 | 68:20 69:11 |
| **relate** 24:13 | **reported** 16:7 | **responsible** | 82:21 87:8 |
| **related** 4:23 | 118:21 | 93:11 119:21 | 89:13 90:7,9 |
| 98:1 121:14,15 | **reporter** 1:17 | **responsive** | 90:10 96:4 |
| **relation** 131:8 | 1:18 4:22 6:8 | 22:23 23:19 | 97:4,6,12,13 |
| **relationship** 26:11 | 6:13 129:24 | **restraining** | 98:12 99:2 |
| **relative** 16:3 | 130:7 131:5,5 | 11:13,15 15:5 | 106:21 107:9 |
| 22:16 24:9 | 131:20,20 | 19:22 20:1 | 107:14 108:6 |
| **relatives** 20:17 | **represented** 123:19 | **result** 70:21 | 109:10 111:13 |
| **relevant** 22:22 | **representing** | **retained** | 112:20 113:20 |
| 23:10 25:9 | 4:20 5:10 6:3 | 129:22 | 113:22,24 |
| **remember** 6:22 | **represents** | **retire** 9:23 | 115:20 117:3 |
| 7:24 18:20 | 118:2 | **retired** 9:22,24 | 117:16 120:25 |
| 36:11 41:21 | **request** 102:1 | 9:24 10:4 | 121:10 124:1,3 |
| 50:18 58:14 | **requested** 22:1 | 17:21 92:18,22 | 124:8 125:2 |
| 62:19 63:10 | 22:4 109:13 | **return** 117:18 | **rights** 93:15,22 |
| 65:13 69:15,22 | **requesting** | 132:13,17 | 94:9,10,23 |
| 72:13,19 100:7 | 24:18 | **returned** 87:7 | 95:20,24 |
| 109:4,24 110:1 | **requests** 3:9 | **review** 21:1,7 | **righty** 11:6 |
| 119:17 125:11 | 23:4 | 116:3 132:7 | **rip** 60:14 |
| 127:6 | **required** | **reviewed** 21:5 | **ripoff** 60:13 |
| **remembering** | 111:16 112:12 | 21:6,12,13 | **rob** 55:4 |
| 15:3 18:13 | 134:13 | **reword** 82:9 | **roll** 119:15 |
| 45:14 | **resend** 116:11 | **ride** 45:4 | **rolling** 56:24 |
| **remind** 90:2 | **resigned** 10:2 | **right** 6:13,24 | **room** 5:11 8:4 |
| | **respect** 26:16 | 7:3 8:8,15 14:6 | 26:3,12,16,25 |
| | **responded** 29:8 | 14:17 16:20 | 71:12 76:18 |
| | | 18:9,13 19:22 | 108:19 |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[rpr - shaking]**

| | | | |
|---|---|---|---|
| **rpr** 131:19 | 122:22 124:8 | 70:5 79:17,18 | **sensible** 73:9 |
| **rule** 6:25 7:5 | 127:21,23 | 79:23,24 80:4 | **sent** 39:19 |
| **rules** 1:13 | **says** 5:14 37:10 | 80:22 84:3,6 | 42:17 67:17 |
| 107:7 | 50:8 51:7 52:5 | 85:6 88:1,13 | 105:1 109:14 |
| **run** 30:3 83:16 | 52:7,9,12,19 | 88:15 90:19,20 | 109:14 116:7 |
| 84:9 | 53:8,9 54:7 | 91:7 96:15,16 | 132:14 |
| **running** 54:2 | 88:12 93:19 | 96:17 99:8 | **separate** 89:22 |
| **russel** 95:16 | 99:25 | 101:1,24 | **september** 9:25 |
| **s** | **scale** 73:21 | 102:19 104:4 | 10:1 |
| **s** 4:1 5:25 133:3 | **scammed** 38:24 | 104:14 108:25 | **serve** 100:9 |
| **safety** 16:21 | **scared** 45:1 | 109:9,22 | **served** 100:7 |
| **sam** 5:25 | **school** 10:17 | 110:12 115:17 | **server** 100:6 |
| **sat** 55:17 | **screen** 4:9 | 116:10 121:5 | **service** 125:7 |
| **savings** 17:18 | **scroll** 110:11 | 123:19,23 | **services** 17:8 |
| 40:20 | **se** 94:16 | **seeing** 36:11 | **session** 102:13 |
| **saw** 47:6 | **search** 23:16,18 | 92:21 109:19 | 102:17 |
| 102:21 109:10 | 23:22,23 24:4 | 125:11 | **sessions** 102:9 |
| 115:20 | 24:5,7,11 | **seeking** 30:6 | 102:17 103:12 |
| **saying** 16:11 | **searched** 24:2 | 107:8,17 | 103:13,16,24 |
| 28:7 32:10,25 | **second** 3:7 34:6 | 110:18 113:21 | 104:3,12,17 |
| 33:11 42:19 | 34:23,24 50:11 | 114:4,4,17 | **set** 3:8 26:1 |
| 50:20 51:1 | 98:4 99:5 | **seen** 4:8 34:11 | 109:8 |
| 52:13 54:4 | 104:20 110:10 | 34:21 35:2,6,6 | **settle** 12:9 |
| 55:24 60:23 | **security** 40:13 | 45:17 52:19,20 | 13:11 15:2 |
| 61:7 65:17 | **see** 9:2 10:16 | 52:22 53:2,4 | **settled** 12:2,22 |
| 69:6,8 72:19 | 11:5 14:17 | 57:8,21 58:6 | 13:8,9,12 |
| 73:18 74:15 | 19:21 26:10 | 58:11 64:3,11 | **seven** 59:4 |
| 76:13 77:20 | 31:21,22 32:25 | 115:22 | **several** 11:5 |
| 80:12 81:18 | 34:6 35:11,12 | **send** 39:17 | 34:20 92:6 |
| 83:10 101:17 | 47:21,23 48:6 | 44:13 90:3 | 127:2 |
| 110:23 111:12 | 48:7,7 54:3,20 | 116:6,14 130:5 | **shady** 15:22 |
| 112:8,9 116:10 | 55:6,6 58:10 | **sense** 7:16 | 16:4 |
| 119:19,23 | 62:13,22 65:22 | 40:13 59:10,15 | **shaking** 55:25 |
| | 66:5,6,7 69:24 | | |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[shannon - standing]**

| | | | |
|---|---|---|---|
| **shannon** 94:20 | **signature** 131:19 | **slow** 34:22 127:12 | 59:24 70:20 86:3 89:15 |
| **share** 34:5 90:18 | **signed** 132:20 | **small** 13:10,25 65:15 96:16 | 90:4 94:7,7 96:8,12 105:15 |
| **she'd** 59:4 | **signs** 31:22 35:11,12,13 | **snatched** 54:11 54:12,12 55:17 | 110:3 111:15 117:17 126:11 |
| **sheet** 132:11 | 45:17 59:5,14 123:19 | 55:18,19 60:18 63:9 85:19 | 126:14,20 127:12,12,18 |
| **sheridan** 27:14 45:13 | **similar** 125:20 | **snow** 14:14,16 | 128:10 129:8,8 |
| **shifting** 75:13 | **simple** 26:14 74:16 | **snowed** 14:12 14:15 | **sound** 89:13 |
| **shoot** 109:20 | **simultaneous** 17:25 73:1 | **soda** 48:10 | **sounded** 120:13 |
| **short** 24:20 73:18 80:18 | **sincerely** 32:17 | **solutions** 4:21 4:23 129:22 132:23 | **space** 26:6 49:6 65:14 |
| **shortly** 47:3 | **sir** 77:8 115:20 | **somebody** 16:18 19:6 | **spaces** 26:2 |
| **show** 11:24 16:15,15 32:19 | **sit** 107:22 | 45:20,22 51:19 55:25 | **speak** 65:19 |
| 59:2 88:12 90:18 | **sitting** 63:22 | **son** 20:16 45:4 45:4 54:17 | **speaking** 94:2 |
| **showed** 58:23 58:25 59:5 70:7 | **situation** 15:22 16:24 19:9 29:8,9 57:25 58:15 60:13 68:19 73:7 115:14 | 91:16 109:22 109:22,23 | **specific** 57:4 62:25 68:18,20 |
| **showing** 36:8 103:7 | **situations** 76:4 77:22 | **son's** 19:25 | **specifically** 72:21 73:17 |
| **shown** 122:21 123:6 | **six** 102:10,11 102:19 113:2 | **soon** 22:12 100:14 | **specifics** 7:19 109:19 |
| **shows** 69:23 70:1 | **sixteenth** 2:8 | **soopers** 31:10 31:19 42:3 45:7 125:3,4,5 125:7 | **spell** 5:18 |
| **sic** 73:20 | **skeen** 94:15 | **sorry** 10:10 18:1 24:3 | **spent** 85:17 |
| **side** 13:16 45:12,13,14,15 48:10,22 66:7 80:2 | **skim** 39:4 | 36:23 37:11,20 46:7 50:10,12 | **spoke** 81:13,14 81:21 93:7 |
| **sign** 36:11,12 36:17 58:23,25 59:2,5 122:20 132:12 | **sky** 111:25 | | **stage** 26:1 |
| | **sleep** 121:22,23 | | **stalking** 11:12 19:23 |
| | **sleeping** 121:21 | | **stamped** 130:6 |
| | **slip** 80:19 83:10 | | **stand** 54:9 |
| | | | **standing** 46:22 47:11,12,14 |

Veritext Legal Solutions
Calendar-CO@veritext.com 303-988-8470

Valerie Laster; April 24, 2026

**[standing - sure]**

| | | | |
|---|---|---|---|
| 48:3,15,24 51:6 52:22 53:21,24 54:2 54:5 65:15 123:10 | 87:15,15,18 118:17 | 48:17 52:20,21 53:18 54:14,21 55:5,9 56:5 57:9 58:9 59:5 62:6 65:4,5 67:7 68:2,22 70:16 73:2 76:19,20,23 79:6 85:23 87:7,20 88:25 89:1,4 91:17 92:1,2 121:7 121:17 123:6 123:25 124:5,9 128:12,22 | **stv** 1:2 4:18 |
| **stands** 48:12 | **statements** 66:10 70:8 78:7,9,13 103:5 | | **subject** 77:25 |
| **stared** 63:8 | | | **subjects** 25:18 27:7 |
| **staring** 54:3,5 55:23 | **states** 1:1 4:16 | | **submit** 77:25 |
| **start** 17:18 32:19 34:22 50:6,24 109:19 115:11,12 117:20 | **statistic** 41:10 | | **submitted** 108:5 |
| | **stay** 118:15 | | **subpoena** 22:8 23:3 24:22 25:4 103:10 |
| | **stenotype** 131:10,13 | | |
| | **step** 43:12 80:2 80:7 | | **subpoenas** 100:7,9 |
| **started** 17:12 34:23 42:20 52:18 56:6,19 56:23,24 57:8 89:20 102:12 102:13 104:15 114:24 115:16 127:16,20 128:1 | **stepped** 65:23 85:14 | | **subscribed** 134:14 |
| | **steps** 14:18 | **stores** 1:7 4:16 32:13 81:22 132:4 133:1 134:1 | **sue** 12:8 95:11 |
| | **sticky** 39:23 | | **sued** 12:19,25 13:4 14:2,3 16:24 |
| | **stood** 45:22 46:22 47:10 48:23 63:7 88:17 128:4 | | |
| | | **story** 16:16 57:12 119:8 | **suffered** 12:4 17:16 |
| | **stop** 92:21 | **straight** 118:18 | **suggestion** 6:25 |
| **starts** 48:6 | **stopped** 76:10 | **strange** 47:14 | **suite** 2:4,9 |
| **state** 5:2,4,18 12:1,1 61:22 131:2 | **store** 27:9,13 27:19,22 28:2 28:3,10,16,18 28:21 29:14,21 30:14 31:14 32:1,22 33:10 35:8,10,10,17 36:18 38:12 40:16 44:16,18 44:18,22 45:4 45:11,18 46:11 | **stranger** 92:4 | **supplemented** 96:1 |
| | | **streaming** 50:24,24 51:13 | **support** 17:10 91:11 119:25 120:8 |
| **stated** 41:5 62:4 127:16 | | **street** 2:3,8 53:5 58:12 | **supposed** 82:21 |
| **statement** 67:18,18 69:22 70:2 72:20 78:15,16,17,18 81:11 87:12,12 | | **stretch** 66:9 | **supposedly** 82:2 |
| | | **studies** 17:14 | |
| | | **stuff** 52:18 54:23 62:23 79:22 80:3 | **sure** 13:4 23:7 34:20 37:1,21 63:24 96:25 97:5 101:4 |

Page 28

Valerie Laster; April 24, 2026

**[sure - thank]**

102:21 110:9 114:10 116:3 116:11
**swear** 6:11
**swipe** 67:19 69:23,24 70:1 70:5 79:17,18
**swiped** 69:13 70:1,6 79:16 79:20 87:16 88:11
**swipes** 69:16
**swiping** 69:17 79:9
**switch** 25:18 27:7
**sworn** 5:14 6:7 131:7 134:14
**symptoms** 121:14,15,15
**system** 25:1 26:21 32:4,7 32:11,24 33:6 33:7 58:20 59:9 61:16 67:21,22,23,24 69:12 79:14 80:25 81:18 82:2,18,20 84:6 86:21 87:1 88:13,16 117:18 118:8 122:17 124:12

**systems** 32:13 33:3

**t**

**t** 5:25 12:4 22:9 133:3,3
**tab** 99:4
**take** 4:11 7:10 7:13 25:24 33:16 34:8 36:24 38:24 39:1 40:21 44:19 51:14,19 51:22,25 53:8 53:10 60:17,20 61:21 62:7,9 62:13,14 90:6 111:24 112:15 112:18 113:11 116:2 118:4 122:22 125:19 125:25
**taken** 1:15 4:14 6:4 43:22 131:10
**takes** 34:7 50:21,22
**talk** 20:5 26:17 27:9 38:3 39:8 53:1 57:2 81:8 88:21 105:12 115:6,8 120:2 121:25

**talked** 15:6 18:16 26:16 65:1,24 66:2 74:1,17 78:25 81:2 82:13 87:24 88:19 95:8 97:25 98:17 102:14 108:9,12 115:5 115:14 117:24 120:9
**talking** 5:22 7:1 10:6 13:2,24 36:21 44:12 50:17 52:24,25 53:6 55:23 57:8 63:7 65:16,18 66:10 71:25 74:24 85:21,22 86:12 97:23 107:18 113:1,4 114:2 114:3 124:9
**tally** 99:20
**tcarroll** 2:11
**tea** 53:23
**techniques** 121:23
**tell** 6:11 11:2,3 16:16 20:18,21 33:7 39:20 40:5,6 49:24 51:13,15,20 54:25 60:24

61:25 66:17 71:4 74:7 81:14,21,22 83:11 84:8 91:21 100:14 108:1 111:11 112:17,20 115:19,21 126:3
**telling** 39:23 51:12 58:13 62:1 64:12 66:14 67:24 72:25 77:1 112:6 113:23
**term** 73:15,16 73:18,22,23
**terms** 39:10
**testified** 37:13 79:4 114:24 119:24 120:19
**testifies** 5:14
**testify** 98:17 131:8
**testimony** 36:17 57:18 77:9 129:20 132:9,18 134:8
**thank** 37:3 48:13 78:22 79:12 83:25 120:25 121:1,2 122:10 129:3,6 129:16,19

Page 29

Valerie Laster; April 24, 2026

**[theatric - timeframe]**

| | | | |
|---|---|---|---|
| **theatric** 58:13 | 28:11,12 29:7 | **thomas** 2:7 5:7 | **till** 93:3 |
| **therapist** 25:3 | 30:16 41:24 | **thought** 17:18 | **time** 4:3 5:4 |
| 92:17,20 | 43:3,9,19,20 | 24:9 29:16 | 7:11 9:1,25 |
| 108:16 | 50:3 56:16 | 43:7 47:14 | 10:19 12:12 |
| **therapists** | 57:24 61:4,11 | 50:23 54:18 | 17:7,18 27:8,8 |
| 108:25 | 63:16,18,22 | 55:7 56:15,18 | 27:8 28:22 |
| **therapy** 13:13 | 64:9,24 69:10 | 60:3 75:3 94:6 | 29:22 31:14,18 |
| 13:15,15 102:6 | 70:11,11 71:14 | 107:19 118:7 | 33:23 34:2 |
| 102:18 114:23 | 75:12 77:15,17 | 120:12 | 36:25 37:2 |
| 114:24 115:7 | 77:20 78:2 | **thoughts** | 40:24 42:18 |
| 115:10 | 79:2 81:13,25 | 120:10,12,13 | 44:20,21,22,23 |
| **thereof** 131:13 | 82:1,15 83:12 | **thousand** 30:12 | 45:2 46:13 |
| **theresa** 15:17 | 84:15,18 87:12 | 30:15,17,25 | 47:2 51:5 54:1 |
| **thieves** 75:24 | 92:22,22,25 | 31:4 51:11 | 61:8 62:4,14 |
| **thing** 17:11 | 93:1 95:15 | 52:5 89:21,23 | 62:18,19 67:7 |
| 33:3 40:18 | 98:13,22 | **threaten** | 69:25 71:15,18 |
| 42:16 55:11 | 102:20,23 | 125:15 | 71:22 76:20 |
| 56:20 85:18 | 103:4,19 | **threatened** | 81:23,25 82:1 |
| 89:19 92:13 | 104:13 105:2,3 | 55:2 | 82:1 85:3,4,14 |
| 98:10 105:20 | 106:9,16 | **threatening** | 85:17,19 86:15 |
| 108:2 110:14 | 107:21,22 | 125:25 | 87:9,13,16 |
| 110:15,19 | 108:14,18 | **three** 43:16 | 88:11 89:4 |
| 122:6 125:13 | 109:20,23 | 57:19,22 58:17 | 90:13,16 91:18 |
| **things** 7:25 9:4 | 110:14,22 | 60:3 62:18 | 94:20 95:19 |
| 22:11 30:2 | 113:7 115:3,4 | 63:2 69:11 | 108:8 109:23 |
| 57:13,19 63:2 | 117:24 120:15 | 80:10,20 | 113:16,17 |
| 69:4 71:9,12 | 120:18 123:9 | 100:10 105:9 | 115:15 116:22 |
| 73:1 97:24 | 130:1,4 | 105:10 118:21 | 117:1 120:15 |
| 111:14 118:24 | **thinking** 19:18 | **threw** 53:13 | 120:21 123:18 |
| **think** 9:3,5 | 51:8 67:23 | **throw** 42:18 | 124:10,17 |
| 10:16,18,19 | 101:17 110:3 | 103:21 | 125:12 129:23 |
| 13:6,22 15:4 | **third** 34:24 | **tight** 49:6,7 | 131:10 132:19 |
| 17:22 18:9 | 35:1 85:3 | 113:3 | **timeframe** |
| 20:1 24:11 | | | 132:8 |

Page 30

Valerie Laster; April 24, 2026

**[times - type]**

| | | | |
|---|---|---|---|
| **times**  28:2,4,12 43:13,20 55:3 60:3 62:19 63:6 80:10 125:10 | 124:23 128:20 | 89:11 124:25 | **try**  6:17,18 7:4 28:24 32:25 33:8 51:10 60:2 63:20 65:8 73:8 83:6 83:6 |
| | **tom**  5:25 130:2 | **transactions** 31:4 83:23 89:12 122:22 125:8 | |
| | **tomorrow** 86:21 117:19 117:19 | | |
| **today**  7:19 10:6 20:19 21:2,8 63:14,22 64:7 64:9 99:1 100:4 101:7,15 102:16 106:2 112:9,10 122:22 | **tonight**  117:21 | **transcript**  7:2 130:3,5 131:13 132:6,20 134:5 134:8 | **trying**  24:6 28:22 33:2 51:17 59:8 60:6 68:11,20 75:22 77:16,18 77:21,22 79:10 79:11 106:25 113:18,18 119:6 |
| | **took**  10:18 35:18 60:19,20 74:5 89:6 123:7,12 127:20 | | |
| | | **treated**  26:12 65:24 66:1,4 67:9 68:1,21 70:17 | |
| | **top**  14:6 18:5 18:10 34:22 52:25 64:8 79:2 87:11 98:22 111:13 | | |
| **today's**  20:6,7 129:7,20 | | **treating**  26:25 27:2 | **turn**  45:21 46:1 46:10 49:11,17 77:24 120:23 |
| **together**  60:13 65:22 128:10 | | **treatment**  65:6 | |
| | **tore**  14:21 | **trial**  98:18 105:18 113:16 113:17 | **turned**  67:21 |
| **told**  11:14 15:16 16:8 24:17,25 32:8 46:5 54:24 55:10,10,17 58:4 62:15,18 66:13,16,22,24 69:19 74:8,9 78:12 81:24,25 83:14 84:4 86:20 87:23 88:4,6,6,8,10 88:20 89:20,22 91:24 111:4,5 115:20 118:3 118:19,20 119:13 124:2 | **total**  13:12,22 21:11 54:15,16 129:21 | | **turns**  52:10 |
| | | **tried**  17:14,19 30:18 54:8 57:15,16 62:17 68:25 80:9 84:14,15 85:6 86:14 | **two**  12:24 18:16 21:6 31:2,3 43:16 43:17 45:12 46:19,23 47:23 57:21 69:23 73:1 74:17 89:12,22 96:3 118:19 |
| | **touched**  43:21 | | |
| | **touching**  43:22 | | |
| | **trained**  17:13 | | |
| | **training**  52:2 | | |
| | **trans**  83:23 | **tries**  32:12 51:4 | |
| | **transact**  122:2 | **true**  25:2 54:5 63:19 67:13,14 67:15 72:13 131:12 134:8 | |
| | **transaction** 31:3 51:7 53:12 59:17,19 62:17 64:5 65:7 68:6,23 69:7 80:10 81:19,23,25 82:2 85:5 | | **type**  17:11 23:23 26:8 31:18 33:6 92:13 122:5 125:13 |
| | | **truly**  19:15 | |
| | | **truth**  6:12,12 6:12 131:8 | |

Page 31

Valerie Laster; April 24, 2026

**[types - video]**

| | | | |
|---|---|---|---|
| **types**  39:16 107:17 114:3 **typewritten** 131:11 | 104:25 **understood**  7:8 17:19 25:17 43:23 48:13 | 34:7 37:19,23 40:6 42:4,9,11 43:18 45:5 | **using**  38:23 42:14 81:3 98:19 |

| **u** |
|---|

**uh**  6:17,17,17 42:12,12 46:8 47:17 94:11,11 99:14
**um**  6:15 24:24 37:6 47:20 48:14 49:9 55:24,25 56:2 56:3 67:8 68:24 79:7 82:14 92:16 97:15 111:3 117:5
**uncovered** 42:20
**under**  5:15 6:8 59:16 107:7
**understand**  6:8 7:6 21:25 70:14 76:8,9 83:25 94:15 99:1 106:1 107:6,8 112:22 113:20
**understanding** 16:17 57:14 69:24 80:24 81:1 97:5

**unemployment** 15:11,11,13
**unfortunately** 106:6
**unintentional** 61:9,11
**unintentionally** 61:6
**unit**  4:13
**united**  1:1 4:16 24:15
**unitedhealth** 25:7
**unitedhealthc...** 24:16,21 103:9
**units**  129:21
**unquote**  23:24 119:20
**update**  101:6 104:21 105:5,8 107:10
**updated**  100:20 107:12 110:24 112:25
**updating** 112:21
**upload**  29:18 30:6,9,11,20,24 31:19,19,25 32:5,12,21,25

46:2,4 50:4,5 51:4,17,19 60:3 62:20 65:8 79:5 82:5 82:7,9 85:4,8 86:6,14 88:8 88:18,19 89:14 89:15,16,18 122:17 123:20 124:19 125:5 128:23
**uploaded**  28:21 31:16 41:18 86:23
**uploading** 31:12 59:21 79:5 124:24
**uploads**  32:9 43:14,15,16 69:23 125:8
**upset**  73:5
**use**  38:5,17 39:2,3,21 40:7 40:9 41:5 42:23 43:5,13 44:6,9 59:8,9 88:14 91:10
**used**  38:11,15 39:9 43:11,20 81:5 88:3,8 129:21 132:20

**usually**  28:22 31:10,19 38:22 41:22,25 45:2 80:16

| **v** |
|---|

**v**  5:24 132:4 133:1 134:1
**vague**  78:8,9,13
**valerie**  1:4,9,14 4:14,15 5:10 5:13 129:20 132:1,5 133:2 133:24 134:2,4 134:12
**verbalize**  6:18 6:22
**verify**  132:9
**veritext**  4:21,23 129:22 130:6 132:14,23
**veritext.com** 132:15
**versus**  4:16 11:20 103:1
**vestibular** 13:15
**video**  1:9,14 4:10,14 8:2 12:6 128:6 129:23

Page 32

Valerie Laster; April 24, 2026

**[videographer - witness]**

| | | | |
|---|---|---|---|
| **videographer** 2:12 4:2,21 33:22 34:1 71:17,21 90:12 90:15 116:18 116:21,25 129:6,10,19 | 47:6 51:18 54:3 91:19 | 122:5 130:7 | **wendy's** 43:19 43:25 |
| **videos** 89:6 123:22 | **walk** 45:15 58:11 65:13 73:2 76:4,18 76:18 118:4 | **wanted** 13:3 20:5 25:18,19 27:7 30:1 34:4 79:3 99:4 105:12 110:2 | **went** 11:13 12:1,21 14:18 14:24 17:7 20:9 24:18 28:15,18 30:22 31:5,14 43:10 43:19,24 44:5 45:14,15,24 47:10 54:22 55:16,16 59:20 59:20 65:19 71:24 81:8 84:3,5 88:15 88:19 89:1,4,5 97:11 105:18 115:15 119:13 121:7 123:11 128:23 |
| **violate** 93:15 94:23 | **walked** 11:16 14:18 45:19 46:1 47:13 48:16,20,21 49:18,20 56:7 | **wants** 126:9 | |
| **violated** 93:22 94:9,10 95:19 | **walking** 58:12 61:6 124:9 125:11 | **watching** 51:18 51:20 56:1 128:4 | |
| **virtually** 4:6 5:11 | **walkway** 14:13 14:14,17 | **water** 48:7 | |
| **visit** 27:9 56:5 | **want** 7:11 11:7 11:8 25:21 34:20 35:2,17 38:3 39:20 40:16 41:2 44:16 46:23 47:15 56:4 62:24,24 63:19 63:23 75:22 77:24 87:13,14 89:24 90:21 91:13 92:3 98:14 106:7 108:1 110:19 110:21 111:1 111:24 112:2,3 112:6 114:8 116:2 120:2,5 | **way** 14:19 19:7 26:13 27:1 29:8 45:17 47:11 50:14 52:9 69:15,24 70:5 71:9 72:8 76:16 77:7 79:21 83:3,7,7 93:11,16 94:24 95:20 126:4 131:14 | |
| **volunteered** 10:18 | | | |
| **volunteering** 10:23 | | **ways** 26:1 121:23 | **westminster** 27:5,14 74:8 |
| **votta** 1:17 4:22 131:4,19 | | **we've** 22:4 47:15 65:1 74:17 95:8 101:2 108:12 112:12 117:24 | **wheeler** 98:5,8 |
| **vs** 1:6 | | | **white** 26:24 27:2 37:8 75:7 76:18 86:1 92:15 102:9 108:16 109:1 109:19 114:25 115:6,9 |
| **w** | | **week** 14:23 101:2,8 104:22 104:23 123:16 | |
| **w** 2:7 | | | **windows** 8:13 |
| **wages** 12:20 | | **welcome** 84:1 | **winston** 15:17 |
| **wait** 45:21 49:10 105:10 126:13 | | | **witness** 4:9 18:18 98:20 |
| **waited** 45:9 48:24 88:24 | | | |
| **waiting** 45:21 45:22 46:22 | | | |

Page 33

Valerie Laster; April 24, 2026

**[witness - zoom]**

131:7 132:8,10 132:12,19
**wolfson**  2:7 3:2 5:7,7,17 6:2 18:2 19:12,24 27:3 33:15,20 34:4,16,19 37:1,4,13 38:3 46:6 57:14 60:14 70:23 71:3,14,24 75:4 83:2,12 83:20 84:23 86:19 87:4 89:3 90:1,4,6,9 90:17 96:6,8 96:11,14 99:7 110:9 112:1,8 112:18 113:15 114:16 116:1,5 116:10,16,19 117:3,11 119:3 120:22 121:1,2 122:7,25 123:2 123:8 124:20 125:22 126:2,9 126:23 127:11 128:8,25 129:4 129:17 130:1
**woman**  24:22
**won**  16:24 19:9
**wondering**  52:23

**word**  73:16 127:4
**words**  25:22 66:19 72:9
**work**  12:17 14:4,5 39:7,10 40:25 67:4 81:2 123:20
**worked**  17:16 26:5 33:3 56:18 59:6 61:15 66:11 114:19
**working**  9:25 10:22 37:18,22 59:4 60:13 100:13 112:21
**works**  30:13 32:7 33:10 87:1
**world**  52:23
**worries**  18:11 37:21 126:15
**worth**  106:10 111:5
**wow**  9:5
**wrapping**  116:2
**written**  1:12 130:3
**wrong**  29:17 61:20 62:2 84:5 86:2 88:5 93:11 110:15

**wrongdoing**  124:18
**wrote**  63:3 78:18

**x**

**x**  3:1

**y**

**y'all**  16:12 50:25 119:18
**yards**  118:12
**yeah**  9:8,17 10:22 11:3 13:6 15:4 19:18 21:15,15 24:15 28:14,17 29:17 31:23 34:15,15 35:5 35:5 41:12 43:20 44:4,14 46:23 47:1,1 52:7,14 56:1,2 56:14 63:17,18 64:9,13 67:13 67:22 72:19 74:5 75:17 78:2 80:14 81:24 85:16,24 89:8,16 90:23 91:5 92:8,20 92:20 93:1,4,4 97:9,21 98:2 99:3,12 101:5 101:16 102:19

104:19 106:12 106:24 107:2 108:11,12,21 109:24 110:9 110:13 115:12 116:11 121:18 122:12 130:4
**year**  12:17 17:17 19:10
**year's**  14:11
**years**  38:13 59:4,13 61:16
**yep**  20:1 33:18 44:1 48:9 64:14 78:5 97:8,17
**youngest**  45:4 91:16

**z**

**zero**  106:21
**zoom**  4:20 5:12 90:21

Page 34

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.